# 23-8010-cv(L), 23-8035-cv(CON)

## United States Court of Appeals
### *for the*
## Second Circuit

UNITED STATES SECURITIES & EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANTS-APPELLANTS

MATTHEW I. MENCHEL
ADRIANA RIVIERE-BADELL
KOBRE & KIM LLP
201 South Biscayne Boulevard,
  Suite 1900
Miami, Florida 33131
(305) 967-6100

DANIEL J. HORWITZ
JONATHAN R. JEREMIAS
MCLAUGHLIN & STERN, LLP
260 Madison Avenue, 20th Floor
New York, New York 10016
(212) 448-1100

*Attorneys for Defendant-Appellant David Gentile*

MICHAEL F. DEARINGTON
ARENTFOX SCHIFF LLP
1717 K Street NW
Washington, DC 20006
(202) 857-6000

GLENN C. COLTON
ARENTFOX SCHIFF LLP
1301 Avenue of the Americas,
  42nd Floor
New York, New York 10019
(212) 484-3900

*Attorneys for Defendants-Appellants
Ascendant Capital, LLC and Jeffry Schneider*

– v. –

ASCENDANT CAPITAL, LLC, JEFFRY SCHNEIDER, DAVID GENTILE,

*Defendants-Appellants,*

GPB CAPITAL HOLDINGS, LLC, ASCENDANT ALTERNATIVE
STRATEGIES, LLC, JEFFREY LASH,

*Defendants*,

UNITED STATES ATTORNEY'S OFFICE FOR THE EASTERN DISTRICT
OF NEW YORK,

*Intervenor.*

## **CORPORATE DISCLOSURE STATEMENT**

No publicly held corporation, parent corporation, or other corporation owns or owns stock in Defendant-Appellant Ascendant Capital, LLC.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT ..................................................6

ISSUES PRESENTED.......................................................................7

STATEMENT OF THE CASE ..........................................................8

    I.   The SEC Filed a Securities Fraud Complaint Against Defendants-Appellants, and the District Court Granted the SEC's Request to Appoint a Monitor Over GPB..............................................................8

    II.  GPB and the Monitor Spent Two Years Liquidating GPB's Assets, Generating More than $1 Billion in Proceeds, But Made No Distributions to Investors. ...................................................................10

    III. Gentile in Good Faith Sought to Appoint New Managers to GPB and Attempted to Make Amendments to the Operating Agreement, but GPB and the Monitor Swiftly Rejected the Appointments and Amendments.....................................................................................14

    IV. The SEC Argued that Gentile's Appointments and Amendments Justified the Extraordinary Step of Converting the Monitorship to a Receivership...................................................................................18

    V.   Over a Year Later, the Magistrate Judge Recommended Appointment of a Receiver over GPB, and the District Court Adopted the Report & Recommendation..........................................................21

SUMMARY OF ARGUMENT ........................................................24

STANDARDS OF REVIEW ...........................................................26

ARGUMENT...................................................................................27

I.   The District Court Erred by Appointing a Receiver Because It Correctly Found that the SEC Failed to Show a Likelihood of Success on the Merits.....................................................................27

   A.   The District Court Erred by Not Requiring the SEC to Demonstrate a "Clear" and "Substantial" Showing of Likelihood of Success on the Merits and Risk of Recurrence of Alleged Securities Law Violations. ..................................................................27

   B.   The District Court's Finding That the SEC's Probability of Success Is "Unclear" Is Fatal to the Appointment of a Receiver. ....32

II.  The District Court Failed to Require the SEC to Demonstrate that the Receivership was "Clearly Necessary" to Avoid Dissipation of Assets as Required by Second Circuit Precedent. ...............................37

III. The District Court Erred in its Findings of Fact and Conclusions of Law.........................................................................................41

   A.   The District Court Erred in Finding That There Was "Imminent Risk" to GPB and its Assets. ..........................................41

   B.   The District Court Erred in Finding the Alternative Legal Remedies Available in Lieu of Receivership Were Inadequate........47

   C.   The District Court Erred by Considering Purported Concerns about Gentile's Credibility, Rather than Focusing on the Lack of Evidence of Fraudulent Conduct by Gentile. ...................................48

   D.   The District Court Erred in Failing to Find that the Probability of Harm to Defendants-Appellants Outweighs Any Potential Harm to GPB and Its Investors.........................................50

E.    This Case Does Not Present "Extreme Circumstances" Warranting Appointment of a Receiver. ...........................................55

IV. The District Court Erred in Concluding that a Purported Violation of the Amended Monitor Order Justifies the Appointment of a Receiver. ................................................................................57

A.    The District Court Erred in Concluding That a Purported Violation of the Monitor Order Warranted the Appointment of a Receiver. ................................................................................58

B.    The District Court Erred in Concluding that Gentile Caused GPB to Violate the Amended Monitor Order. ..................................59

C.    The District Court Erred in Concluding that GPB Failed to Cure the Purported Violation of the Amended Monitor Order. .......62

**CONCLUSION** ................................................................65

**CERTIFICATE OF COMPLIANCE** ..................................67

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Baliga v. Link Motion Inc.*,

   No. 18-cv-11642, 2022 WL 2531535 (S.D.N.Y. Mar. 9, 2022)........47, 48

*Baliga v. Link Motion Inc.*,

   2022 WL 3699339 (S.D.N.Y. Aug. 25, 2022)........................48

*Chambers v. Blickle Ford Sales, Inc.*,

   313 F.2d 252 (2d Cir. 1963).....................................37

*Citibank, N.A. v. Nyland (CF8) Ltd.*,

   839 F.2d 93 (2d Cir. 1988)......................................37

*City of New York v. Golden Feather Smoke Shop, Inc.*,

   597 F.3d 115 (2d Cir. 2010)....................................28

*Commodity Futures Trading Comm'n v. Walsh*,

   712 F.3d 735 (2d Cir. 2013)....................................26

*Dixon v. von Blanckensee*,

   994 F.3d 95 (2d Cir. 2021).....................................12

*Eberhard, v. Marcu*,

   530 F.3d 122 (2d Cir. 2008)....................................31

*Ferguson v. Birrell*,

   190 F. Supp. 506 (S.D.N.Y. 1960) .............................48

*Ferguson v. Tabah*,

   288 F.2d 665 (2d Cir. 1961)...............................passim

*Gordon v. Washington*,

   295 U.S. 30 (1935) .........................................31, 40

*Highland Ave. & B.R. Co. v. Columbian Equip. Co.*,
    168 U.S. 627 (1898) ..................................................................29

*In re Faiveley Transp. Malmo AB*,
    No. 08-cv-3330, 2009 WL 3270854 (S.D.N.Y. Oct. 7, 2009)................46

*JDP Mortg. LLC v. Gosman*,
    No. 19-cv-5968, 2020 WL 8082390 (E.D.N.Y. Dec. 21, 2020) ..39, 47, 55

*KF ex rel. CF v. Monroe Woodbury Cent. Sch. Dist.*,
    No. 12-cv-2200, 2012 WL 1521060 (S.D.N.Y. Apr. 30, 2012) ..............46

*Liu v. SEC*,
    140 S. Ct. 1936 (2020) ..............................................................28

*Meineke Disc. Muffler Shops, Inc. v. Noto*,
    603 F. Supp. 443 (E.D.N.Y. 1985)................................................39

*Meisels v. Meisels*,
    No. 19-cv-4767, 2020 WL 6110827 (E.D.N.Y. Oct. 16, 2020)...............39

*Meisels v. Meisels*,
    No. 19-cv-4767, 2020 WL 7000903 (E.D.N.Y. May 12, 2020) .............39

*Mertens v. Hewitt Associates*,
    508 U.S. 248 (1993) ..................................................................28

*Patsy's Italian Rest., Inc. v. Banas*,
    658 F.3d 254 (2d Cir. 2011)........................................................27

*Roberts v. Royal Atlantic Corp.*,
    542 F.3d 363 (2d Cir. 2008)................................................27, 41, 57

*Rosen v. Seigel*,
    106 F.3d 28 (2d Cir. 1997)................................................... passim

*S.E.C. v. Alan F. Hughes, Inc.*,
    461 F.2d 974 (2d Cir. 1972) ................................................................. 38

*S.E.C. v. Am. Bd. of Trade, Inc.*,
    645 F. Supp. 1047 (S.D.N.Y. 1986) ..................................... 25, 38, 39, 42

*S.E.C. v. Am. Bd. of Trade, Inc.*,
    830 F.2d 431 (2d Cir. 1987) ................................................. 25, 26, 31, 38

*S.E.C. v. Brigadoon Scotch Distribs., Ltd.*,
    388 F. Supp. 1288 (S.D.N.Y. 1975) ...................................................... 39

*S.E.C. v. Gabelli*,
    653 F.3d 49 (2d Cir. 2011) .............................................................. 33, 34

*S.E.C. v. Garfinkle*,
    No. 75-cv-184, 1975 WL 363 (S.D.N.Y. Mar. 18, 1975) ........................ 39

*S.E.C. v. H. S. Simmons & Co.*,
    190 F.Supp. 432 (S.D.N.Y. 1961) ......................................................... 56

*S.E.C. v. Unifund SAL*,
    910 F.2d 1028 (2d Cir. 1990) ........................................................ passim

*S.E.C. v. Universal Express, Inc.*,
    No. 04-cv-2322, 2007 WL 2469452 (S.D.N.Y. Aug. 31, 2007) ........ 38, 39

*U.S. Bank Nat. Ass'n v. Nesbitt Bellevue Prop. LLC*,
    859 F. Supp. 2d 602 (S.D.N.Y. 2012) ................................................... 39

*U.S. Bank Nat. Ass'n v. Nesbitt Bellevue Prop. LLC*,
    866 F. Supp. 2d 247 (S.D.N.Y. 2012) ................................................... 42

*United States v. Ianniello*,
    No. 86-cv-1552, 1986 WL 4685 (S.D.N.Y. Apr. 16, 1986) .............. 33, 55

*United States v. Vasquez,*
  389 F.3d 65 (2d Cir. 2004) ................................................................27

*Wells Fargo Bank, Nat'l Ass'n as Tr. for Benefit of Registered Holders of*
  *UBS Com. Mortg. Tr. 2017-C2, Com. Mortg. Pass-Through*
  *Certificates, Series 2017-C2 v. 3708 Vestal Pkwy E., LLC,*
  No. 22-cv-4714 (ER), 2023 WL 4741216 (S.D.N.Y. July 25, 2023) 44, 56

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ................................................................................28

*Yang v. Kosinski,*
  960 F.3d 119 (2d Cir. 2020) ..........................................................27, 29

## Statutes

15 U.S.C. § 77v(a), Section 27 ....................................................................6

15 U.S.C. § 78aa, Section 214 ....................................................................6

15 U.S.C. § 78u(d)(5) ..........................................................................28, 37

15 U.S.C. § 80b-14 .....................................................................................6

28 U.S.C. § 1292(a)(2) ................................................................................7

28 U.S.C § 636(b)(1) ...................................................................................6

## Rules

Fed. R. Civ. P. 60(b) ...................................................................................2

## Other Authorities

Federal Practice and Procedure § 2983 (1999) .........................................41

# INTRODUCTION

This appeal arises from the District Court's extraordinary and unjustified decision to appoint a receiver over GPB Capital Holdings, LLC ("GPB") at the request of Plaintiff-Appellee the Securities and Exchange Commission ("SEC"). David Gentile, Jeffry Schneider, and Ascendant Capital, LLC ("Defendants-Appellants") appeal from the orders of the District Court because the SEC came nowhere close to meeting the standard of proof required to obtain this drastic relief, and the District Court ignored binding precedent when it appointed a receiver over GPB.

In February 2021, the SEC brought an action against Defendants-Appellants and GPB, an investment firm that manages funds that own portfolio companies as the general partner of the funds. The SEC alleged securities fraud claims principally concerning GPB's financial condition and distributions to investors. At the SEC's request, the District Court appointed Joseph T. Gardemal, III as the independent monitor (the "Monitor") to oversee GPB based on the SEC's representation of a purportedly urgent need to protect investors through such oversight. Gentile, who is the sole owner and member of GPB, had recently stepped

down as CEO of the company and consented (along with GPB) to the Monitor's appointment in an effort to cooperate with the SEC and act in the best interest of investors.

In May 2022, Gentile provided notice to GPB that he intended to appoint three new managers to GPB and to amend certain aspects of the Company's Operating Agreement (the "Appointments and Amendments") pursuant to his rights under the GPB Operating Agreement and Delaware law. In tandem with this notice, Gentile also filed a motion under F.R.C.P. 60(b) (the "Rule 60 Motion") notifying the District Court of the Appointment and Amendments and seeking to maintain but adjust the Monitor's responsibilities to clarify Gentile's rights with respect to GPB.

In June 2022, although GPB management and the Monitor rejected the Appointments and Amendments (which consequentially never took effect nor had any impact on GPB), the SEC seized on this event to try to convert the Monitorship into a receivership. The SEC filed a second "emergency" motion, with the support of the Monitor, whom the SEC proposed to be a receiver, and also requested a litigation injunction to pause any lawsuits that could affect the putative receivership estate.

Critically, the SEC's Motion did not even attempt to show a likelihood of success on the merits, let alone show a clear and substantial likelihood of success on the merits and risk of recurrence as required for such extraordinary and drastic relief. The SEC also failed to make the requisite showing that a receivership was clearly necessary to avoid dissipation of GPB's assets or harm to investors. Defendants-Appellants opposed the SEC's Motion, highlighting these and other defects that were fatal to the SEC's Motion.

More than *thirteen months* after the SEC filed its motion, without holding an evidentiary hearing and with scant findings of fact, the Magistrate Judge (Vera M. Scanlon, *M.J.*) issued a Report and Recommendation endorsing the SEC's unsubstantiated request for a receivership and a litigation injunction (the "Report & Recommendation").

Over four months later—*and approximately eighteen months* after the SEC filed its "emergency" motion—the District Court (Brodie, *J.*) adopted the Magistrate Judge's Report and Recommendation and appointed the Monitor as receiver over GPB. The District Court granted this extraordinary relief even though it expressly acknowledged that the

SEC's likelihood of success on the merits was "unclear," which as a matter of law precludes a receivership. The District Court also failed to hold the SEC to the correct standard of proof—specifically, that it must have demonstrated that a receivership is clearly necessary to prevent the dissipation of GPB's assets. Indeed, eighteen months after the SEC filed its motion, the Monitor was (and is) continuing to work unimpeded to oversee the operation of GPB and its fund assets, liquidate certain of GPB's fund assets, and propose a plan to make distributions to investors, with no interference by Gentile or anyone else. Far from diminishing in value, the sales of GPB assets netted over $1 billion for the funds. The Monitor could propose a distribution plan, or approve a distribution plan proposed by GPB, to responsibly distribute funds to investors at any time without the need for a receivership.

Indeed, no harm or threatened harm has come to GPB, its assets, or its investors whatsoever since the SEC filed its complaint and the Court appointed the Monitor in 2021. On the other hand, the imposition of a receivership will deprive Gentile of his company before there has been any finding of wrongdoing. Furthermore, the Orders risk severe infringement of Defendants-Appellants' privileged and common-interest

4

communications because the District Court authorized the putative receiver to waive such privileges on behalf of GPB without providing appropriate safeguards or a process to assess joint or common interest privilege rights that Defendants-Appellants hold with GPB. Not only will such waiver power risk substantial harm to Defendants-Appellants, but also parsing out joint or common interest privileged documents and communications within the approximately sixteen million documents in this and the related criminal and civil cases will come at great burden and expense to GPB.

The District Court also erred in holding that it could order a receivership solely due to Gentile's purported violation of the underlying Amended Monitor Order and failure to cure—irrespective of whether the receivership was "clearly" necessary. Even if Gentile's actions caused a violation (which, as explained below, they did not), that alone cannot justify the appointment of a receiver as a matter of law under this Circuit's binding precedent governing the standards for appointment of a receiver.

In sum, the record establishes that there is no basis in fact or law to impose a receivership over GPB, and the Orders constitute a gross

abuse of discretion and a serious departure from clearly established and controlling case law governing imposition of a receivership. The Court should reverse the Orders.

## JURISDICTIONAL STATEMENT

On February 4, 2021, the SEC filed a complaint against, among others, Defendants-Appellants in United States District Court for the Eastern District of New York, alleging violations of federal securities laws. A-27.[1] The SEC asserted that the District Court has subject-matter jurisdiction over this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 214 of the Advisers Act, 15 U.S.C. § 80b-14, and 28 U.S.C § 636(b)(1). A-32.

On July 28, 2023, the Magistrate Judge issued the Report & Recommendation recommending that the District Court appoint a receiver over GPB and impose a litigation injunction. A-574. Defendants-Appellants objected to the Report & Recommendation. A-608, A-640. On December 7, 2023, the District Court entered an order

---

[1] References to "A-" herein refer to the Joint Appendix and "SPA-" herein refer to the Special Appendix filed herewith.

adopting the Report & Recommendation, SPA-1, and an order appointing a receiver and imposing a litigation injunction, SPA-42 (collectively, the "Orders").

On December 12, 2023, Gentile timely appealed the Orders to this Court. A-889. On December 13, 2023, Schneider and Ascendant Capital timely appealed the Orders to this Court. A-892. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1292(a)(2).

## **ISSUES PRESENTED**

1. Whether the District Court erred by appointing a receiver over GPB despite its finding that the SEC's likelihood of success was "unclear," where Second Circuit precedent requires a "clear" and "substantial" showing of likelihood of success on the merits to obtain preliminary equitable relief of this kind.

2. Whether the District Court erred by applying a preponderance of the evidence standard of proof in appointing a receiver over GPB rather than the "clearly necessary" standard required by Second Circuit precedent.

3. Whether the District Court erred in reaching its conclusions regarding: (1) the purported imminent risk to GPB; (2) the purported

inadequacy of alternative legal remedies; (3) purported "concern[s]" over Gentile's credibility raised by the SEC's allegations; (4) the absence of findings as to probability of harm to Defendants-Appellants or the balancing of harms between GPB and Defendants-Appellants; and (5) the existence of purported "extreme circumstances" warranting appointment of a receiver.

4.     Whether the District Court erred by concluding that: (1) the purported violation of the Amended Monitor Order justified the appointment of a receiver; (2) Gentile caused GPB to violate the Amended Monitor Order; and (3) GPB failed to cure the purported violation.

## STATEMENT OF THE CASE

### I.     The SEC Filed a Securities Fraud Complaint Against Defendants-Appellants, and the District Court Granted the SEC's Request to Appoint a Monitor Over GPB.

On February 4, 2021, the SEC filed a nine-count complaint against Defendants-Appellants and GPB, among others,[2] alleging that they engaged in conduct that violated the anti-fraud provisions of the 1933 Securities Act, the 1934 Securities Exchange Act, and the 1940

---

[2] Ascendant Alternative Strategies, LLC and Jeffrey Lash were also named as defendants in this action but are not parties to this appeal.

8

Investment Advisors Act. *See* A-27. Gentile founded GPB, a Delaware corporation, and remains its sole member.

On February 8, 2021, the SEC filed an "Emergency" Motion for an Order to Show Cause why the District Court should not enter an order appointing Joseph T. Gardemal, III as the independent monitor (the "Monitor" or "Gardemal") to oversee GPB pending a final disposition of the action. A-155. The SEC asserted then that "a monitor is urgently needed to maintain the stability to preserve the assets available to [GPB] investors." A-158. It further asserted that Gardemal, a Managing Director in the Washington, D.C., office of Alvarez & Marsal, is "a restructuring specialist who is uniquely qualified" to be Monitor. A-158, A-164. Gentile consented to the appointment of the Monitor and resigned as CEO in an effort to, among other things, cooperate with the SEC and further the interests of GPB's investors in the face of the SEC's litigation. A-218.

On February 12, 2021, the District Court appointed Gardemal as the Monitor overseeing GPB. A-168. The District Court's order granted the Monitor access to all non-privileged books, records, and account statements for the funds for which GPB was general partner and fund

manager (the "GPB Funds") and their portfolio companies, and it conferred upon the Monitor numerous broad powers and duties. A-168– 174. These included, among other things, authority to approve or disapprove of "[a]ny material corporate transactions" by GPB, the GPB Funds, or the portfolio companies, as well as "to resume distributions to investors in any of the GPB Funds, consistent with the investment objectives of the GPB Funds." A-170.[3] The District Court entered an Amended Monitor Order on April 14, 2021, which mirrored the initial Monitor Order in all relevant respects. A-187 (the "AMO").

## II. GPB and the Monitor Spent Two Years Liquidating GPB's Assets, Generating More than $1 Billion in Proceeds, But Made No Distributions to Investors.

GPB and the Monitor—who is also the putative receiver—have endeavored to liquidate the assets of GPB and the portfolio companies but have failed to make any distributions to investors.

In November 2021, with the Monitor's approval, GPB sold Prime

---

[3] On March 10, 2021, the District Court stayed the case at the request of the U.S. Attorney's Office for the Eastern District of New York, which was pursuing a parallel criminal case against certain of the same Defendants, but excluded from the stay any work performed by the Monitor, matters related to the Monitorship, or any future expansion of the Monitorship. *See* March 10, 2021 Order granting Motion to Stay.

Automotive Group—GPB's largest asset—for approximately $880 million, thereby realizing what the Monitor described as a 195% realized value (as compared to pre-monitorship valuation). *See* A-293, A-545. The SEC itself characterized this important transaction as a "successful sale . . . [that] was imperative to achieve a maximum return for investors." A-278. Since that time, the Monitor has approved GPB's sale of additional assets, including Alliance Physical Therapy in December 2021 and Cold Storage in April 2022 resulting in (i) realized proceeds of $119 million and what the Monitor described as a 213% realized value and (ii) realized proceeds of $78 million and a 134% realized value, respectively. A-776, A-778. In a June 2022 declaration, the Monitor stated that GPB had "in excess of $920 million in cash (of which $700 million is currently invested in 3-month T-bills)." A-298.

In an October 2023 filing with the District Court, the Monitor reported that GPB has generated more than $1 billion in proceeds from the sale of assets, and "management is actively marketing the remaining assets." Dkt. No. 182 at 6.[4] The Monitor further noted: "The available

---

[4] All docket citations contained herein refer to *S.E.C. v. GPB Cap. Holdings, LLC, et al.*, No. 21-cv-583-MKB-VMS, unless otherwise specified.

funds that GPB has raised from these sales continue to be invested in conservative vehicles that are generating a reasonable return, with over $40 million in interest earned through September 2023." *Id.*

In a January 2024 filing, the Monitor indicated that it had made additional asset sales, and that GPB had "generated approximately $1.3 billion in gross proceeds from the sale of assets," while reiterating that "management is actively marketing the remaining assets," which will further increase the amount of cash equivalents available for distribution.[5] Dkt. No. 195 at 6. The Monitor further noted that the investment of the proceeds had generated "approximately $55 million in interest earned through December 2023." *Id.*

Despite having over $1 billion available in cash equivalents, *see e.g.,*

---

[5] Although information in the Monitor's January 2024 quarterly report filing was not available to the District Court when it appointed a receiver over GPB, this information was available to GPB and the SEC and should have been disclosed to Defendants-Appellants and the District Court as it was directly relevant to the SEC's issues under consideration in the SEC's Motion. This Court may properly take judicial notice of the Monitor's Report disclosing this information. *See Dixon v. von Blanckensee*, 994 F.3d 95, 102 (2d Cir. 2021) (appellate court "has discretion to determine whether to take judicial notice of documents that are not part of the record on appeal"). The continued sales reinforce the fact that Gentile's Appointments and Amendments did not harm GPB or impede the Company's ability to continue to operate under the Monitor as it has been operating for the last three years.

12

Dkt. No. 182 at 6, GPB and the Monitor have failed to make *any* distributions to investors. In fact, GPB and the Monitor have failed to even propose and make available a distribution plan, notwithstanding their repeated public pronouncements over the last two years that such a plan has been made and distributions are forthcoming. *See* A-783 (Q3 2022 Monitor Report stating "[p]rior to and since the filing of the receivership motion, the Monitor team has continuously engaged in extensive discussions with GPB and Mayer Brown (GPB counsel) to further the development of a distribution plan, including . . . created investor recovery analysis and full model of investor-by-investor returns to evaluate distribution scenarios across funds[, r]eviewed distributions plan issues . . . [and] evaluated GPB proposals of possible distribution scenarios"); A-817 (Q4 2022 Monitor Report stating same); A-851 (Q1 2023 Monitor Report stating same); A-885 (Q2 2023 Monitor Report stating same); *see also* Dkt. No. 130 at 1 (Monitor's counsel representing that GPB is and remains fully able to distribute funds to investors).

In May 2023, the SEC seemingly expressed frustration that investors have "been denied access to their funds," recognizing that, "[a]nother year has gone by and investors are no closer to having access

to their funds," A-562, despite the Monitor's ability, but failure, to propose or approve distributions.[6]

## III. Gentile in Good Faith Sought to Appoint New Managers to GPB and Attempted to Make Amendments to the Operating Agreement, but GPB and the Monitor Swiftly Rejected the Appointments and Amendments.

In May 2021, shortly after the Monitor's appointment, Gentile, as the sole owner of GPB, sought access to GPB's financial statements and books and records, so that he could complete his tax returns and for use in his defense in the companion criminal case, and made other requests under the GPB operating agreements and Delaware law. *See* Dkt. No. 51. In September 2021, after the Monitor refused his requests, Gentile sought an order requiring the Monitor to mediate these issues under paragraph 4 of the AMO. *See id.*; Dkt. No. 56. The Monitor and the SEC objected, and the Magistrate Judge denied the request in April 2022, observing that Delaware law provided avenues for the relief sought by Gentile. *See* April 28, 2022 Order denying Motion to Request Mediation.

---

[6] Gentile and Schneider have repeatedly requested and supported distributions to investors pursuant to a reasonable and prudent plan that takes into consideration GPB's contingencies and liabilities. *See, e.g.*, A-401–404, A-520–521; A-557–560; A-734–737; Dkt. No. 167-6 at 3.

On May 27, 2022, after consulting with counsel, Gentile provided written notice to GPB, as required by GPB's Operating Agreement, that he intended to appoint three new Managers pursuant to his rights under the GPB Operating Agreement and Delaware law and intended to amend the Operating Agreement (*i.e.*, the Appointments and Amendments). *See* Dkt. No. 168-10.

On May 31, 2022, Gentile filed the Rule 60 Motion, seeking to adjust the Monitor's responsibilities to clarify Gentile's rights with respect to GPB. A-211, Dkt. Nos. 79, 81-83. The Rule 60 Motion asked the District Court to modify the AMO to:

- Amend the scope of the Monitor's responsibilities to reflect changed circumstances since the Monitor's appointment, including the completion of his review of the Company and its operations, and the sale of Prime Automotive, which was identified by the SEC in its February 8, 2021 application as a principal object of the Monitorship;

- Pause the sale of additional GPB assets pending assessment by management to ensure that the remaining financially viable portfolio companies were not prematurely sold for prices that failed to achieve investor and fund objectives;

- Permit Gentile to participate in the dispute resolution provisions of the AMO; and

- Direct the Monitor to periodically submit a budget to the District Court reflecting the scope and estimated costs of work in light of the achievement of the Monitor's objectives, as outlined in the

15

AMO, and the high cost to the investors of the originally scoped monitorship. A-215.

In the Rule 60 Motion, Gentile further explained to the District Court and the parties (again, with prior notice to GPB) that as GPB's sole member, he sought under Delaware law and the GPB Operating Agreement to appoint additional managers to work collaboratively with the Monitor and GPB management to facilitate the operation of GPB's remaining assets. A-230. Gentile made this request in part because GPB management had not acted in the best interest of investors by, among other things, prematurely selling assets, and by failing to develop and implement a plan to distribute liquid assets to investors. A-216–217.

In response to Gentile's notice to GPB and his Rule 60 Motion, the Monitor issued a letter to GPB (copying Gentile), giving GPB ten business days to "cure" what the Monitor viewed as a breach of the AMO. A-731. By that time, the SEC had argued (and the Magistrate Judge had already ruled) that Gentile was neither subject to nor could avail himself of the AMO's mediation provision. *See* April 28, 2022 Order. Accordingly, upon receipt of this notice, Gentile did not believe he had any rights or authority under the AMO upon which he could act, much less that he could "cure" GPB's purported violation of the AMO.

16

Within 24 hours of the Monitor's demand that GPB "cure" the purported breach of the AMO—and well within the ten-day cure period—GPB rejected the Appointments and Amendments. Dkt. No. 168-3 at 2. GPB stated that "the Company (i) does not recognize [the new managers] as validly appointed managers and (ii) does not accept the amended and restated limited liability agreement as being validly adopted." *Id.* The Monitor likewise declined to approve the managerial appointments pursuant to his authority under the AMO and later represented to the District Court that the "purported managerial appointments were never approved by the Monitor" and were not "deemed properly appointed under the Amended Monitor Order." Dkt. No. 114 at 4, 6.

As a result, it is undisputed that GPB and the Monitor never recognized the proposed new managers, nor did GPB or the Monitor meet with the proposed new managers or take any action at their request, and no amendments to the Company's Operating Agreement took effect. Likewise, GPB never paid, nor arranged to pay, the managers that Gentile proposed to appoint in May 2022. *See* A-694 (GPB acknowledging that "the Gentile Managers were never recognized or compensated by the

17

Company"). And all three proposed managers have since formally resigned. *See* Dkt. No. 168-7.

## IV. The SEC Argued that Gentile's Appointments and Amendments Justified the Extraordinary Step of Converting the Monitorship to a Receivership.

On June 13, 2022, the SEC filed an "emergency" motion seeking an order appointing a receiver and imposing a litigation injunction (the "SEC's Motion"), arguing that the Appointments and Amendments "caused GPB . . . to violate the [Amended] Monitor Order." A-276. The SEC took the position that the Appointments and Amendments were an attempt by Gentile to "re-take control of GPB" and that a receivership was "necessary to fend off Gentile's takeover ploy." A-276–277.

The SEC further argued that Gentile caused GPB to "retain three new managers with lucrative compensation packages without Monitor approval," A-284 n.7, and that GPB's violation of the AMO without curing authorized conversion of the Monitorship into a receivership. A-279 n.6. But the SEC omitted from its motion that GPB and the Monitor's rejection of the Appointments and Amendments cured any purported breach by GPB, and that the proposed new managers had never even met with GPB management or received any compensation, let alone taken

18

control of GPB.[7]  Despite accusing GPB of a breach, moreover, the Monitor acknowledged in a declaration that his "experiences with [GPB's management] to date have been constructive and collaborative," belying his claim of a breach by GPB.  A-432.

Despite the Monitor's acknowledgement that his experience with management has been "constructive and collaborative," A-432, the SEC argued that "a receivership is necessary because the [SEC] is not confident that the current management structure . . . is capable of making the decisions necessary to effectuate a timely and cost-effective distribution to investors."  A-277.  The Monitor made a similar claim in a declaration attached to the SEC's motion, stating that a "Receivership [is] now . . . the most efficient, cost-effective, and value-maximizing means of liquidating remaining assets, distributing proceeds as soon as possible to the investors in the GPB Funds, and winding down the GPB Funds and related holding company entities."  A-298.

The Monitor and the SEC failed to explain, however, why the

---

[7]  The SEC also raised factual disputes, including expressing disagreement with Gentile's argument that the Monitor had improperly denied him information and not acted in the best interests of investors when liquidating assets.  *See, e.g.*, A-280–281.

Monitor could not propose a distribution plan or approve a distribution plan proposed by GPB without first being appointed receiver. The Monitor stated that he had been working with GPB and its counsel on a distribution plan prior to the SEC's Motion. A-783 ("Prior to and since the filing of the receivership motion, the Monitor team has continuously engaged in extensive discussions with GPB and Mayer Brown (GPB counsel) to further development of a distribution plan, including the preparation of a motion, plan exhibit, and supporting analysis."). And the Monitor indicated in June 2022, at the time of the SEC's Motion, that he needed only 45 more days to finalize and file the distribution plan with the Court if the Court appoints him receiver. A-300. But neither the Monitor nor the SEC explained why the Monitor's finalization and approval of his plan was contingent on the Court appointing a receivership over GPB.

Critically, the SEC did *not* argue in its Motion that it could demonstrate a clear or substantial likelihood of success on the merits— or any likelihood of success on the merits at all—or that a receiver was necessary to avoid the imminent dissipation of assets. *See generally* A-272–288. Nor did the SEC acknowledge that these were threshold

requirements for the appointment of a receiver over GPB.

Defendants-Appellants opposed the SEC's Motion on the ground that the SEC had failed to make the required showing to warrant the extraordinary relief of appointing a receiver over GPB and requested oral argument and an evidentiary hearing. A-383, A-397; *see also* Dkt. No. 106, A-520, A-557. Defendants-Appellants also highlighted that the order proposed by the SEC purported to empower the SEC to waive GPB's privileges, which would create a grave risk that Defendants-Appellants' privileges would be invaded, due to joint defense and common interest privileges with GPB. A-394–395. And Gentile also submitted the expert opinion of retired Delaware Supreme Court Justice Jack Jacobs who fully supported Gentile's view that, as a Member of the Company, Gentile was authorized by Delaware law to make the Appointments and Amendments. *See* A-370–371.

## V. Over a Year Later, the Magistrate Judge Recommended Appointment of a Receiver over GPB, and the District Court Adopted the Report & Recommendation.

On July 28, 2023, **over thirteen months** after the SEC's "emergency" motion, without holding an evidentiary hearing or even oral argument, and without any dissipation of assets or actual harm to GPB

21

(and, to the contrary, while the Monitor reported that GPB's assets continued to grow), the Magistrate Judge issued the Report & Recommendation endorsing the SEC's Motion. A-574. Notwithstanding GPB's immediate rejection of the Appointments and Amendments and refusal to give them any force or effect, *see* Dkt. No. 168-3 at 2, the Magistrate Judge ruled that GPB failed to cure the purported violation and recommended the appointment of a receiver, approval of the SEC's Receivership Order, and entry of the proposed litigation injunction. A-574–585, A-594, A-606.

Defendants-Appellants objected to the Report & Recommendation and again requested oral argument and an evidentiary hearing. A-608, A-640; *see also* A-716, A-738. Gentile also informed GPB, the Monitor, and the SEC that, as of August 28, 2023, he had withdrawn the Appointments and Amendments—which the Monitor and GPB had immediately rejected anyway—and further assured them he would "refrain from taking any unilateral action regarding the management and corporate governance of GPB" in light of the Report & Recommendation. *See* Dkt. No. 168-8 at 3.

On December 7, 2023— *almost eighteen months* after the SEC filed

its "emergency" motion—the District Court adopted the Report & Recommendation without any oral argument or hearing and entered the Orders, denying Gentile's Rule 60 Motion as moot. SPA-1, SPA-42. The District Court imposed a receivership over GPB because GPB purportedly breached the AMO, and Gentile failed to cure GPB's breach. SPA-22. The District Court also concluded that a receivership was warranted based on factors from *Wright and Miller* while also finding that none of the factors were "dispositive," and rejecting Defendants-Appellants' argument that such relief is only appropriate upon a showing that it is clearly necessary. SPA-26, SPA-31. For example, the District Court acknowledged that "the SEC's probability of success [on the merits] is unclear," SPA-30, but still found the appointment of a receiver to be appropriate. The District Court further found that "there is an imminent risk that the assets of GPB will diminish in value" absent a receivership, SPA-27, even though this had not occurred in the almost three years GPB has been operating under the monitorship. To the contrary, GPB's gross proceeds from sales currently stand at more than $1.3 billion, an approximately $400 million increase from the roughly $900 million in gross proceeds related to the sale of GPB assets in November 2021. A-

473; Dkt. No. 195 at 6.

On December 12, 2023 and December 13, 2023, Defendants-Appellants timely appealed the District Court's Orders and Adoption of the Magistrate Judge's Report and Recommendation.[8]

## SUMMARY OF ARGUMENT

The District Court erred in four ways when it adopted the Report and Recommendation, appointed a receiver over GPB, and entered a litigation injunction, each of which requires reversal. Together, these errors leave no doubt that the Court should reverse the Orders.

First, the District Court ignored binding precedent requiring that the SEC demonstrate a "clear" and "substantial" likelihood of success on the merits—both as to the alleged securities law violations and risk of recurrence—before obtaining mandatory preliminary relief such as a receivership. The SEC failed to make such a showing, as the District Court recognized when it found that the SEC's likelihood of success on

---

[8] On December 14, 2023 the District Court granted a temporary stay of the Orders pending resolution of a motion to be filed with the Court of Appeals staying the Orders pending appeal. *See* Dec. 14, 2023 Order denying Motion for Order to Show Cause. On December 21, 2023, Defendants-Appellants filed an unopposed motion to stay the Orders pending appeal with this Court, which remains pending. *S.E.C. v. Ascendant Capital LLC, et al.*, No. 23-8035, Dkt. No. 13.1.

the merits was "unclear." SPA-30. This finding should have been fatal to the SEC's Motion, as it precluded appointment of a receiver.

Second, the District Court erred by ruling that it could appoint a receiver over GPB if the SEC demonstrated the appropriateness of a receivership by a preponderance of the evidence. To the contrary, a motion for a receivership may be "granted only when *clearly necessary* to protect plaintiff's interests in the property." *Rosen v. Seigel*, 106 F.3d 28, 34 (2d Cir. 1997) (emphasis added); *see also S.E.C. v. Am. Bd. of Trade, Inc.*, 645 F. Supp. 1047, 1052 (S.D.N.Y. 1986) (holding receivership "is an extraordinary remedy to be invoked only in cases of necessity and upon a clear showing that an emergency exists."), *aff'd*, 830 F.2d 431 (2d Cir. 1987). The SEC came nowhere close to meeting the required standard of proof. It did not demonstrate by a clear showing that an appointment of a receiver was necessary and instead the SEC made *no showing* that GPB's assets would be dissipated absent a receivership. On the contrary, gross proceeds had grown by more than $400 million in cash or cash equivalents between December 2021 and December 2023 when the District Court entered the Orders. A-473; Dkt. No. 195 at 6. Nor had any assets dissipated in the eighteen months between when the SEC filed

its Motion and the District Court appointed a receiver. This, too, foreclosed the receivership.

Third, the District Court repeatedly erred in its application of the Wright & Miller factors relevant to the appropriateness of a receiver. The District Court's conclusions cannot withstand *de novo* review applicable to mixed questions of law and fact, and, even under a "clearly erroneous" standard of review, the District Court's findings fail.

Fourth, the District Court erred in concluding that Gentile caused GPB to breach the AMO through the Appointments and Amendments, and in concluding that Gentile or GPB failed to "cure" the purported breach within ten days. Even if the District Court were correct, moreover, these are not proper bases to appoint a receiver.

Accordingly, the Court should reverse the Orders.

## STANDARDS OF REVIEW

This Court generally reviews a District Court's decision to appoint a receiver for abuse of discretion. *See Am. Bd. of Trade, Inc.*, 830 F.2d at 436. The Court reviews *de novo* the District Court's rulings of law in considering whether there has been an abuse of discretion. *Commodity Futures Trading Comm'n v. Walsh*, 712 F.3d 735, 750 (2d Cir. 2013).

26

Further, the Court reviews *de novo* the District Court's determination regarding the authority to enter preliminary equitable relief but reviews the scope of relief and its ultimate decision to award such relief for abuse of discretion. *Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 272 (2d Cir. 2011); *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020). The Court reviews the District Court's finding of fact under a clearly erroneous standard. *United States v. Vasquez*, 389 F.3d 65, 72 (2d Cir. 2004). Mixed questions of law and fact are reviewed *de novo*. *See Roberts v. Royal Atlantic Corp.*, 542 F.3d 363, 367 (2d Cir. 2008).

## ARGUMENT

**I.  The District Court Erred by Appointing a Receiver Because It Correctly Found that the SEC Failed to Show a Likelihood of Success on the Merits.**

>   A.  The District Court Erred by Not Requiring the SEC to Demonstrate a "Clear" and "Substantial" Showing of Likelihood of Success on the Merits and Risk of Recurrence of Alleged Securities Law Violations.

The District Court erred as a matter of law by appointing a receiver over GPB without requiring the SEC to demonstrate a clear and substantial likelihood of success on the merits and a recurrence of alleged securities laws violations.

A plaintiff who seeks preliminary equitable relief must

27

demonstrate a likelihood of success on the merits under basic principles of equity. *See, e.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits . . . ."). Where a plaintiff requests that a court "exercis[e] its equitable discretion" by ordering *mandatory* relief, meaning relief that does "more than preserv[e] . . . the status quo," the court must "require a more substantial showing of likelihood of success, both as to violation and risk of recurrence. . . ." *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1039 (2d Cir. 1990).[9] Such a showing must not only be "substantial" but also "clear." *Id.* at 1039-40; *accord City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 121 (2d Cir. 2010).

Such a high standard is warranted because, as this Court

---

[9] A court's authority to order "any equitable relief that may be appropriate or necessary for the benefit of investors" under Section 21(d)(5) of the Exchange Act, 15 U.S.C. § 78u(d)(5), is limited to "'those categories of relief that were typically available in equity.'" *Liu v. SEC*, 140 S. Ct. 1936, 1942 (2020) (quoting *Mertens v. Hewitt Associates*, 508 U.S. 248, 256 (1993)) (emphasis omitted). There is no indication when Congress enacted Section 21(d)(5) that it intended to relax the standard of proof the SEC must meet when it seeks relief typically available in equity, which, for mandatory relief requires "a more substantial showing," as this Court found in *Unifund*.

recognized in *Unifund*, preliminary relief requested by the SEC "can have very serious consequences." 910 F.2d at 1039. Acknowledging the potential for severe and irreversible results, the *Unifund* court held:

> [A] district court, exercising its equitable discretion, should bear in mind the nature of the preliminary relief the Commission is seeking, and should require a more substantial showing of likelihood of success, both as to violation and risk of recurrence, whenever the relief sought is more than preservation of the status quo. Like any litigant, *the Commission should be obliged to make a more persuasive showing of its entitlement to a preliminary injunction the more onerous are the burdens of the injunction it seeks.*

*Id.* (emphasis added); *see also Yang v. Kosinski*, 960 F.3d 119, 127-28 (2d Cir. 2020) (where the movant is seeking to modify the status quo by virtue of a "mandatory preliminary injunction," the movant must, among other things, "demonstrate a *clear or substantial likelihood of success on the merits*") (emphasis added) (internal quotation marks and citations omitted).[10]

---

[10] Although a receivership "is not technically and strictly an order of injunction," it is "something in the nature of a mandatory injunction— that is, a command to the receiver to take, and to the defendant to surrender, possession." *Highland Ave. & B.R. Co. v. Columbian Equip. Co.*, 168 U.S. 627, 630-31 (1898).

29

In *Unifund*, the SEC sought (1) a prohibition against future securities law violations; and (2) a freeze order of appellants' accounts. *Unifund*, 910 F.2d at 1029. The court found that because the SEC's request seeking a prohibition against future securities law violations "subjects the defendant to contempt sanctions if its subsequent trading is deemed unlawful and also has serious collateral effects," and because "it accomplishes significantly more than preservation of the status quo," the SEC was required to make a substantial showing of likelihood of success as to the underlying violation, as well as risk of repetition. *Id.* at 1040. Where the SEC alleged insider trading, but the record revealed only "unusual trading," the court found that the SEC failed to show "a probable insider trading violation," and rejected the SEC's request. *Id.* at 1041. And while the court entered a limited freeze order to assure "that any funds that may become due can be collected," *id.*, it refused to impose a limit on defendants' trading using the same accounts without the Commission's approval due to the SEC's "inadequate" showing and "bearing in mind the basic principle that burdensome forms of interim relief require correspondingly substantial justification." *Id.* at 1042.

The court's rulings in *Unifund* are applicable here. As in *Unifund*,

the SEC here seeks preliminary equitable relief in the form of a receivership over GPB with particularly "onerous" burdens, thus requiring a clear and substantial showing of likelihood of success on the merits and recurrence. 910 F.2d at 1039. The Second Circuit has already recognized that "the appointment of a receiver is considered to be *an extraordinary remedy," Rosen*, 106 F.3d at 34 (internal quotation marks omitted) (emphasis added), and "a drastic remedy," *Ferguson v. Tabah,* 288 F.2d 665, 674 (2d Cir. 1961). And the consequences for Gentile are particularly onerous and severe. A receivership over GPB will not only deprive Gentile of any rights to the company he founded over a decade ago, but it will lead to its permanent liquidation according to the putative receiver.[11] Such an action, once taken, cannot be undone. It also

---

[11] The putative receiver's stated intent to liquidate all assets is particularly problematic given that the purpose of a receivership is "to preserve and protect the property pending its final disposition," *Gordon v. Washington*, 295 U.S. 30, 37 (1935), and the Second Circuit disapproves of the use of a receivership to liquidate a company's assets. *See Am. Bd. of Trade, Inc.*, 830 F.2d at 436 ("We have in the past criticized the use of receivers to effect the liquidation of a defendant firm in litigation under the Securities Act or the Securities Exchange Act."); *see also Eberhard, v. Marcu*, 530 F.3d 122, 132 (2d Cir. 2008) ("[B]ecause receivership should not be used as an alternative to bankruptcy, we have disapproved of district courts using receivership as a means to process claim forms and set priorities among various classes of creditors.").

constitutes mandatory relief, because a receivership—particularly one whose stated goal is liquidation of all assets—does more than simply preserve "the status quo." *Unifund*, 910 F.2d at 1039.

The District Court thus erred as a matter of law by failing to require that the SEC make a clear and substantial showing of a likelihood of success on the merits and risk of recurrence, requiring reversal.

B. <u>The District Court's Finding That the SEC's Probability of Success Is "Unclear" Is Fatal to the Appointment of a Receiver</u>.

Not only did the SEC fall far short of the "more substantial" showing of likelihood of success required by Second Circuit precedent, but it fell short of *any* showing of likelihood of success on the merits. The District Court correctly recognized "that the SEC's probability of success [on the merits] is unclear." SPA-30. Such a finding by the District Court is dispositive and alone requires reversal of the receivership order.

The District Court was correct in finding that the SEC failed in this regard. Indeed, the SEC did nothing to meet its burden regarding its likelihood of success. In fact, the SEC's initial motion seeking appointment of a receiver made no reference to any purported likelihood of success in the underlying action. *See generally* A-272. Nor did it make

any reference to a likely recurrence of the alleged securities laws violations. *See generally* A-272.

The District Court recognized the absence of factual support presented by the SEC, and evaluated only the fact of the indictment pending against Gentile and Schneider and whether that may properly form the basis for a finding of a likelihood of success—it clearly cannot.

As the District Court acknowledged, an indictment is "merely a statement of charges and not itself evidence." SPA-30 (quoting A-662). Thus, an indictment, without more, cannot support a finding of a likelihood of success on the merits, let alone substantial risk of recurrence. *See also United States v. Ianniello,* No. 86-cv-1552, 1986 WL 4685, at *5 (S.D.N.Y. Apr. 16, 1986) (declining to "appoint[] a receiver . . . on the basis of inference of continued wrongdoing alone" even after a conviction). Nonetheless, the District Court cited two cases—*SEC v. Gabelli*, 653 F.3d 49 (2d Cir. 2011), and *Ferguson*, 288 F.2d 665— erroneously suggesting that there is ambiguity in the case law as to whether an indictment may, in fact, properly justify the appointment of a receiver. SPA-30–31. This is not only internally inconsistent with the District Court's own statement to the contrary, but also the two cases

cited by the District Court do not stand for such a proposition.

In *Gabelli*, the SEC sought an injunction "prohibiting the [d]efendants from further violations of" the securities laws, *see* Complaint at 3, No. 08-cv-3868 (S.D.N.Y.), and the defendants sought (and the district court granted) a motion to dismiss the SEC's request for injunctive relief. *Gabelli*, 653 F.3d at 61. In reversing the district court's dismissal of the SEC's request, the Second Circuit merely found that the complaint "plausibly allege[d]" a willful violation of the securities laws such that its prayer for injunctive relief could survive a motion to dismiss. *Id.* ("[I]t is most unusual to dismiss a prayer for injunctive relief at this preliminary stage of the litigation"). The *Gabelli* court *did not* make a finding as to whether the allegations in the complaint itself could support a factual finding of the SEC's likelihood of success on the merits—indeed, the court indicated the opposite. *Id.* at 61 ("determining the likelihood of future violations is almost always a fact-specific inquiry"); *see also id.* at 61 n.6 ("For present purposes, we simply assume *without deciding* that a complaint must include sufficient factual allegations to plausibly allege . . . a claim to relief") (emphasis added) (internal quotation marks and citations omitted).

The District Court also cited *Ferguson*, specifically pointing to its finding that "the arrest of virtually all high company officials on fraud allegations . . . [posed a] threat which the district judge found 'sufficient to tip the balance in favor of a receiver.'" SPA-30–31 (citing *Ferguson*, 288 F.2d at 675). But the court in *Ferguson* did not merely uphold the appointment of a receiver due to the "arrest of virtually all high company officials on fraud allegations," SPA-30, as the District Court suggests (and which in and of itself is distinguishable from this case).[12] Instead, the *Ferguson* court upheld such a "drastic remedy" only after also finding that (1) the former director and chairman—who was a fugitive in Brazil—might continue to exert influence control over the company absent a receiver; and (2) that the company's "credit position ha[d] been sever[e]ly jolted over the last decade by the apparent repeated raids by its management." 288 F.2d at 674-75. Indeed, the *Ferguson* court recognized that appointment of a receiver in that case posed a "difficult problem" noting that a receivership is "usually imposed only where no

---

[12] Gentile's arrest and release in February 2021 cannot plausibly serve as a basis to appoint a receiver, particularly given the passage of time (nearly three years) and the fact that a court-appointed Monitor has been supervising and managing GPB, its management, and its significant assets during that time period.

lesser relief will be effective" and that it "*would ordinarily be presumed that a watchdog over all expenditures should be sufficient to safeguard the corporate treasury from further depredations.*" *Id.* at 674 (emphasis added) (internal quotation marks omitted).

A watchdog is precisely what GPB already has—a court-appointed Monitor safeguarding GPB's assets and regularly reporting to the District Court and the SEC about its oversight efforts and the funds it has expended to do so. And this lesser relief—which the SEC chose in lieu of seeking a receiver at the outset of the SEC's and government's cases—has allowed GPB to operate for three years. Indeed, GPB continues to sell assets and generate proceeds (including as recently as January 2024) that have resulted in over $1 billion in cash equivalents that have been available to GPB under the purview of the Monitor and can be used to fund a reasonable distribution plan for investors that also accounts for GPB's other obligations.

Far from making a "clear" and "substantial" showing of likelihood of success on the merits "as to both a current violation and the risk of repetition," *Unifund*, 910 F.2d at 1039-40, the SEC's failure to make any showing of likelihood of success on the merits is fatal to its Motion. The

District Court cannot—through a court-appointed receiver—deprive Gentile of his company without finding that he is even *likely* liable. In these circumstances, the District Court erred in granting the SEC's Motion and appointing a receiver over GPB.

## II. The District Court Failed to Require the SEC to Demonstrate that the Receivership was "Clearly Necessary" to Avoid Dissipation of Assets as Required by Second Circuit Precedent.

While the "appointment of a receiver lies in the discretion of the court,"[13] SPA-25–26 n.16, it may not disregard clear and controlling Second Circuit precedent holding that "'the appointment of a receiver is considered to be *an extraordinary remedy,'* and . . . should be employed cautiously and granted *only when **clearly necessary*** to protect plaintiff's interests in the property." *Rosen*, 106 F.3d at 34 (emphases added) (quoting *Citibank, N.A. v. Nyland (CF8) Ltd.*, 839 F.2d 93, 97 (2d Cir. 1988)); *accord Nyland*, 839 F.2d at 97; *Chambers v. Blickle Ford Sales, Inc.*, 313 F.2d 252, 260 (2d Cir. 1963)).

---

[13] The District Court also pointed to its power to grant "any equitable relief that may be appropriate or necessary for the benefit of investors" under Section 21(d)(5) of the Exchange Act, 15 U.S.C. § 78u(d)(5). SPA-22.

Although the District noted *Rosen*'s holding, it nevertheless erroneously held that the standard of proof in seeking a receivership is "by a preponderance of the evidence," while citing no case law to support this ruling. SPA-25. To the contrary, the Second Circuit's "clearly necessary" standard of proof demands that the SEC *clearly* demonstrate that a receivership is *necessary* to preserve and avoid imminent dissipation of GPB's assets. *See Rosen*, 106 F.3d at 34 (receivership appropriate only "when clearly necessary to protect plaintiff's interests in the property"); *see also S.E.C. v. Alan F. Hughes, Inc.*, 461 F.2d 974, 982-84 (2d Cir. 1972) (upholding appointment of a receiver where after "commendable" and "careful handling of the receivership application," the district court found there was "***clear*** [and] present danger" to the underlying assets) (emphasis added); *Ferguson*, 288 F.2d at 674 (receivership "usually imposed only where no lesser relief will be effective").[14]

---

[14] This explains why the Orders are also contrary to numerous district court decisions applying Second Circuit law. *See, e.g.*, *Am. Bd. Of Trade, Inc.*, 645 F. Supp. at 1052, *aff'd*, 830 F.2d 431 (2d Cir. 1987) ("The appointment of a receiver is an extraordinary remedy to be invoked only in cases of necessity and upon a ***clear showing that an emergency exists***.") (emphasis added) (citations omitted); *S.E.C. v. Universal*

Such a high standard of proof is also required by longstanding Supreme Court precedent holding that appointment of a receiver "should be resorted to only on a **plain showing of some threatened loss or**

---

*Express, Inc.*, No. 04-cv-2322, 2007 WL 2469452, at *3 (S.D.N.Y. Aug. 31, 2007) ("The appointment of a receiver is an 'extraordinary remedy to be invoked only in cases of necessity and upon a clear showing that an emergency exists.'") (quoting *Am. Bd. Of Trade, Inc.*, 645 F. Supp. at 1052); *S.E.C. v. Brigadoon Scotch Distribs., Ltd.*, 388 F. Supp. 1288, 1293 (S.D.N.Y. 1975) (appointment of a Receiver denied where "[n]o showing ha[d] been made that such a drastic remedy is necessary for the protection of the public."); *S.E.C. v. Garfinkle*, No. 75-cv-184, 1975 WL 363, at *1 (S.D.N.Y. Mar. 18, 1975) (refusing to "appoint a receiver *pendenie lite*," holding that it is "an extreme remedy and the facts here simply do not show the immediate risk of additional harm required for such extraordinary relief," where "the supervision by the State Department of Insurance tended to diminish the chance of imminent danger of loss."); *JDP Mortg. LLC v. Gosman*, No. 19-cv-5968, 2020 WL 8082390, at *2 (E.D.N.Y. Dec. 21, 2020) ("In the Second Circuit, 'the appointment of a receiver is considered to be an extraordinary remedy' that 'should be employed cautiously and granted only when *clearly necessary* to protect plaintiff's interests in the property.'" (emphasis added) (internal quotation marks omitted); *U.S. Bank Nat. Ass'n v. Nesbitt Bellevue Prop. LLC*, 859 F. Supp. 2d 602, 610 (S.D.N.Y. 2012) (same); *Meineke Disc. Muffler Shops, Inc. v. Noto*, 603 F. Supp. 443, 444-45 (E.D.N.Y. 1985) ("a receiver 'is, like an injunction, an extraordinary remedy, and ought never to be made except in cases of necessity, and upon *a clear showing* that . . . emergency exists, in order to protect the interests of the plaintiff in the property.'" (emphasis added) (internal quotation marks omitted); *Meisels v. Meisels*, No. 19-cv-4767, 2020 WL 7000903, at *5 (E.D.N.Y. May 12, 2020) ("the burden is on the moving party to show by *clear and convincing* evidence that such relief is necessary.") (emphasis added) (citing *Rosen*, 106 F.3d at 34), *report and recommendation adopted by* 2020 WL 6110827 (E.D.N.Y. Oct. 16, 2020).

*injury to the property*, which the receivership would avoid." *Gordon v. Washington*, 295 U.S. 30, 39 (1935) (emphasis added). The District Court erred by failing to apply this correct standard of proof.

This standard is fatal to the SEC's Motion, because the SEC failed to even attempt to demonstrate imminent danger that GPB's assets would be dissipated absent appointment of a receiver. *See infra* Argument Section III.A. Nor could it. By the time the District Court ruled, it had been approximately eighteen months since the SEC filed its motion, and there was no evidence that GPB's assets were ever in jeopardy. To the contrary, the Monitor continuously reported that it had been successfully selling assets, generating more than $1 billion in proceeds, and earning tens of millions of dollars in interest on the sales. A-765, A-775, A-799, A-809, A-833, A-843, A-859, A-867, A-877. The AMO also included controls and required the Monitor to approve certain decisions affecting assets to prevent dissipation of assets, without the need to appoint a receiver. A-188–189. The District Court's failure to apply the correct standard of proof, coupled with the fact that the SEC's Motion cannot survive such standards, requires reversal.

## III. The District Court Erred in its Findings of Fact and Conclusions of Law.

As explained above, the District Court appointed a receiver based on an incorrect, lower standard of proof—preponderance of the evidence. *See supra* Argument Section II. Even under this incorrect lower standard, however, the District Court's application of the case law to its scant findings of facts fails to survive *de novo* review applicable to such mixed questions of law and fact, *see Roberts*, 542 F.3d at 367, or even a clearly erroneous standard of review. As explained below, all of the factors[15] the District Court addressed in considering the appointment of a receiver militate *against* the appointment of a receiver over GPB.

### A. The District Court Erred in Finding That There Was "Imminent Risk" to GPB and its Assets.

The District Court recognized that a finding of "imminent risk" to

---

[15] The District Court relied on factors outlined in Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2983 (1999). Defendants-Appellants submit that the Wright & Miller factors, while instructive, are not dispositive. What is dispositive, as explained above, is controlling case law holding that a plaintiff must make a showing that appointment of a receiver is "clearly necessary" to protect the plaintiff's interest in the property at issue, which necessarily requires a showing of a likelihood of success on the merits. *Rosen*, 106 F.3d at 34. Regardless, the District Court failed to properly apply the Wright & Miller factors, as explained below.

the underlying company and its assets is "a critical factor in the analysis of whether to appoint a receiver." SPA-27–28 (quoting *U.S. Bank Nat. Ass'n v. Nesbitt Bellevue Prop. LLC*, 866 F. Supp. 2d 247, 250 (S.D.N.Y. 2012)); *see also Am. Bd. of Trade, Inc.*, 645 F. Supp. at 1052 (observing that imminent danger is a critical factor because appointment of a receiver is an "extraordinary remedy to be invoked only in cases of necessity and *upon a clear showing that an emergency exists*") (citations omitted) (emphasis added). Such a requirement is consistent with this Court's holding that a receivership is "an extraordinary remedy, and . . . should be employed cautiously and granted only when clearly necessary to protect plaintiff's interests in the property." *Rosen*, 106 F.3d at 34 (internal quotation marks and citations omitted).

In finding "real and imminent harm" to GPB and its investors, however, the District Court relied on the following clearly erroneous factual findings: "(1) [the] appointment of new managers, whose collective compensation *could* reach over $1.2 million annually to be paid by GPB. . . . and (2) [Gentile's] attempt to reinstate three terminated executives of a company directly overseen by GPB, whose collective compensation amounts to nearly $1.7 million annually to be paid by

GPB." SPA-29 (emphasis added). These findings were clearly erroneous for at least three reasons.

First, it is undisputed that the Appointments and Amendments were ineffectual because GPB and the Monitor immediately rejected them outright. GPB and the Monitor did not recognize the appointment of any new managers, and GPB and the Monitor did not reinstate any terminated executives (or take any other action at the request of the proposed new managers). GPB and the Monitor also never paid any of the collective compensation amounts referenced by the District Court. To the contrary, less than 24 hours after receiving a letter from Gentile informing GPB of the Appointments and Amendments, GPB responded that "the Company (i) does not recognize [the new managers] as validly appointed managers and (ii) does not accept the amended and restated limited liability agreement as being validly adopted." Dkt. No. 168-3 at 2. Similarly, the Monitor later represented to the District Court that the "purported managerial appointments were never approved by the Monitor" and were not "deemed properly appointed under the Amended Monitor Order." Dkt. No. 114 at 4, 6. Thus, the District Court's finding

that the collective compensation of the new managers[16] and reinstated executives—none of whom were ever installed—posed an "imminent harm" to GPB is contradicted by GPB and the Monitor's own statements and representations.[17]   Moreover, in finding "imminent harm," the District Court ignored that the AMO requires the Monitor to oversee and police executive compensation, such that the Monitor could have simply

---

[16] Further contributing to the District Court's clearly erroneous factual findings is the District Court's disregard that (i) management compensation was on a sliding scale according to the number of hours worked each month and, to achieve $400,000 in annual compensation, a manager would have to work the maximum number of hours each month for the entire year—an unlikely feat, A-655 n.5; and (ii) even if the managers received $400,000 per year, this would still be less than GPB executives' past compensation.   For instance, in 2022, CEO Robert Chmiel earned $718,493; GC Mike Emmanuel made $975,000; and CFO Evan Cutler made $468,300.   Dkt. No. 168-9 at 142, 145.

[17] Moreover, had any payments to the appointed managers actually been paid (and, again, they were not), such payments would also have had to be approved by the Monitor, which lays bare that there never was any "imminent danger to the company or its assets."   And while the District Court found otherwise, the standard, as stated above, is whether there is *imminent* harm to the Company, not whether the SEC or GPB disagrees with Gentile's actions or could plausibly argue that his actions are not beneficial to the Company or its investors.   *See, e.g.*, *Wells Fargo Bank, Nat'l Ass'n as Tr. for Benefit of Registered Holders of UBS Com. Mortg. Tr. 2017-C2, Com. Mortg. Pass-Through Certificates, Series 2017-C2 v. 3708 Vestal Pkwy E., LLC*, No. 22-cv-4714 (ER), 2023 WL 4741216, at *5 (S.D.N.Y. July 25, 2023) (no imminent threat of harm where asset value had not diminished despite allegations of misappropriating rents and mismanagement of assets).

rejected the proposed compensation.  A-188–189.

Second, the District Court also ignored that GPB's substantial assets have not been impacted in any way by Gentile's actions and, in fact, have realized significant value when sold in the last two years. Specifically, the District Court dismissed Gentile's argument that the April 2023 Monitor Report reported various mergers & acquisitions and other transactions with realized values of 195%, 213%, and 134% as each of those transaction "pre-date Gentile's appointment of the new managers and amendment of the Operating Agreement."  SPA-29.  This finding misses the point.  The fact that these sales predate the Appointment and Amendments is irrelevant to the "imminent harm" analysis.  Instead, what matters is that the transaction took place with the Monitor's oversight and approval, and that significant realized values resulting from the sale of these assets continue to be supervised by the Monitor and remain unaffected by any action by Gentile.  Moreover, the Monitor's quarterly reports suggest that the Monitor has continued to transact additional sales (including as recently as January 2024) after the Appointments and Amendments, which further buttresses the conclusion that there was no "imminent harm" to GPB by Gentile's

actions. *Compare, e.g.*, A-811 (Q4 2022 GPB Monitor Report stating Armada Waste Management "[s]ale not complete"), *with* A-845 (Q1 2023 GPB Monitor Report stating Armada Waste Management "[r]ealized LP [p]roceeds in [m]onitorship to date" are $13 million).

Third, the passage of time alone—*approximately eighteen months* after the SEC filed its "emergency" motion for appointment of a receiver—without any harm belies the District Court's imminent-harm finding. Instead, in keeping with its public announcements over nearly the last two years, *see, e.g.*, A-783, A-817, A-851, A-885, GPB is and remains fully able (under the Monitor's oversight) to both distribute funds to investors—including over a billion dollars in cash equivalents— and operate the remaining portfolio companies. As district courts have found repeatedly as a matter of law, the fact that eighteen months have passed dictates that there should have been no finding of "imminent harm" by the District Court. *See In re Faiveley Transp. Malmo AB*, No. 08-cv-3330, 2009 WL 3270854, at *2 (S.D.N.Y. Oct. 7, 2009) (finding no "imminent harm" justifying a preliminary injunction where most recent harmful conduct occurred one year prior); *KF ex rel. CF v. Monroe Woodbury Cent. Sch. Dist.*, No. 12-cv-2200, 2012 WL 1521060, at *4

(S.D.N.Y. Apr. 30, 2012) (finding a nearly six month delay in bringing action for injunctive relief negated the existence of imminent harm).

B. <u>The District Court Erred in Finding the Alternative Legal Remedies Available in Lieu of Receivership Were Inadequate</u>.

The District Court found "that [alternative] legal remedies are inadequate," while at the same time conceding that it was "unclear" whether alternative legal remedies—like imposition of a financial penalty—exist.[18] SPA-29. This lack of clarity is fatal as a matter of law to the Orders. *See Gosman*, 2020 WL 8082390, at *2 (appointment of a receiver "justified ***only*** where there is a clear necessity to protect a party's interest in property, [and] legal and ***less drastic equitable remedies are inadequate***") (emphasis added); *Baliga v. Link Motion*

---

[18] The District Court also stated that it was "not persuaded" that a further AMO—as offered by Gentile—"explicitly defin[ing] the limits of Gentile's actions vis-à-vis GPB in his capacity as the owner and sole Member of GPB . . . [would] eliminat[e] any future action the SEC or Monitor may deem detrimental to GPB." Rather than articulate a non-perfunctory explanation for why further amending the AMO was inadequate, the District Court simply adopted a view that because Gentile allegedly did "it" once, he could try to do it again. This unsupported reasoning does not address the adequacy of amending the AMO to include additional, stricter controls, nor does it account for still other available, less drastic remedies. Nor does it account for the fact that the Monitor refused to approve the Appointment and Amendments, effectively stopping them in their tracks.

*Inc.*, No. 18-cv-11642, 2022 WL 2531535, at \*19 (S.D.N.Y. Mar. 9, 2022) (discharging receiver where plaintiff failed to show inadequacy of available legal remedies, finding plaintiff could not "meet his 'heavy' burden") (citations omitted), *report and recommendation adopted by* 2022 WL 3699339 (S.D.N.Y. Aug. 25, 2022); *Ferguson v. Birrell*, 190 F. Supp. 506, 511 (S.D.N.Y. 1960), *aff'd*, *sub nom. Ferguson v. Tabah*, 288 F.2d 665 (2d Cir. 1961) (reserving "decision on the request for the appointment of a receiver . . . to follow a less stringent course designed to preserve the status quo") (citations omitted).

C. <u>The District Court Erred by Considering Purported Concerns about Gentile's Credibility, Rather than Focusing on the Lack of Evidence of Fraudulent Conduct by Gentile.</u>

The District Court made no finding that Gentile had engaged in fraudulent conduct, the first Wright & Miller factor the Order discusses, SPA-25, which should have weighed heavily against ordering a receivership. Nevertheless, the District Court pointed to "significant concerns" regarding Gentile's credibility, SPA-27, which is not a substitute for a finding of fraudulent conduct under the Wright & Miller factors the District Court applied.

Moreover, the District Court's "concerns" merely arise from the

48

SEC's allegation that "[i]n his sworn testimony under oath before the [SEC] in February 2020, Gentile admitted that he knew that investor money was being used to pay distributions to investors, contrary to GPB's representations to investors." SPA-27. But the District Court made no finding of its own regarding the SEC's allegation, even if it raised concerns. And without full context, the SEC's allegation proves neither fraudulent conduct nor lack of credibility.

Nor could the District Court have found fraudulent conduct by Gentile. The actions relevant to this inquiry—the Appointments and Amendments—were not fraudulent and Gentile took them only after the Magistrate Judge expressly recognized that Gentile should seek relief under Delaware law. *See* Apr. 28, 2022 Order denying Motion to Request Mediation. Gentile believed in good faith that the Appointments and Amendments were consistent with and abided by corporate formalities, Delaware law, and the AMO, and he made known his plans to GPB, the District Court, the Monitor, the SEC, the Department of Justice, and GPB's investors by filing his proposed further amended monitor order in good faith with the District Court. *See* A-211, A-240, A-348, A-361, A-362.

Gentile's proposed further amended monitor order also requested that the District Court keep the Monitor in place with the full range of oversight authority already granted by the AMO. *See* A-211, A-240, A-348. Moreover, the managers appointed by Gentile—who took no action and collected no compensation—have since resigned. *See* Dkt. No. 168-7 (manager resignation letters); A-694 (GPB acknowledging that "the Gentile Managers were never recognized or compensated by the Company"). Accordingly, the District Court erred by failing to recognize that the lack of fraudulent conduct by Gentile militates against a receivership, and in treating purported concerns over Gentile's credibility arising from the SEC's allegations as relevant to the inquiry.

D. <u>The District Court Erred in Failing to Find that the Probability of Harm to Defendants-Appellants Outweighs Any Potential Harm to GPB and Its Investors.</u>

The District Court failed to conduct any review of the facts in balancing the probability of harm to Defendants-Appellants against that of GPB and its investors, merely stating that "*[Magistrate] Judge Scanlon found that*" GPB's investors will benefit from having a Receiver "preserve the status quo, conserve the existing estate, prevent the dissipation of assets, and protect the investors by preventing

50

Gentile . . . from undermining GPB's finances through improper access to funds and information." SPA-30 (emphasis added). The lack of such a finding cuts against the appointment of a receiver.

Moreover, as explained above, the Appointments and Amendments resulted in no harm to GPB. *See supra* Argument Section III.A. To the contrary, the current monitorship adequately preserves the status quo as the District Court intended when it appointed the Monitor in February 2021: GPB has continued to operate under the SEC-requested Monitorship and sell assets that have resulted in over $1 billion in cash equivalents that have been available for nearly two years under the purview of the Monitor and can be used to fund a reasonable distribution plan that appropriately accounts for GPB's other obligations.

The District Court, however, ignored entirely the various harms to *both* GPB and Defendants-Appellants that would result from the appointment of a receiver. As a threshold matter, the putative receiver's stated intention to liquidate GPB's assets would cause substantial harm to Gentile as GPB's owner—a fact the District Court ignored entirely. And it is contrary to the purpose of a receivership and disfavored by the Second Circuit. *See supra* Argument Section I.A.

Critically, the putative receiver's ability to waive privilege under the Orders, and refusal to require any procedure to preserve the privileges that are jointly held by Defendants (including Defendant GPB), are unlikely to benefit GPB or investors.[19]   Instead, waiver authority threatens great expense and burden to GPB.   Parsing out privileged documents and communications within the approximately sixteen million documents in the criminal and civil cases has been and will continue to be onerous, time consuming, and expensive for GPB and other parties, and appointing a receiver will likely only exacerbate these issues.  *See* A-667–668.

While the District Court held that "[t]o the extent the receiver seeks to waive privileged conversations of others, the receiver is required to

---

[19] The SEC proffered no reason for empowering a receiver to waive GPB's privileges, and the District Court made no finding of fact nor conclusion of law regarding any purported connection between the basis for the appointment of a receiver (*i.e.*, to protect investors and preserve GPB assets) and the need for a receiver to be empowered to waive GPB's privileges.  Instead, the District Court simply repeated the putative *powers* enumerated to the receiver in the Amended Proposed Order as a basis for why the receiver should have the authority to exercise such power. SPA-38–39.  This truism ignores the fact that waiver authority is unnecessary to preserve GPB assets, and, as explained below, instead threatens to (1) impose great expense, thereby actually reducing GPB's assets while also imposing a substantial burden on the District Court; and (2) imperil Gentile and Schneider's legal defenses.

'comply with applicable law in the exercise of such privileges or immunities,'" SPA-40 (quoting A-606), the District Court nevertheless ignored the complex task that will be required to comply with such applicable law given the long history of common interest privileges shared by certain third parties, including Defendants-Appellants, and GPB.[20] Yet, the District Court made no attempt to assess these costs and risks to GPB, let alone weigh them against the purported benefit of the receiver's ability to waive privilege in service of preserving assets.

Exacerbating these costs, as with any privilege waiver, a receiver would have to give reasonable notice to all privilege owners, *i.e.*, each individual Defendant-Appellant and others, and provide reasonable time for them to seek to protect their privileged materials. Given the large volume of documents, disputes would be unavoidable and would necessarily include a time-consuming and expensive *in camera* inspection or other processes involving the District Court. Thus,

---

[20] Indeed, there are a plethora of documents subject to joint defense privileges and/or a common-interest agreement between GPB and Ascendant Capital. *See* Dkt. No. 99-1, ¶¶ 3–6. Ascendant was a co-client with GPB of the law firm of Herrick Feinstein, *id.* ¶ 5 & n.1, and their coordination in furtherance of their common legal interests began at least as early as March 2018. *Id.* ¶ 4.

empowering a receiver to waive, assign, or release GPB's privileges is unnecessary, and the proposed unfettered power to waive such privileges risks costly, unintended consequences contrary to the putative reason for a receiver.

Putting aside the severe pecuniary harm to GPB, the possibility that the receiver could seek to waive GPB's, Gentile's, and Schneider's privileges would cause additional, significant harm to Gentile and Schneider. Indeed, disclosing their privileged information would improperly provide the SEC (and the DOJ) with a tactical advantage in this case and the companion criminal action, in which trial is mere months away. This would be an abuse of Gentile's and Schneider's fundamental rights to due process and fairness under the Constitution and, as explained above, it serves no purpose for furthering the preservation of GPB's assets.

Ultimately, the harm to both GPB on one hand, and Gentile and Schneider on the other hand, far outweighs the speculative harm to the investors while GPB's assets remain under continued monitorship, and all while GPB has consistently pronounced its readiness to make distributions to investors. Thus, this factor weighed against the

receivership—not in favor of it.

E.  This Case Does Not Present "Extreme Circumstances" Warranting Appointment of a Receiver.

The District Court found this case to be one of "extreme circumstances" warranting appointment of a receiver. SPA-32. The District Court specifically pointed to "the gravity of the allegations and that one of the Individual Defendants [not a party to this appeal] has already pled guilty to criminal charges, that GPB's investors have been unable to access their funds for more than thirty-four months, and that GPB's management and Gentile have proven unable to agree or work together to implement GPB's future strategy." SPA-31. For all the reasons described above, these erroneous factual findings cannot sustain the appointment of a receiver as a matter of law. Indeed, as recognized by the District Court and discussed above, *supra* Argument Section I.B, an indictment alone is not proof of guilt. SPA-30. Nor can a co-defendant's guilty be proof of Defendants' guilt—especially so when that co-defendant (again, not a party to this appeal) was neither the sole owner nor Member of GPB.

Nor do these erroneous factual findings constitute "extreme circumstances" as demonstrated by comparison with other cases in this

circuit. *See e.g.*, *Ianniello*, 1986 WL 4685, at *5 (declining to "appoint[] a receiver . . . on the basis of inference of continued wrongdoing alone[]" where underlying indictment had resulted in a conviction); *3708 Vestal Pkwy*, 2023 WL 4741216, at *5 (no imminent threat of harm where— despite allegations of misappropriating rents and/or mismanagement of assets—the value of the asset at issue had not diminished); *Gosman*, 2020 WL 8082390, at *3 (denying receivership motion where movant had not "submitted any reliable documentation regarding the amount by which [the nonmovant] ha[d] allegedly diminished the value of the [p]roperty."); *S.E.C. v. H. S. Simmons & Co.*, 190 F.Supp. 432, 432 (S.D.N.Y. 1961) (appointment of receiver appropriate because corporate defendant was insolvent and continued to engage in unauthorized use and sale of customers' securities); *cf. Ferguson*, 288 F.2d at 674-75 (appointing receiver where, unlike here, extreme circumstance included (1) "arrest of virtually all high [company] officials" on fraud allegations, (2) fugitive former director and chairman's continued influence over the company absent a receiver; and (3) adverse impacts on the company's credit position).

Furthermore, the District Court made the clearly incorrect factual

finding that investors have been "unable to access their funds" because of the Appointments and Amendments, which is untrue. That investors have not had access to their funds is wholly unrelated to Gentile or his actions. The Monitor is currently empowered (and has been since February 2021) to propose or approve a distribution plan proposed by GPB and protected under the AMO; GPB has repeatedly announced its intention to make investor distributions; and Defendants-Appellants have repeatedly stated their support for an appropriate distribution plan. *See, e.g.*, A-520, A-733–737. That GPB has yet to make distributions in the more than three years that a Monitor has been in place is not the result of Gentile's conduct.

Simply put, the record is devoid of the "extreme" circumstances that warrant the appointment of a receiver. *Ferguson*, 288 F.2d at 674-75.

## IV. The District Court Erred in Concluding that a Purported Violation of the Amended Monitor Order Justifies the Appointment of a Receiver.

The District Court also erred in concluding that Gentile caused GPB to violate the AMO, and that GPB failed to cure the purported breach. As a mixed question of law and fact, the Court reviews this issue *de novo*, *see Roberts*, 542 F.3d at 367, but the District Court's conclusions

57

fail even under a clearly erroneous standard of review.

A. <u>The District Court Erred in Concluding That a Purported Violation of the Monitor Order Warranted the Appointment of a Receiver</u>.

The District Court incorrectly reasoned that, "[b]ecause of GPB's violations [of the AMO] and failure to cure, the [District] Court has authority to convert the monitorship to a receivership pursuant to paragraph 21 of the [AMO]." SPA-22. Paragraphs 20 and 21 of the AMO provide:

> If the *Monitor believes* GPB is in some way not materially in compliance with the terms of this Order, upon notice of noncompliance to GPB, GPB shall have 10 business days in which to cure any claimed material noncompliance . . . If GPB does not comply with the above provisions and does not make requested changes within the Cure Period, upon motion of the SEC resulting in a Court Order, the Monitorship shall convert to a receivership.

A-193 (emphasis added).

Even if Gentile's actions caused a violation (which, as explained below, they did not), that alone cannot justify the appointment of a receiver as a matter of law. The conversion to a receivership provided for in paragraphs 20 and 21 rests solely upon the Monitor's subjective "belief" of GPB's noncompliance with the AMO. But the District Court cannot ignore binding precedent governing the standards for

appointment of a receiver, *e.g.*, *supra* Argument Sections I-II, by simply relying on an order empowering the Monitor to unilaterally conclude there was a violation and accepting that conclusion to automatically trigger a receivership. In so ordering the appointment of a receiver here, the District Court acted contrary to established precedent requiring a substantial and clear likelihood of success. *See Unifund*, 910 F.2d at 1039; *Golden Feather*, 597 F.3d at 121.

B. The District Court Erred in Concluding that Gentile Caused GPB to Violate the Amended Monitor Order.

The District Court also erred in concluding that a receiver was appropriate because "Gentile's actions caused GPB to violate the Amended [Monitor] Order when he appointed the new managers, instructed GPB's CEO to recognize and work with the managers, and the new managers modified the Operating Agreement, all without the approval of the Monitor." SPA-20.

Gentile sought the Appointments and Amendments because he had a good faith belief in his right under Delaware law to do so. Gentile initially sought Court-supervised mediation under the AMO with the Monitor in September 2021 to reach consensus regarding the scope of his rights as a Member of GPB under the Operating Agreement and

Delaware law. Dkt. Nos. 51, 56. The Magistrate Judge denied this motion and instructed Gentile to seek relief under Delaware law. *See* April 28, 2022 Order. This is exactly what he did. After consulting with counsel, Gentile provided written notice to GPB and its acting CEO, as required by the Operating Agreement. Dkt. No. 168-10. Within days of such notice, Gentile also publicly filed his Rule 60 Motion, which informed the District Court of the Appointments and Amendments and sought to continue the Monitorship under a further amended monitor order. *See* A-211.

When Mr. Gentile submitted his opposition to the SEC's receivership motion, he also submitted the expert opinion of retired Delaware Supreme Court Justice Jack Jacobs, who fully supported Mr. Gentile's view that, as a Member of the Company, Gentile was authorized under Delaware law to make the Appointments and Amendments. *See* A-367, A-370–371. Each one of these actions was done in plain view of the Monitor, the SEC, the Department of Justice, GPB, its investors, and the District Court through a public proceeding based upon Gentile's reasonable interpretation of his authority to make the Appointments and

60

Amendments to make the Appointments and Amendments under GPB's Operating Agreement, Delaware law, and the AMO.

Rather than usurp the Monitor's function, Gentile notified the Monitor of the Appointment and Amendments despite his good faith belief that he was not required to seek prior approval. The Monitor, in turn, exercised his core authority to review and reject "any material change to compensation of any executive officer, affiliate, or related party of GPB" under the AMO. A-188–189.

As the District Court recognized, the role of the Monitor in this scenario was to exercise its authority to "review, approve, or disapprove GPB's retention of any 'management-level professional,'" SPA-19, including the three managers Gentile appointed, if the Monitor believed them to be within the purview of the definition of "management-level professional" (which he did). The AMO *does not* prevent or otherwise limit Gentile from making such appointments—it simply gives the Monitor authority to approve or disapprove individuals "bearing operational responsibilities." SPA-14–15.

The District Court held that "[t]he issue is whether any such appointed managers may be retained by GPB without the Monitor's

approval." SPA-19. This overlooks the critical fact that *no such appointed managers were ever retained by GPB*. Instead, the Monitor, pursuant to his authority, rejected the Appointments and Amendments and, for its part, GPB immediately refused to recognize the Appointments and Amendments. Contrary to what the District Court found, the new managers did not "immediately exercise[] their managerial powers . . . all without the Monitor's approval," SPA-20, but instead their appointments made under and any amendments to the Operating Agreement were swiftly rejected by the Monitor and GPB. Thus, Gentile's actions—taken pursuant to his understanding of GPB's Operating Agreement, Delaware law, and the AMO—did not cause GPB to violate the AMO because no such approval by the Monitor was given and GPB did not implement the Appointments and Amendments.

Thus, no violation of the AMO occurred, and the District Court erred in concluding otherwise.

C. <u>The District Court Erred in Concluding that GPB Failed to Cure the Purported Violation of the Amended Monitor Order</u>.

The District Court incorrectly found that "Gentile's actions caused GPB to violate the Amended [Monitor] Order . . . .[and] there was no dispute that Gentile did not take any curative action within ten days of

notification of the violations, although Gentile 'alone was able to do so.'" SPA-21–22. These conclusions are flawed for at least two reasons.

First, the District Court's assumption that only Gentile could cure the purported violation is contradicted by the District Court's own findings and the Monitor's notification to GPB.[21] It was (and still is) internally inconsistent to conclude that, on the one hand, only GPB could violate the AMO given that Gentile is not a party to it, yet on the other hand, only Gentile could somehow cure GPB's violation. Moreover, the District Court expressly found that GPB had authority to convert the monitorship to a receivership "[b]ecause of GPB's violations *and failure to cure.*" SPA-22 (emphasis added). The logic of the District Court's

---

[21] To the extent the District Court is correct that only Gentile could cure the violation caused by the Appointments and Amendments, Gentile did so as soon as the Magistrate Judge issued the Report & Recommendation by withdrawing the Appointments and Amendments. While the District Court criticized these withdrawals as "underminin[g]" Gentile's argument that only GPB could cure its own purported violation, SPA-21 n.14, this was Gentile's first notice that the lower court considered him in violation of the AMO and his first opportunity to bring himself into compliance, which he did. Indeed, prior to the Report & Recommendation, Gentile only knew that *the SEC and the Monitor* considered his actions to be a violation of the AMO, which was why the Monitor and GPB rejected them outright. Ultimately, however, the withdrawals do not change the incontestable fact that nothing happened as a result of the Appointments and Amendments because they were rejected outright by GPB and the Monitor.

findings aside, the Monitor's notice to GPB of the purported violation mentioned nothing of Gentile and, instead, expressly stated "that *the Company has ten (10) business days in which to cure* the Material Non-Compliance, and if such cure does not occur within such period, the remedies described in Section 21 of the [AMO] may be invoked with immediate effect." A-731–732 (emphasis added).

Second, even if Gentile somehow caused GPB to violate the AMO (which he did not), GPB promptly cured that violation by its immediate rejection of the Appointment and Amendments. As explained above, GPB responded to notification of the Appointment and Amendments that "the Company (i) does not recognize [the new managers] as validly appointed managers and (ii) does not accept the amended and restated limited liability agreement as being validly adopted." Dkt. No. 168-3 at 2. If this outright refusal to recognize the Appointment and Amendment was not a prophylactic measure by GPB against any actual violation of the AMO, then it certainly was the cure. Moreover, the Monitor's own statements in support of the SEC's Motion that his "experiences" with GPB's and Highline's management "to date have been constructive and collaborative" belies his claim that GPB breached and failed to cure. A-

64

432.

In sum, the record evidence clearly demonstrates that even if the Appointments and Amendments caused a violation of the AMO, GPB immediately cured the purported violation (well within the ten-day cure period), and the Appointments and Amendments caused no harm to GPB assets or investors. Accordingly, the District Court's conclusions concerning the failure to cure the purported violation of the AMO caused by the Appointment and Amendments were clearly erroneous.

## CONCLUSION

The District Court failed to apply the proper standard of proof that requires the SEC to make a clear and substantial showing of a likelihood of success on the merits and risk of recurrence before imposing the drastic remedy of a receivership. The District Court also erred and failed to follow binding precedent when it imposed a receivership despite the undisputed evidence that there was no danger to or dissipation of GPB's assets. To the contrary, GPB continues to maintain significant assets—well in excess of $1 billion—that are under the purview of the Monitor. For all the reasons described above, this Court should reverse the Orders

of the District Court and remand the case with directions to deny the SEC's Motion.

Dated: February 16, 2024

Respectfully submitted,

**KOBRE & KIM LLP**

/s/ *Adriana Riviere-Badell*
Adriana Riviere-Badell
Matthew I. Menchel
201 South Biscayne Boulevard
Suite 1900
Miami, FL 33131
Tel.: (305) 967-6100
Fax: (305) 967-6120
Adriana.Riviere-
Badell@kobrekim.com
Matthew.Menchel@kobrekim.com

**MCLAUGHLIN & STERN, LLP**

/s/ *Daniel J. Horwitz*
Daniel J. Horwitz
Jonathan R. Jeremias
260 Madison Avenue
New York, New York 10016
Tel.: (212) 448-1100
Fax: (212) 448-0066
DHorwitz@ mclaughlinstern.com
JJeremias@mclaughlinstern.com

*Attorneys for Defendant-Appellant David Gentile*

**ARENTFOX SCHIFF LLP**
/s/ *Michael Dearington*
Michael Dearington
1717 K Street NW
Washington, D.C. 20006-5344
Tel.: (202) 857-6000
Fax: (202) 857-6395
Michael.Dearington@afslaw.com

**ARENTFOX SCHIFF LLP**
/s/ *Glenn C. Colton*
Glenn C. Colton
1301 Avenue of the Americas, 42nd
Floor
New York, NY 10019
Tel.: (212) 484-3900
Fax: (212) 484-3990
Glenn.Colton@afslaw.com

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32 of the Federal Rules of Appellate Procedure, Daniel J. Horwitz, a partner at McLaughlin & Stern LLP, hereby certifies that according to the word count feature of the word processing program used to prepare this document, the document contains 13,910 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(6).

<u>/s/ *Daniel J. Horwitz*</u>
Daniel J. Horwitz

# SPECIAL APPENDIX

i

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

| | Page |
|---|---|
| Memorandum & Order, dated December 7, 2023 .... | SPA-1 |
| Order Appointing Receiver and Imposing Litigation Injunction, dated December 7, 2023 ..................... | SPA-42 |

SPA-1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------
SECURITIES AND EXCHANGE COMMISSION,

                        Plaintiff,

                v.

GPB CAPITAL HOLDINGS, LLC, ASCENDANT
CAPITAL, LLC, ASCENDANT ALTERNATIVE
STRATEGIES, LLC, DAVID GENTILE, JEFFRY
SCHNEIDER, and JEFFREY LASH,

                        Defendants.

---------------------------------------------------------------

**MEMORANDUM & ORDER**
21-CV-583 (MKB) (VMS)

MARGO K. BRODIE, United States District Judge:

       Plaintiff Securities and Exchange Commission (the "SEC") commenced the above-captioned action on February 4, 2021, against Defendants GPB Capital Holdings, LLC ("GPB"), Ascendant Capital, LLC ("Ascendant Capital"), Ascendant Alternative Strategies, LLC ("Ascendant Strategies"), David Gentile, Jeffry Schneider, and Jeffrey Lash (the "Individual Defendants").  (*See* Compl., Docket Entry No. 1.)  The SEC alleged claims (1) against GPB, Ascendant Capital, Ascendant Strategies, Gentile, and Schneider for violations of the Securities Act, 15 U.S.C. § 77q(a); (2) against Gentile, Schneider, and Lash for aiding and abetting violations of the Securities Act, 15 U.S.C. § 77q(a) as controlling persons pursuant to 15 U.S.C. § 77o(b); (3) against GPB, Ascendant Capital, Ascendant Strategies, Gentile, and Schneider for violations of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5; (4) against Gentile, Schneider, and Lash for aiding and abetting violations of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5 pursuant to 15 U.S.C. § 78t(e); (5) against GPB and Gentile for violations of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2); (6) against Gentile for aiding and abetting

violations of the Advisers Act, 15 U.S.C. §§ 80b-6(1) and 80b-6(2) pursuant to 15 U.S.C. §§ 80b-9(d) and 80b-9(f); and (7) against GPB for violations of the Advisers Act, 15 U.S.C. § 80b-6(4) and 17 C.F.R. § 275.206(4)-2, 15 U.S.C. § 80b-6(4) and 17 C.F.R. § 275.206(4)-7, 15 U.S.C. § 78l(g), and 15 U.S.C. § 78u-6 and 17 C.F.R. § 240.21F-17(a).[1]  (*See id.*)

On February 12, 2021, the Court appointed a monitor, Joseph T. Gardemal III (the "Monitor"), to oversee GPB, (Order Appointing Monitor (the "Order"), Docket Entry No. 23), and on April 14, 2021, on consent of the SEC and GPB, the Court amended the Order (the "Amended Order"), (Am. Order, Docket Entry No. 39).  On May 31, 2022, Gentile moved for relief from the Amended Order, and on June 13, 2022, the SEC cross-moved to convert the monitorship into a receivership and impose a litigation injunction.

Currently before the Court is a report and recommendation dated July 28, 2023, from Magistrate Judge Vera M. Scanlon recommending that the Court (1) grant the SEC's application to convert the monitorship into a receivership and impose a litigation injunction, and (2) deny Gentile's motion as moot (the "R&R").  (R&R 33, Docket Entry No. 157.)  On September 8, 2023, Schneider and Ascendant Capital filed an objection to the R&R, and Gentile filed a separate objection.  On September 22, 2023, the SEC and GPB filed responses in support of the R&R, and on September 29, 2023, Gentile, Schneider, and Ascendant Capital filed replies.

For the reasons discussed below, the Court grants the SEC's motion, adopts the Amended Proposed Order, and denies Gentile's motion as moot.

---

[1]  The SEC alleged that Defendants perpetrated a fraudulent scheme in which they used investor funds to satisfy an annualized 8% distribution to investors, while representing to the investors that the distributions represented profits from the companies GPB invested in; failed to deliver audited financial statements; failed to register two funds with the SEC; impeded former employees from communicating with the SEC; and retaliated against a whistleblower.  (*See* Compl. ¶¶ 1–7.)

SPA-3

## I. Background

### a. Factual and procedural background

GPB is a Delaware limited liability company with a principal place of business in New York, New York, which holds approximately $238,637,198 in assets under management. (Compl. ¶ 21.)  Ascendant Strategies is a Delaware limited liability company with a principal place of business in New York, New York, and since March of 2017, "offers and sales of the interests in GPB Capital limited partnership funds have been sourced through [Ascendant Strategies]."  (*Id.* ¶ 23.)  Ascendant Capital is a Delaware limited liability company with a principal place of business in West Lake Hills, Texas, and serves as the placement agent for GPB.  (*Id.* ¶ 22.)  Ascendant Capital is a branch office of Ascendant Strategies.  (*Id.* ¶ 23.) Gentile is the founder, owner, and former CEO of GPB.[2]  (*Id.* ¶ 24.)  Schneider is a minority owner of Ascendant Strategies and the sole owner and CEO of Ascendant Capital.  (*Id.* ¶ 25.) Lash served as managing partner of GPB from 2013 to early 2018 and was responsible for formulating GPB's automotive retail strategy.  (*Id.* ¶ 26.)

The SEC alleged in the Complaint that between April of 2014 and December of 2018, GPB served as the general partner and/or fund manager in five limited partnership funds: Automotive Portfolio, Holdings I, Holdings II, Waste Management, and Cold Storage (the "Funds").  (*Id.* ¶ 29.)  GPB marketed its investments exclusively through Ascendant Capital, and Ascendant Strategies promoted the investments to dozens of broker-dealers nationwide.  (*Id.* ¶ 31.)  Investors in the Funds paid significant fees and expenses, including $79 million in

---

[2] On February 5, 2021, Gentile resigned as CEO and sole manager of GPB and appointed Rob Chmiel as interim CEO and sole manager.  (Decl. of Joseph T. Gardemal III ("Gardemal Decl.") ¶ 10, Docket Entry No. 90.)  On July 1, 2021, GPB officially named Chmiel as CEO. (*Id.*)

management fees to GPB, $26 million in acquisition fees to Ascendant Strategies and another broker-dealer, and $187 million in selling fees to Ascendant Capital and other broker-dealers. (*Id.* ¶ 33.)  To attract investors, GPB promised an 8% per annum distribution as well as additional "special distributions."  (*Id.* ¶¶ 34–35.)  GPB represented that the source of the distributions would be profits from operations of the Funds' portfolio companies.  (*Id.* ¶ 36.) Starting "as early as August 2015," instead of paying distributions based on operations of the portfolio companies, GPB used investor funds to cover the shortfall between the profits from operations of the Funds' portfolio companies and the amounts needed for the distribution payments.  (*Id.* ¶¶ 41–42.)  The Individual Defendants[3] "manipulated certain of the Funds' financial statements to give the false appearance that the income [was being] earned by the Funds" rather than inform investors that the Funds were not performing as projected.  (*Id.* ¶ 49.)

---

[3] On February 4, 2021, Gentile, Schneider, and Lash were publicly charged in a criminal action in the Eastern District of New York (the "Criminal Action").  *See* Indictment, *United States v. Gentile*, No. 21-CR-54 (E.D.N.Y. Feb. 4, 2021).  The indictment alleges, among other things, that Gentile, Schneider, and Lash "together with others, engaged in a scheme to defraud investors and prospective investors" relating to GPB and its Funds.  *See id.*  On July 26, 2023, Lash pleaded guilty to one count of wire fraud.  *See* Order Accepting Guilty Plea, *United States v. Gentile*, No. 21-CR-54 (E.D.N.Y. July 26, 2023).  Gentile and Schneider are scheduled to proceed to trial on June 3, 2024.  *See* Minute Entry, *United States v. Gentile*, No. 21-CR-54 (E.D.N.Y. Apr. 17, 2023).  On November 9, 2021, Schneider filed an action in Delaware Chancery Court against GPB and related entities, seeking advancement of legal expenses for the various actions pending against himself, including the criminal prosecution in the Eastern District of New York (the "Delaware Action").  (*See* Schneider & Ascendant Capital's Objs. to the R&R ("Schneider's Objs.") 4, Docket Entry No. 167.)  The Delaware Action resulted in an order granting summary judgment, (*see* Final Order Granting Summ. J., annexed to Decl. of Glenn C. Colton ("Colton Decl.") as Ex. A, Docket Entry No. 167-2), and two orders regarding advancement, one of which sets forth specific procedures for the evaluation and then advancement of attorneys' fees and other expenses (the "*Fitracks* Order").  (*See* Schneider's Objs. 4; *Fitracks* Order, annexed to the Colton Decl. as Ex. B, Docket Entry No. 167-3; Judicial Action Form, annexed to the Colton Decl. as Ex. C, Docket Entry No. 167-4.)  On December 20, 2021, Gentile filed a similar action in Delaware Chancery Court, which granted a similar advancement order.  (*See* Stipulation and Advancement Order, annexed to the Decl. of Jonathan R. Jeremias ("Jeremias Decl.") as Ex. 10, Docket Entry No. 168-11.)

SPA-5

In addition, Gentile and Schneider engaged in conflicted transactions, including overpaying for acquisitions to inflate their own acquisition fees and otherwise inflating their own compensation without disclosing these conflicted transactions to investors.  (*Id.* ¶¶ 71–73, 74.)  Finally, the SEC alleged that GPB failed to comply with the applicable regulatory requirements, including by failing to deliver audited financial statements, (*id.* ¶¶ 77–81), failing to register certain of its Funds, (*id.* ¶¶ 82–83), requiring employees to sign termination agreements that restricted their ability to report misconduct at GPB, (*id.* ¶¶ 84–91), and retaliating against whistleblowers, (*id.* ¶¶ 92–111).

On February 12, 2021, the Court appointed the Monitor, and on April 14, 2021, amended the Order.  (*See* Order; Am. Order.)  On May 31, 2022, Gentile moved for relief from the Amended Order, arguing that the Monitor had completed his work and therefore the scope of his duties should be narrowed.[4]  (*See* Gentile's Relief Mem. 6, 25.)  In support of his motion, Gentile argued that GPB, its interim management, and the Monitor had "steadfastly blocked" his repeated efforts to assist the company and benefit its investors.  (*Id.* at 16.)  He contends that he saw "no other option . . . [than] to appoint new managers" in order to "carry out GPB's business plan, instead of merely liquidating assets."  (*Id.* at 24.)

On June 13, 2022, the SEC moved for an order to show cause why the monitorship should not be converted into a receivership.[5]  (SEC's Mot.)  The SEC alleged that on or about

---

[4] (Gentile's Not. of Mot. for Relief ("Gentile's Relief Mot."), Docket Entry No. 79; Gentile's Mem. in Supp. of Gentile's Relief Mot. ("Gentile's Relief Mem."), Docket Entry No. 80.)

[5] (SEC's Mot. for an Order to Show Cause ("SEC's Mot."), Docket Entry No. 88; SEC's Mem. in Supp. of SEC's Mot. ("SEC's Mem."), Docket Entry No. 89; Gentile's Mem. in Opp'n to SEC's Mot. ("Gentile's Opp'n"), Docket Entry No. 102; SEC's Reply in Supp. of SEC's Mot. ("SEC's Reply"), Docket Entry No. 103.)

SPA-6

May 27, 2022, Gentile advised GPB's CEO and sole manager, Rob Chmiel, that he had appointed three new managers. (SEC's Mem. 5.) Gentile directed GPB's CEO to cooperate with his newly-installed managers and "seek consensus" with them regarding GPB's future course. (*Id.* at 5.) In addition, the SEC alleged that Gentile and the new managers modified GPB's Operating Agreement[6] so that it provided (1) Gentile and the new managers expanded information rights, (2) compensation packages for the new managers of up to $400,000 per year, (3) Gentile with the ability to unilaterally amend the Operating Agreement, (4) mandatory tax distributions to Gentile, (5) exclusive jurisdiction to the Delaware Chancery Court for all actions related to the Operating Agreement, and (6) advancement of expenses. (*Id.* at 5; *see also* Gardemal Decl. ¶ 21.) The SEC argued that Gentile's "distortion of the factual record" in an effort to gain control of GPB "require[d] that a receiver be appointed to take exclusive managerial control over [GPB] and the GPB Funds . . . for the benefit of investors." (SEC's Mem. 7.) The SEC also argued that Gentile's actions constituted a breach of the Amended Order and a separate basis for converting the monitorship to a receivership. (*See id.* at 5 n.6; SEC's June 2, 2022 Letter 1–2, Docket Entry No. 85.) In addition to its motion, the SEC filed a proposed order that detailed its proposed terms of the receivership (the "Proposed Order"). (*See* Proposed Order, annexed to the Decl. of Neal Jacobson as Ex. 1, Docket Entry No. 91-1.)

By report and recommendation dated July 28, 2023, Judge Scanlon recommended that the Court (1) grant the SEC's application to convert the monitorship into a receivership and impose a litigation injunction, and (2) deny Gentile's motion as moot. (R&R 33.) Judge Scanlon also directed the SEC to submit a revised order that included certain minor revisions and

---

[6] (Limited Liability Company Agreement of GPB Capital Holdings, LLC ("Operating Agreement"), annexed to the Decl. of David Gentile as Ex. A, Docket Entry No. 82-1.)

clarifications, which the SEC filed on August 2, 2023 (the "Amended Proposed Order"). (*See* R&R 30; Am. Proposed Order, annexed to the SEC's Aug. 2, 2023 Letter, Docket Entry No. 161-2.)

On September 8, 2023, Schneider and Ascendant Capital filed an objection to the R&R, and Gentile filed a separate objection (collectively, the "Objectors"). (*See* Schneider's Objs.; Gentile's Objs. to the R&R ("Gentile's Objs."), Docket Entry No. 168.) On September 22, 2023, the SEC and GPB filed responses urging the Court to adopt the R&R.[7] (*See* SEC's Resp. 18; GPB's Resp. 23.) On September 29, 2023, Gentile, Schneider, and Ascendant Capital filed replies.[8] (*See* Gentile's Reply; Schneider's Reply.)

**b.  The R&R**

Judge Scanlon recommended that the Court grant the SEC's motion to convert the monitorship to a receivership and impose a litigation injunction, subject to certain clarifications and amendments,[9] and deny as moot Gentile's motion for relief from the Amended Order. (R&R 33.)

---

[7] (SEC's Resp. to Defs.' Objs. ("SEC's Resp."), Docket Entry No. 170; GPB's Resp. to Defs.' Objs. ("GPB's Resp."), Docket Entry No. 171.)

[8] (Gentile's Reply in Supp. of Objs. to the R&R ("Gentile's Reply"), Docket Entry No. 175; Schneider & Ascendant Capital's Reply in Supp. of Objs. to the R&R ("Schneider's Reply"), Docket Entry No. 176.)

[9] Judge Scanlon also recommended that the SEC provide clarification regarding "the relationships among the proposed receivership entities, particularly as to the 'GPB Funds,'" due to inconsistency in the Proposed Order as to whether there are eight or ten receivership entities, and "[i]f an amendment to the Proposed Order is needed, [the SEC] should submit the proposed revised text." (R&R 4 n.3.) In addition, Judge Scanlon recommended that the Proposed Order be amended to add the final sentence: "Any person or entity may seek leave of this Court to proceed against the Receiver, in such capacity; the Retained Personnel, in such capacity; the Ordinary Course Professionals, in such capacity; the Receivership Estate; the Receivership Entities; and the Receivership Assets." (R&R 33.) On August 2, 2023, the SEC filed a letter

Judge Scanlon found that by (1) appointing three new managers to direct GPB and thus expanding the number of managers from one to four, (2) amending the Operating Agreement of the company to provide new compensation for non-employee managers, and (3) failing to take curative action when notified that he had violated the terms of the Amended Order, Gentile caused GPB to breach the terms of the Amended Order. (*Id.* at 13–14.) She found that under the terms of the Amended Order, a breach "authorizes the Court to convert the monitorship to a receivership." (*Id.* at 20.) Judge Scanlon then considered whether "recent events require the additional step of converting the monitorship to a receivership," (*id.* at 23), and concluded that Gentile's actions had caused "a fracture in GPB's leadership that is irremediable without [c]ourt intervention," (*id.* at 26). She noted that "[o]n one hand, GPB, under the purview of the Monitor, has been working to address the state in which Mr. Gentile left it and move forward in a manner that is productive to its investors," while "[o]n the other hand, GPB is in the precarious position of operating with three new 'purported' managers and a 'purportedly' amended [Operating] Agreement, both of which may actively undermine the aforementioned efforts." (*Id.* at 26.) She concluded that "[t]he uncertainty of GPB's position is creating significant consequences, which are damaging its financial health and, by extension, the finances of its investors" and therefore recommended that the Court convert the monitorship into a receivership. (*Id.* at 33.)

In addressing the litigation injunction, Judge Scanlon concluded that it was "warranted in this case." (*Id.* at 29.) She found *SEC v. Wencke*, 622 F.2d 1363, 1371, 1373 (9th Cir. 1980), and *Liberte Cap. Grp. v. Capwill*, 462 F.3d 543, 551–52 (6th Cir. 2006) "persuasive" as applied to the facts of this case given that "GPB and its [F]unds face a number of complicated litigations

_____

providing such clarification and submitted an amended proposed order. (SEC's Aug. 2, 2023 Letter, Docket Entry No. 161; Am. Proposed Order.)

that threaten to delay distributions to investors."  (*Id.* at 30.)  Judge Scanlon determined that a

litigation injunction "is necessary to centralize all claims to the assets before this Court" and

"prevent potentially disparate actions in different courts that could affect the receivership assets

subject to this Court's jurisdiction and control." (*Id.* (quoting SEC's Mem. 13).)

   **c.   Objections to the R&R**

   Gentile objects to the R&R on the grounds that (1) the legal standard for appointing a

receiver sets an "[e]xtremely [h]igh [b]ar" which has not been met by the circumstances of this

case, (Gentile's Objs. 5–20; *see also* Gentile's Reply 5–8); (2) the litigation injunction would

"run afoul" of rulings made in the Delaware Action and impose an "extreme burden" on the

Court, (Gentile's Objs. 23–24; *see also* Gentile's Reply 10–11); and (3) the receiver should not

be empowered to waive privilege, (Gentile's Objs. 24–25.)  In support of his argument that the

legal standard for appointing a receiver has not been met in this case, Gentile argues that (1) his

actions did not cause an "imminent danger" to GPB or its assets, (Gentile's Objs. 7–9; *see also*

Gentile's Reply 6–8); (2) the conversion of the monitorship to a receivership "[t]hreatens to

[d]isrupt the [s]tatus [q]uo" and will not conserve GPB's assets, (Gentile's Objs. 9–11); (3) the

appointment of a receiver is not necessary to protect GPB's investors' interests and is an

improper remedy to reach a distribution plan, (*id.* at 11–15); (4) there are less drastic alternative

remedies available, (*id.* at 15–16); (5) Judge Scanlon did not properly analyze the likelihood of

success on the merits and did not identify any allegedly fraudulent conduct by Gentile, (*id.* at

16–20); and (6) the probability of harm to Gentile outweighs the harm to GPB and its investors,

(*id.* at 20–21).

   Schneider and Ascendant Capital raise the same objections as Gentile with respect to

whether the facts of this case warrant converting the monitorship into a receivership under the

applicable legal standard.  (Schneider's Objs. 9–18.)  Schneider and Ascendant Capital also argue that the Court lacks subject matter jurisdiction to impose a receivership over property that is not the subject of the Complaint.  (*Id.* at 19–21.)  Finally, Schneider and Ascendant Capital argue in the alternative that if the Court converts the monitorship into a receivership, the Court should hold an evidentiary hearing to determine whether the SEC has met its burden and should not empower the receiver to waive privilege.  (*Id.* at 21–25; *see also* Schneider's Reply 7–8.)

In opposing Gentile's objections, the SEC argues that they "are contradicted by the record," (SEC's Resp. 3; *see also* GPB's Resp. 3–10), a record that supports Judge Scanlon's recommendation that "appointment of a receiver is the appropriate remedy for Gentile's violations of the Amended Order," and her independent recommendation that "appointment of a receiver and the imposition of a litigation injunction is warranted here to remedy violations of the federal securities laws," (SEC's Resp. 4–18.  The SEC also argues that, as Judge Scanlon noted regarding Gentile's violations of the Amended Order, "[i]t is not clear that Gentile or Schneider even have standing to object to the appointment of a receiver as a remedy for violations of the Amended Order."  (*Id.* at 2 n.3.)  In addition, the SEC argues that Schneider's jurisdictional argument is without merit because "the SEC clarified that all of the entities that would be subject to the receivership are GPB itself, are affiliates of or are controlled by GPB, and thus are the proper subject of the receivership."  (*Id.* at 16.)  GPB raises many of the same arguments as the SEC and also argues that Judge Scanlon did not err by recommending a receivership without holding an evidentiary hearing.  (*See* GPB's Resp. 11–22.)

In response to the SEC's and GPB's submissions, Gentile reiterates many of his original objections, including that "the SEC has failed to meet its high burden of showing that appoint[ment] of a receivership is warranted," (Gentile's Reply 5–6), there was no threat of

imminent financial harm to GPB because of Gentile's appointment of managers, (*id.* at 6–7), and appointment of a receiver and an imposition of a litigation injunction would be "an extraordinary imposition on this Court's time and resources," (*id.* at 10).  In addition, Gentile argues that there is no basis for the assertions by the SEC and GPB that Gentile's actions "(i) disrupted the operations of GPB and its ability to begin the distribution process by causing 'uncertainty in [its] corporate authority,' or (ii) caused the expenditure of 'substantial resources to determine which actions could be taken with or without manager authority,'" (*id.* at 7 (quoting SEC's Resp. 3); *see also* GPB's Resp. 6, 8–9, 13–16), and that appointment of a receiver cannot be "predicated on a belief that . . . Gentile may act similarly in the future if one is not appointed," (Gentile's Reply 8–10).  Schneider and Ascendant Capital similarly reiterate their original objections.  (*See* Schneider's Reply.)

## II.  Discussion

### a.  Standard of review

A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  When a party submits a timely objection to a report and recommendation, the district court reviews *de novo* the parts of the report and recommendation to which the party objected.  *Id.*; *see also United States v. Romano*, No. 15-CR-992, 2022 WL 402394, at *3 (2d Cir. Feb. 10, 2022) (citing *United States v. Romano*, 794 F.3d 317, 340 (2d Cir. 2015)).  The district court may adopt those portions of the recommended ruling to which no timely objections have been made, provided no clear error is apparent from the face of the record.  *See S.J. v. N.Y.C. Dep't of Educ.*, No. 21-CV-240, 2022 WL 1409578, at *1 n.1 (2d Cir. May 4, 2022) (noting that the district court applied correct legal standard in conducting *de novo*

review of portions of the magistrate judge's report to which specific objections were made and reviewing portions not objected to for clear error).  The clear error standard also applies when a "party makes only conclusory or general objections, or simply reiterates his original arguments."  *Miller v. Brightstar Asia, Ltd.*, 43 F.4th 112, 120 (2d Cir. 2022) (quoting *Thomas v. Astrue*, 674 F. Supp. 2d 507, 511 (S.D.N.Y. 2009)); *Wu v. Good Samaritan Hosp. Med. Ctr.*, 815 F. App'x 575, 579 (2d Cir. 2020) ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under . . . Fed. R. Civ. P. 72(b)." (quoting *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 766 (2d Cir. 2002))); Fed. R. Civ. P. 72(b)(2) ("[A] party may serve and file specific written objections to the [magistrate judge's] proposed findings and recommendations.").  Where, however, a party "t[akes] issue with a specific legal conclusion in the report and recommendation," a district court reviews the objected-to portions of the report and recommendation *de novo*.  *Miller*, 43 F.4th at 120–21 (concluding that the plaintiff's objection, although revisiting an issue already argued, should have been reviewed *de novo* where the plaintiff objected to a "specific legal conclusion in the report and recommendation," and noting that clear error is normally applied "when the objections are nonspecific or 'merely perfunctory responses . . . argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition'" (quoting *Edwards v. Fischer*, 414 F. Supp. 2d 342, 346–47 (S.D.N.Y. 2006) (alteration in original))).

> **b.  The Court exercises its inherent equitable power to enforce a prior court order to convert the monitorship to a receivership**

"A court can take 'any reasonable action . . . to secure compliance [with a court order],' and the 'scope of a district court's equitable powers to remedy past wrongs is broad.'"  *In re Tronox Inc.*, 855 F.3d 84, 112 (2d Cir. 2017) (quoting *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985) (alteration in original)); *Hunt v. Enzo Biochem, Inc.*, 904 F. Supp. 2d 337, 344

(S.D.N.Y. 2012) ("Courts have inherent power to enforce their orders."). "[T]he power of a court to make an order carries with it the equal power to punish for a disobedience of that order." *Hunt*, 904 F. Supp. 2d at 344 (quoting *In re Debs*, 158 U.S. 564, 594 (1895) (alteration in original)); *see also In re Lafayette Radio Elec. Corp.*, 761 F.2d 84, 93 (2d Cir. 1985) ("[A]ncillary jurisdiction is recognized as part of a court's inherent power to prevent its judgments and orders from being ignored or avoided with impunity."). "Moreover, courts have inherent power to issue orders designed to correct wrongs committed through its process." *Hunt*, 904 F. Supp. 2d at 344 (citing *Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.*, 249 U.S. 134, 146 (1919)); *see also Arkadelphia Milling Co.*, 249 U.S. at 145–46 ("It is one of the equitable powers, inherent in every court of justice so long as it retains control of the subject-matter and of the parties, to correct that which has been wrongfully done by virtue of its process."); *In re Lafayette Radio Elec. Corp.*, 761 F.2d at 92–93 ("[I]t is established that a federal court sitting in equity that has jurisdiction to issue a decree necessarily has ancillary and supplemental jurisdiction to enter orders and judgments designed to effectuate that decree." (first citing *Dugas v. Am. Surety Co.*, 300 U.S. 414 (1937); and then citing *Root v. Woolworth*, 150 U.S. 401 (1893))). A "court's choice of how to enforce the order is reviewed for abuse of discretion." *In re Tronox Inc.*, 855 F.3d at 112 (citing *EEOC v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Joint Apprentice-Journeyman Educ. Fund*, 925 F.2d 588, 595 (2d Cir. 1991)).

### i. Gentile's actions caused GPB to violate the terms of the Amended Order

The Court converts the monitorship into a receivership pursuant to the terms of the Amended Order based on GPB's violations of the order, caused by Gentile's actions, and GPB's failure to cure the violations.

Gentile does not dispute that he appointed new managers and altered GPB's Operating Agreement by, *inter alia*, giving compensation packages of up to $400,000 per year to these new managers.  (*See, e.g.*, Gentile's Objs. 1 (stating that Gentile's position has not changed in the time since he "sought to appoint three new managers to GPB . . . and amend certain aspects of the [c]ompany's Operating Agreement").)  Instead, he argues that "there was nothing illegal, inappropriate or untoward" in his "appointment of additional managers" because (1) the Amended Order does not govern the type of managers he appointed, and (2) the Amended Order did not divest him of his appointment authority and GPB cannot limit his appointment authority without his consent.[10]  (Gentile's Opp'n 9, 17.)  The Court is not persuaded by either of Gentile's arguments.

### 1.  There is no meaningful distinction between "management-level professionals" and "managers"

Gentile first argues that the Amended Order does not govern the type of managers he appointed, drawing a distinction between "management-level professionals," as referred to in the Amended Order, and "managers," as defined in the Operating Agreement.  (*Id.* at 9.)  Gentile argues that "[u]nder Delaware law, the 'managers' of a limited liability company such as GPB subject to the member's appointment authority are akin to corporate directors — whose appointment is not subject to approval by the Monitor — and not individuals bearing operational

---

[10]  Although Gentile has since "withdrawn" his appointment of managers and amendments to the Operating Agreement, he maintains that he has a "good faith belief that he has the right to do so," but will "refrain from taking any unilateral action regarding the management and corporate governance of GPB."  (Gentile's Objs. 12; *see also* Gentile's Aug. 28, 2023 Letter 1, annexed to the Jeremias Decl. as Ex. 7, Docket Entry No. 168-8 ("Notwithstanding Mr. Gentile's right as the sole member of GPB to make such lawful modifications and appointments to the Company's management structure and amendments to the Operating Agreement[,] . . . Mr. Gentile has withdrawn the three Manager appointments and amendments to the Operating Agreement that were made on May 27, 2022.").)

responsibilities, whose appointment *is* subject to approval by the Monitor."[11]  (*Id.*)  Given the

plain meaning of the terms of the Operating Agreement and the Amended Order and the purpose

of the appointment of the Monitor, the Court is not persuaded that there is any meaningful

distinction between the terms "manager" and "management-level professional."

    As a general rule, "words and phrases should be given their plain meaning."  *Com.*

*Lubricants, LLC v. Safety-Kleen Sys., Inc.*, No. 14-CV-7483, 2017 WL 3432073, at *7 (E.D.N.Y.

Aug. 8, 2017) (quoting *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152,

157 (2d Cir. 2016)); *see also Briscoe v. City of New Haven*, No. 09-CV-1642, 2010 WL

2794231, at *4 (D. Conn. July 12, 2010) (noting that, in response to the defendant's motion for

clarification of a prior court order, "the [c]ourt does not believe such clarification is necessary in

light of the plain language of the opinion" but nevertheless providing such clarification).

    The Operating Agreement uses the defined term "Manager."  (Operating Agreement 3

(defining "Manager" as "the Persons designated by the Members in Article VI, Section 1 hereof

to act collectively as the manager of the Company within the meaning of the Delaware Act and

shall include all successors appointed pursuant to the provisions of this Agreement").)  Black's

Law Dictionary defines a "manager" as "[s]omeone who administers or supervises the affairs of

---

[11] Gentile cites opinions of his expert — Jack B. Jacobs, former Justice of the Delaware
Supreme Court — in support of his conclusion.  (*See, e.g.*, Gentile's Opp'n 9 (citing Expert
Opinion of Jack B. Jacobs ("Gentile's Expert Op.") ¶ 9, annexed to the Decl. of Daniel J.
Horwitz as Ex. F, Docket Entry No. 102-7 ("A 'Manager' of an LLC, analogous to a director of a
corporation,' is 'a person who is named as a manager of [the LLC] pursuant to an [LLC]
agreement.'" (quoting Del. Limited Liability Act, 6 Del. C. § 101(12)))); *id.* (citing Gentile's
Expert Op. ¶ 16 ("The Operating Agreement contains no provision that limits or otherwise
qualifies or restricts the power legally conferred upon the Members holding a majority of the
Distribution Percentages to determine the number of Managers or to fill any newly created
Manager positions.")); *id.* (citing Gentile's Expert Op. ¶ 17 (concluding that "Gentile . . . was the
person exclusively empowered to increase the number of its Manager positions and to fill the
resulting Manager vacancies by written consent, so long as he satisfied the conditions prescribed
by the Operating Agreement" and that "Gentile satisfied those conditions")).)

a business, office, or other organization."  *Manager*, Black's Law Dictionary (11th ed. 2019).

Notably, the Operating Agreement specifies that "[t]he *management* of the Company's business

shall be vested in its Managers."  (Operating Agreement 9 (emphasis added); *see also* Gentile's

Expert Op. ¶ 13.)  The Amended Order uses the term "management-level professional" without

definition.  (Am. Order ¶ 6(e).)  Black's Law Dictionary defines "management" as "[t]he people

in an organization who are vested with a certain amount of discretion and independent judgment

in managing its affairs" and "top management" as "[a] high level of company management at

which major policy decisions and long-term business plans are made."  *Management*, Black's

Law Dictionary.  Thus, the plain meaning of the terms "manager" and "management" — and the

Operating Agreement's own reference that managers are vested with the "management" of the

business — support the Court's finding that there is no textual distinction between the terms

"manager" and "management-level professional" as used in the Operating Agreement and the

Amended Order, respectively.

   Contrary to Gentile's arguments, Gentile's expert opinion does not support any textual

distinction between the terms "manager" and "management-level professional."  The expert

opinion paragraphs Gentile cites either do not address this distinction, (Gentile's Expert Op.

¶¶ 16–17), or do not support such a distinction, (*id.* ¶ 9)  For example, in paragraph 9, Gentile's

expert recites the definition of a "manager" under Delaware law, but he does not take a position

on whether a "manager" falls within the scope of a "management-level professional," as referred

to in the Amended Order.  (*Id.*)  In fact, the expert did not rely upon nor review the Amended

Order in rendering his opinion.  (*Id.* ¶¶ 5, 8; *see also* R&R 18.)  The expert expressly stated that

he "addressed only the application of Delaware law to the facts assumed in this specific setting

and [his opinion] is not intended to express any view on matters of federal law or the law of any

other state or jurisdiction."  (Gentile's Expert Op. ¶ 18.; *see also id.* ¶ 16 ("To the extent the

SEC's contention presents a question of federal law, this Opinion expresses no view.").)  Thus,

Gentile's expert's conclusions do not support Gentile's argument.

The purpose of the appointment of the Monitor — to protect investors — further

demonstrates that there is no textual distinction between the terms.  (*See* Order 1 ("[T]he Court

finds that . . . the appointment of a monitor in this action . . . is necessary and appropriate for the

protection of investors.").)  The SEC moved to appoint a monitor[12] to, *inter alia*, prevent Gentile

from retaining control over GPB — whether on his own or through others selected by him — at

the expense of investors.  (SEC's Emergency Mem. 2 ("Gentile and his handpicked management

team should not have unchecked authority over incoming cash that could be used to redeem

investors."); *id.* ("In short, an independent monitor . . . would provide much-needed assurances

to the investors . . . that an unbiased and qualified person who is not beholden to Gentile is

vetting any significant transactions and decisions and looking out for the interests of investors.");

*see also* SEC's June 2, 2022 Letter 1 ("Gentile's Motion seeks to curtail the authority and

powers of the Court-appointed Monitor and to have the Court retroactively approve Gentile's

installation . . . of himself and his hand-picked team as new management over GPB CH.");

GPB's Resp. 5 ("The purpose of the Monitorship was thus . . . to protect Investors' money from

the threat posed by Gentile and those associated with him.").)  To protect investors, the Court

appointed the Monitor, granting him the authority to review, approve, or disapprove material

changes that would fundamentally affect the structure, assets, or liabilities of GPB.  (Am. Order

¶ 6; R&R 17; *see also* Gentile's Opp'n 8 ("The Monitor Order extends certain powers to the

---

[12]  (SEC's Emergency Mot. for an Order to Show Cause ("SEC's Emergency Mot."),
Docket Entry No. 10; SEC's Mem. in Supp. of SEC's Emergency Mot. ("SEC's Emergency
Mem."), Docket Entry No. 12.)

Monitor, principally authorizing him to review, approve, or disapprove certain material actions by the GPB Businesses.")).

Specifically, the Amended Order gives the Monitor "authority to approve or disapprove . . . any material change to compensation of any executive officer, affiliate, or related party of GPB, . . . [and] any retention by GPB . . . of any management-level professional or person. (Am. Order ¶ 6(d)–(e).)  Paragraphs 6(d) and 6(e) are the only subparagraphs addressing the Monitor's authority regarding leadership of GPB and their compensation.  (*Id.* ¶ 6.)  Pursuant to Gentile's argument, the Monitor would only have authority to approve or disapprove individuals "bearing operational responsibilities," but not any GPB leadership (i.e., corporate directors).[13]  (Gentile's Opp'n 9.)  To accept Gentile's argument would require the Court to ignore the purpose of the Monitor and the repeated concerns raised by the SEC that Gentile would retain control of GPB through GPB's leadership at the expense of investors.  (SEC's Emergency Mem. 2; *see also* SEC's June 2, 2022 Letter 1.)  In view of the fact that paragraphs 6(d) and 6(e) are the only references to the Monitor's approval authority over GPB leadership, the Court finds that the Monitor must be able to exercise authority over key GPB leadership positions to prevent "Gentile and his handpicked management team [from having] unchecked authority over incoming cash that could be used to redeem investors."  (SEC's Emergency Mem. 2.)  As Judge Scanlon explained:

---

[13]  As Judge Scanlon noted, Gentile's expert's opinion does not support Gentile's assertion that "management-level professionals" are those "bearing operational responsibilities" and thus are not "managers."  (R&R 18 ("Mr. Gentile's conclusory assertion that 'management-level professionals' are those 'bearing operational responsibilities' and that, because of such unsubstantiated definition, 'management-level professionals' are not 'managers' is unaddressed and unsupported by its sole citation to the Expert's opinion.").)  As the Court noted above, Gentile's expert did not analyze nor opine on the meaning of the term "management-level professionals."

> In order for the Monitor to exercise sufficient control to support the legal and operational integrity of GPB, it is necessary and consistent with the Monitor's overall authority to bring within such authority oversight over all key leadership positions.  To permit the dilution of centralized authority without the Monitor's approval would be inconsistent with the overall structure of the Monitor's powers and responsibilities.  Mr. Gentile's view that the voting authority of the sole manager could be diluted to one quarter of its current voting power, . . . without the Monitor's approval is inconsistent with the stewardship and oversight responsibilities required of the Monitor by paragraph 6 and would undermine the entire Amended Order.

(R&R 17–18.)  Thus, based on the plain meaning of the terms of the Operating Agreement and the Amended Order and the purpose of the appointment of the Monitor, the Court finds that there is no meaningful distinction between "management-level professionals" and "managers."

### 2.  The Amended Order, not GPB, places limitations on Gentile's appointment and amendment rights

Gentile also argues that he "was duly authorized under Delaware law and the Operating Agreement to appoint additional managers and . . . [GPB] cannot limit — even in its consent to the [Amended] Order — those rights."  (Gentile's Opp'n 17; *see also id.* at 9 ("[W]ithout Mr. Gentile's consent, [GPB] has no authority to limit his appointment rights.").)  Gentile is mistaken.  The Court, not GPB, has placed limits on Gentile's right to appoint managers.  As discussed above, the Amended Order provides the Monitor with the authority to review, approve, or disapprove GPB's retention of any "management-level professional," including the three managers Gentile appointed.  (*See supra* Section II.b.i.)  Whether Gentile was permitted to appoint managers under the Operating Agreement, as Gentile's expert argues, is not the issue.  The issue is whether any such appointed managers may be retained by GPB without the Monitor's approval.  (R&R 16 ("The question is not whether Mr. Gentile can appoint managers under the [Operating] Agreement, but, rather, is whether any such managers may be retained by GPB; without the Monitor's approval, the answer is no.").)  In May of 2022, Gentile appointed

the new managers and instructed GPB's CEO and sole manager to "cease any and all actions taken or to be taken in the capacity as [m]anager, and [to] seek consensus with [the new managers] regarding the course of GPB and any actions to be taken by the [new m]anagers," (Gentile's May 27, 2022 Letter 1, annexed to Gentile's Opp'n as Ex. B, Docket Entry No. 102-3; *see also* SEC's Mem. 5; GPB's Resp. 6–7), and the new managers immediately exercised their managerial powers by modifying the Operating Agreement upon appointment, (SEC's Mem. 5; GPB's Resp. 6–7), all without the Monitor's approval.  As discussed above, the specific terms of the Amended Order and the purpose of the appointment of the Monitor do not support Gentile's conclusion that he can retain managers without the approval of the Monitor.  Therefore, the Court finds that Gentile's actions caused GPB to violate the Amended Order when he appointed the new managers, instructed GPB's CEO to recognize and work with the managers, and the new managers modified the Operating Agreement, all without the approval of the Monitor.

In addition, Gentile amended the Operating Agreement to, *inter alia*, provide compensation packages of up to $400,000 to each new purported manager.  (SEC's Mem. 5; GPB's Resp. 1–2; *see also* Gardemal Decl. ¶ 21(b) ("GPB CH's new managers would now be entitled to be paid between $10,000 and $35,000 per month, . . . so each of the three managers could be paid over $400,000 per year.").)  Under the Amended Order, the Monitor has approval authority over "any material change to compensation of any executive officer, affiliate, or related party of GPB."  (Am. Order ¶ 6(d).)  Black's Law Dictionary defines "material" as "significant" or "essential."  *Material*, Black's Law Dictionary.  The parties do not dispute that the creation of an entirely new compensation package qualifies as a "material change" in compensation, requiring approval by the Monitor under paragraph 6(d).  Thus, the Court finds that Gentile's actions caused GPB to violate the Amended Order when he and the three new managers

20

amended the Operating Agreement to provide each new manager with a compensation package

without the Monitor's approval.

> ### ii. GPB failed to cure the violations caused by Gentile's actions within ten business days of being notified of the violations

Without the approval of the Monitor, Gentile's actions caused GPB to violate the

Amended Order.  Under the Amended Order:

> 20. If the Monitor believes GPB is in some way not materially in compliance with the terms of this Order, upon notice of noncompliance to GPB, GPB shall have 10 business days in which to cure any claimed material noncompliance (the "Cure Period").
>
> 21. If GPB does not comply with the above provisions and does not make requested changes within the Cure Period, upon motion of the SEC resulting in a Court Order, the Monitorship shall convert to a receivership.  GPB shall be afforded an opportunity to oppose any such application by the SEC before conversion to a receivership.

(Am. Order ¶¶ 20, 21.)  Pursuant to the terms of the Amended Order, GPB's violations would

trigger the conversion of the monitorship to a receivership, upon the SEC's motion, unless cured

within ten days of being provided notice of such violations.  (*Id.* ¶ 21.)  The parties do not

dispute that GPB was provided sufficient notice.[14]  (Monitor's May 31, 2022 Letter, as annexed

---

[14]  Gentile admits that GPB "was put on notice of a purported breach of the Amended Monitor Order by the Monitor and given ten business days to cure" and that he was "copied on the Monitor's notice to GPB." (Gentile's Reply 3.)  He nevertheless argues that he "was never given notice or an opportunity to cure by either the Monitor or the Magistrate [Judge]." (*Id.*)  He further argues that he "was neither subject to nor could avail himself of the [Amended] Order's provisions, thus vitiating any ability for him to 'cure' under its provisions," pursuant to Judge Scanlon's April 28, 2022 Order (the "April 2022 Order").  (*Id.*)

Gentile misunderstands the April 2022 Order.  Under the April 2022 Order, Judge Scanlon ruled that neither Gentile nor any non-party to the Amended Order could avail himself of the mediation provision "as it was drafted to provide only the entity that is actually being monitored, GPB, with a method for raising disputes regarding its oversight." (Apr. 2022 Order.)  The April 2022 Order does not prevent Gentile from taking steps to remedy a violation that *he caused* by his unilateral action.  The fact that Gentile cured his violations approximately one month after Judge Scanlon issued the R&R further undermines Gentile's argument.  (*See* Gentile's Objs. 12 ("As of August 28, 2023, Mr. Gentile informed GPB, the Monitor, and the

to Gentile's Opp'n as Ex. E, Docket Entry No. 102-6.)  At the time Judge Scanlon issued the

R&R, there was no dispute that Gentile did not take any curative action within ten days of

notification of the violations,[15] although Gentile "alone was able to do so."  (GPB's Resp. 7.)

Accordingly, GPB did not cure the violations caused by Gentile within ten days of being notified

of such violations.  Because of GPB's violations and failure to cure, the Court has authority to

convert the monitorship to a receivership pursuant to paragraph 21 of the Amended Order, and

does so for the reasons discussed.

### c. The Court also exercises its statutory and equitable power to convert the monitorship to a receivership

"In any action or proceeding brought or instituted by the Commission under any

provision of the securities laws, the Commission may seek, and any Federal court may grant, any

equitable relief that may be appropriate or necessary for the benefit of investors."  15 U.S.C.

§ 78u(d)(5); *see also SEC v. Byers*, 609 F.3d 87, 92 (2d Cir. 2010) ("There is no question that

district courts may appoint receivers as part of their broad power to remedy violations of federal

securities laws."); *Eberhard v. Marcu*, 530 F.3d 122, 131 (2d Cir. 2008) ("District courts possess

broad power to remedy violations of federal securities laws." (citing *SEC v. Manor Nursing*

*Ctrs.*, 458 F.2d 1082, 1103 (2d Cir. 1972), *abrogated on other grounds by SEC v. Ahmed*, 72

---

SEC that he had withdrawn the Appointments and Amendments."); SEC's Resp. 2 n.2; GPB's
Resp. 10–11.)

   [15] (SEC's Mem. 11 n.7 ("Upon information and belief, Gentile has failed to cure these
GPB breaches, which he caused."); Gentile's Opp'n 17 (arguing that "there was nothing illegal,
inappropriate or untoward in Mr. Gentile's appointment of additional managers"); SEC's Reply
5 ("Gentile's attempt to assert managerial control result[ed] in a serious uncured breach of the
[Amended] Order."); Order dated Apr. 28, 2023 ("April 2023 Order") (directing the parties to
file letters as to any fact-based updates); Gentile's May 8, 2023 Letter re April 2023 Order,
Docket Entry No. 141; SEC's May 8, 2023 Letter re April 2023 Order, Docket Entry No. 142;
GPB's May 8, 2023 Letter re April 2023 Order, Docket Entry No. 143; Monitor's May 8, 2023
Letter re April 2023 Order, Docket Entry No. 144.)

F.4th 379 (2d Cir. 2023))); *SEC v. Friedlander*, 49 F. App'x 358, 360 (2d Cir. 2002) (affirming the district court's appointment of a receiver where the court "carefully considered the costs of a receiver, and weighed the equities with care"); *SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987) (noting that although "'the appointment of . . . receivers[] should not follow requests by the SEC as a matter of course,' a district court's decision to appoint a . . . receiver may be disturbed on appeal only if the district court has abused its discretion" (quoting *Manor Nursing Ctrs., Inc.*, 458 F.2d at 1105)); *Manor Nursing Ctrs.*, 458 F.2d at 1105 (concluding that the district court "appropriate[ly] exercise[d] . . . its equity powers" to appoint a trustee and noting that "we repeatedly have upheld the appointment of trustees or receivers to effectuate the purposes of the federal securities laws" (citations omitted)); *Ferguson v. Tabah*, 288 F.2d 665, 673–74 (2d Cir. 1961) (affirming the district court's appointment of a receiver since although receivership is a "drastic remedy," it was "within the discretion of the court"); *see also Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883, 895 (5th Cir. 2019) ("Exercising their jurisdiction under the securities laws, federal district courts can utilize a receivership where a troubled entity, bedeviled by their violation, will be unable to satisfy all of its liabilities to similarly situated investors in its securities." (citing *Capwill*, 462 F.3d at 552–53)).  "Although neither the Securities Act of 1933 nor the Securities Exchange Act of 1934 expressly vests the power to appoint receivers in the district courts, 'courts have consistently held that such power exists, where necessary to prevent the dissipation of a defendant's assets pending further action by the court.'"  *SEC v. Malek*, 397 F. App'x 711, 713 (2d Cir. 2010) (quoting *Am. Bd. of Trade*, 830 F.2d at 436); *Eberhard*, 530 F.3d at 131 (same); *see also Lankenau v. Coggeshall & Hicks*, 350 F.2d 61, 63 (2d Cir. 1965) ("In appointing the receiver, the district court was . . . exercising its exclusive federal jurisdiction for the purpose of enforcing the Securities Exchange Act of 1934.

23

While it is true that the Act does not explicitly provide for appointment of receivers, there is little reason to doubt that equitable power to do so exists." (internal citation omitted)).

"Receivers appointed at the SEC's request are equipped with a variety of tools 'to help preserve the status quo while the various transactions [are] unraveled . . . to obtain an accurate picture of what transpired.'" *Eberhard*, 530 F.3d at 131 (quoting *Manor Nursing Ctrs.*, 458 F.2d at 1103 (alterations in original)).  "[A] federal receiver is appointed, under the district court's broad equitable discretion, 'to restore to a defrauded entity or defrauded persons that which was fraudulently diverted from its or their custody and control.'"  *Malek*, 397 F. App'x at 713 (quoting *SEC v. Shiv*, 379 F. Supp. 2d 609, 618 (S.D.N.Y. 2005)).  Their responsibilities include, *inter alia*, "marshal[ing] the assets" of the defendant, "prevent[ing] the dissipation of [the] defendant's assets pending further action by the court," and, where the entity in receivership is a corporation, "report[ing] to the SEC and conven[ing] shareholder meetings on [the corporation's] behalf."  *Eberhard*, 530 F.3d at 131–32 (first quoting *Esbitt v. Dutch-Am. Mercantile Corp.*, 335 F.2d 141, 143 (2d Cir. 1964); then quoting *Am. Bd. of Trade*, 830 F.2d at 436; and then citing *SEC v. Koenig*, 469 F.2d 198, 202 (2d Cir. 1972) (third alteration in original)); *see also Manor Nursing Ctrs.*, 458 F.2d at 1106 (affirming "the district court's decision temporarily to freeze appellants' assets"); *Esbitt*, 335 F.2d at 143 (noting that "[a] primary purpose of appointing a receiver is to conserve the existing estate").  "[T]he power of a securities receiver is not without limits."  *Eberhard*, 530 F.3d at 132.  The Second Circuit has "expressed strong reservations as to the propriety of allowing a receiver to liquidate [an estate]," *id.* (quoting *Lankenau*, 350 F.2d at 63 (alteration in original)), has found that "receivership should not be used as an alternative to bankruptcy," and has "disapproved of district courts using receivership as a means to process

claim forms and set priorities among various classes of creditors," *see id.* (citing *Am. Bd. of Trade*, 830 F.2d at 437–38).

"'[T]he appointment of a receiver is considered to be an extraordinary remedy,' and . . . should be employed cautiously and granted only when clearly necessary to protect plaintiff's interest in the property." *Rosen v. Siegel*, 106 F.3d 28, 34 (2d Cir. 1997) (quoting *Citibank, N.A. v. Nyland (CF8) Ltd.*, 839 F.2d 93, 97 (2d Cir. 1988) (alterations in original)). Even so, "[a] decision to appoint or not to appoint a receiver is committed to the sound discretion of the trial court." *Varsames v. Palazzolo*, 96 F. Supp. 2d 361, 365 (S.D.N.Y. 2000) (citing *Rosen*, 106 F.3d at 34). In determining whether a receiver should be appointed, courts in this Circuit routinely consider the factors set forth in Charles A. Wright and Arthur R. Miller's treatise *Federal Practice and Procedure*, including:

> [F]raudulent conduct on the part of defendant; the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and, in more general terms, plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.

Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2983 (1999) (the "Wright and Miller factors"); *Varsames*, 96 F. Supp. 2d at 365 (quoting the Wright and Miller factors); *see also Carbone v. Martin*, No. 18-CV-3509, 2023 WL 2477682, at *7 (E.D.N.Y. Mar. 13, 2023) (quoting *Varsames*, 96 F. Supp. 2d at 365); *U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop. LLC*, 859 F. Supp. 2d 602, 610 (S.D.N.Y. 2012) (quoting *Varsames*, 96 F. Supp. 2d at 365). A court reviews these factors by a preponderance of the evidence.[16]

---

[16] The Objectors rely on two 2020 cases, *Meisels v. Meisels*, No. 19-CV-4767, 2020 WL 7000903 (E.D.N.Y. May 21, 2020), *report and recommendation adopted by* 2020 WL 6110827 (Oct. 16, 2020), and *JDP Mortg. LLC v. Gosman*, No. 19-CV-5968, 2020 WL 8082390

The Court finds that this case is "extraordinary" under the Wright and Miller factors and Second Circuit caselaw and independently converts the monitorship into a receivership pursuant to the Court's statutory and equitable powers to enforce federal securities laws.[17]  *See* 15 U.S.C. § 78u(d)(5); *Byers*, 609 F.3d at 91; *Eberhard*, 530 F.3d at 131.

---

(E.D.N.Y. Dec. 21, 2020), *report and recommendation adopted by* 2021 WL 66290 (Jan. 7, 2021), to argue that the appropriate standard by which the Court should consider these factors is "clear and convincing evidence."  (Gentile's Objs. 5; Schneider's Objs. 9–10.)  These cases rely, in part, on *In re Oakland Lumber Co.*, a 1909 Second Circuit case reviewing an ex parte order appointing a receiver over an alleged bankrupt corporation.  174 F. 634 (2d Cir. 1909).  In *Oakland Lumber Co.*, the district court appointed a receiver based on the plaintiff's moving papers and "without notice to the bankrupt [corporation] or the assignee."  *Id.* at 635.  The Second Circuit vacated the appointment, explaining:

> The power to take from a man his property, without giving him an opportunity to be heard, is both arbitrary and drastic and should not be exercised except in the clearest cases.  Congress recognized the necessity for caution by limiting the appointment of receivers to cases where it is "absolutely necessary" for the preservation of the estate.  In other words the reason for such an interference with the rights of property must be clear, positive and certain. . . . [I]n no case should a remedy so far reaching in its effects be resorted to except upon clear and convincing proof.

*Id.* at 636–37 (quoting Act of July 1, 1898, 30 Stat. 545).  The statutory authority to appoint a receiver in *Oakland Lumber Co.* stemmed from the 1898 Bankruptcy Act, which was repealed in 1978, *see* Pub. L. No. 95-598, tit. IV, 92 Stat. 2682; *id.* at § 105(b), 92 Stat. 2555 ("[A] bankruptcy court may not appoint a receiver in a case under this title."), and not federal securities laws, *Oakland Lumber Co.*, 174 F. at 636.  The Objectors have provided no arguments or caselaw to support application of the "clear and convincing" standard in this context.  Rather, the appointment of a receiver "lies in the discretion of the court" and "the form and quantum of evidence required on a motion requesting the appointment of a receiver is a matter of judicial discretion."  Wright & Miller, Federal Practice and Procedure § 2983.

[17]  Schneider argues for the first time in his objections to the R&R that the Court lacks subject matter jurisdiction over most of the twenty different entities listed by the SEC as part of the "Receivership Estate" in the Proposed Amended Order because such entities were not included in the SEC's complaint.  (Schneider's Objs. 20 ("[T]he SEC's complaint alleges that Defendants defrauded investors of only six funds." (citing Compl. ¶¶ 23–27)).)  The SEC responds that it "clarified that all of the entities that would be subject to the receivership are GPB itself, are affiliates of or are controlled by GPB, and thus are the proper subject of the receivership."  (SEC's Resp. 16.)  Because the SEC submitted this list of entities in its original Proposed Order and Schneider did not object at that time, (*see* Schedule 1 of Proposed Order),

SPA-27

First, the Court finds that Gentile's actions and sworn testimony have raised "significant concerns about [his] credibility." *Carbone*, 2023 WL 2477682, at *7 (citing discrepancies between the defendant's assertions and prior court orders "raises significant concerns about [the d]efendant's credibility" under the first Wright and Miller factor); *see also SEC v. Gabelli*, 653 F.3d 49, 61 (2d Cir. 2011) (finding that allegations of fraud in a complaint can be sufficient to warrant injunctive relief because "fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations" (quoting *Manor Nursing Ctrs.*, 458 F.2d at 1100)), *rev'd on other grounds by Gabelli v. SEC*, 568 U.S. 442 (2013), *aff'd in part, rev'd in part by Gabelli v. SEC*, 518 F. App'x 32, 33 (2d Cir. 2013). For example, the SEC stated in its reply to Gentile's opposition of appointment of a receiver that "[i]n his sworn testimony under oath before the [SEC] in February 2020, Gentile admitted that he knew that investor money, and not only money from the portfolio companies' operations, was being used to pay distributions to investors," contrary to GPB's representations to investors.[18] (SEC's Reply 6–7; *see also* SEC's Resp. 13 (same).)

Second, the Court finds that there is an imminent risk that the assets of GPB will diminish in value — harming investors — based on Gentile's prior conduct. "[T]he existence of any imminent danger of the diminution of the value of the propert[y] . . . is a critical factor in the

---

the Court declines to consider Schneider's belated argument. *See, e.g.*, *Gov. Emps. Ins. Co. v. Grody*, No. 22-CV-6187, 2023 WL 6307340, at *2 (E.D.N.Y. Sept. 28, 2023) ("Even on *de novo* review, . . . the Court 'will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but [were] not, presented to the Magistrate Judge in the first instance.'" (quoting *Haynes v. Quality Mkts.*, No. 02-CV-250, 2003 WL 23610575, at *3 (E.D.N.Y. Sept. 22, 2003))); *Saada v. Golan*, No. 18-CV-5292, 2023 WL 1993538, at *2 (E.D.N.Y. Feb. 13, 2023) (stating the same).

[18] While Judge Scanlon did not cite these facts in the R&R, the SEC did present the evidence and make arguments based on the evidence to Judge Scanlon, and thus the Court can consider it. *Cf. Grody*, 2023 WL 6307340, at *2; *Saada*, 2023 WL 1993538, at *2.

analysis of whether to appoint a receiver."  *U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop. LLC*,

866 F. Supp. 2d 247, 250 (S.D.N.Y. 2012) (citing *Melnick v. Press*, No. 06-CV-6686, 2007 WL

2769490, at *1 (E.D.N.Y. Sept. 21, 2007)).  Judge Scanlon found that "the actions of Mr. Gentile

and the three new managers that he purportedly appointed, as they affect GPB, have resulted in a

fracture in GPB's leadership that is irremediable without [c]ourt intervention," and the resulting

"uncertainty of GPB's position is creating significant consequences, which are damaging its

financial health and, by extension, the finances of its investors."  (R&R 26.)  In support of her

finding, Judge Scanlon cited the fact that:

> the three purported managers newly appointed by Mr. Gentile,
> without approval of the Monitor, will receive "up to $400,000 per
> year in compensation," have caused "GPB . . . and the Monitor [to]
> incur[] substantial legal expenses," and "have already attempted to
> reverse a reduction in force implemented by GPB . . . with Monitor
> consent to reduce unnecessary expense."

(*Id.* at 23.)  The attempted reversal of a reduction in force of Highline Management executives

was initiated by the three new managers Gentile appointed.  (*See* Hayes' June 30, 2022 Letter 3,

annexed to the Suppl. Decl. of Joseph T. Gardemal III ("Gardemal Suppl. Decl.") as Ex. A,

Docket Entry No. 104 ("[W]e have also learned that GPB has terminated three key executives of

Highline Management, which is directly overseen by GPB.  We do not understand . . . why GPB

would take such action during this period of transition without consultation with the newly

appointed managers. . . . We believe they should be reinstated as soon as practical . . . .").)  The

executives had aggregate salaries of more than $1.7 million per year.  (Gardemal Suppl. Decl.

¶ 14.)

Gentile argues that Judge Scanlon's finding that there is "uncertainty" regarding "GPB's

position" is factually untrue because the "Monitor is currently supervising over $1 billion of

GPB's cash equivalents" and the "April 2023 Monitor Report also reported realized values of

195%, 213%, and 134% as a result of various mergers & acquisitions and other transactions."
(Gentile's Objs. 7–8; *see also* April 2023 Monitor Report 24, 25, 27, Docket Entry No. 137.)  As
GPB clarifies, the three transactions cited in the April 2023 Monitor Report all pre-date Gentile's
appointment of the new managers and amendment of the Operating Agreement.  (GPB's Resp.
15 ("But what Gentile conveniently leaves out is that all three of the transactions cited in the
Monitor's Report *pre-date his 2022 Memorial Day weekend takeover attempt*; GPB Capital sold
the three cited-to Portfolio Companies in November 2021, December 2021, and April 2022,
respectively." (emphasis in original)).)

The Court finds that, given Gentile's previous (1) appointment of new managers, whose
collective compensation could reach over $1.2 million annually to be paid by GPB, and (2)
attempt to reinstate three terminated executives of a company directly overseen by GPB, whose
collective compensation amounts to nearly $1.7 million annually to be paid by GPB, Gentile's
actions constituted a real and imminent threat of financial harm to GPB and its investors.  (*See*
Gardemal Decl. ¶ 21(b); Gardemal Suppl. Decl. ¶ 14; Hayes' June 30, 2022 Letter 2; R&R 23,
26.)

Third, the Court finds that legal remedies are inadequate.  Because Gentile's actions
caused GPB to violate the Amended Order, the Court is not persuaded that "a further amended
monitor order . . . explicitly defin[ing] the limits of Mr. Gentile's actions vis-à-vis GPB in his
capacity as the owner and sole Member of GPB . . . [would] eliminat[e] any future action the
SEC or Monitor may deem detrimental to GPB."  (Gentile's Objs. 16.)  In addition, it is unclear
whether a financial penalty, such as one "under penalty of contempt of court" as suggested by
Schneider, (*see* Schneider's Reply 1), against Gentile would be an adequate, alternative legal
remedy.

SPA-30

Fourth, the Court finds that the probability of harm to the SEC, GPB, and GPB's investors by denial of the receivership would be greater than the injury to the Objectors.  Judge Scanlon found that the SEC and, by extension, GPB's investors, will obtain the benefit of having a receiver preserve the status quo, conserve the existing estate, prevent the dissipation of assets, and "protect the investors by preventing Mr. Gentile and the new purported managers from undermining GPB's finances through improper access to funds and information," (R&R 23–24), concluding that "[t]he investors' and GPB's interests outweigh Mr. Gentile's interests," (*id.* at 24).  The Objectors argue that the "R&R failed to weigh the balance of harms" by ignoring that their constitutional rights would be violated if a receiver is appointed and a litigation injunction granted, because they are entitled to have the Delaware state court orders receive full faith and credit.  (Gentile's Objs. 20–22; Schneider's Objs. 13–14; Schneider's Reply 3–4.)  Because the reimbursement procedures set forth in the Delaware state court orders are exempt from the proposed litigation injunction, (*see infra* Section II.d), any harm to the Objectors is outweighed by the harm to the SEC, GPB, and GPB's investors.

Fifth, the Court finds that the SEC's probability of success is unclear.  The Objectors are correct that an indictment is "merely a statement of charges and not itself evidence."  (Gentile's Objs. 19 (citing 1-29 Leonard B. Sand, Modern Federal Jury Instructions-Criminal, P. 3.01[1], Instruction 3-1).)  *But see Gabelli*, 653 F.3d at 61 (reversing the district court's dismissal of the SEC's request for injunctive relief "since the complaint alleges that for almost three years [defendants] intentionally aided and abetted Advisers Act violations and since 'fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations'" (quoting *Manor Nursing Ctrs.*, 458 F.2d at 1100)); *Tabah*, 288 F.2d at 675 (noting that while the arrest of virtually all high company officials on fraud allegations "was not new 'evidence' of misdeeds, it

did present a situation where there was a possible complete breakdown of the [company's] high command," a threat which the district judge found "sufficient to tip the balance in favor of a receiver"). Ultimately, at this time, the Court does not have enough information to determine the SEC's probability of success in this action. None of the individual Wright and Miller factors, however, is dispositive. *See, e.g.*, *SEC v. Amerindo Inv. Advisors, Inc.*, No. 05-CV-5231, 2013 WL 1385013, at \*13 (S.D.N.Y. Mar. 11, 2013) (appointing a receiver based on evidence of only three of the five Wright and Miller factors), *aff'd*, 639 F. App'x 752 (2d Cir. 2016).

Under these circumstances, the Court finds it appropriate to exercise its statutory and equitable power to convert the monitorship to a receivership. GPB has been under monitorship since February of 2021, during which time its more than 17,000 investors nationwide, approximately 4,000 of whom are seniors, have been unable to access their funds. (*See* SEC's Mem. 3; SEC's Resp. 1.) Accordingly, given the gravity of the allegations and that one of the Individual Defendants has already pled guilty to criminal charges, that GPB's investors have been unable to access their funds for more than thirty-four months, and that GPB's management and Gentile have proven unable to agree or work together to implement GPB's future strategy, the Court exercises its equitable authority to convert the monitorship into a receivership. *See, e.g.*, *Friedlander*, 49 F. App'x at 360 (affirming the district court's appointment of a receiver where the court gave the manager of a hedge fund accused of fraud "the benefit of the doubt initially, and only . . . appoint[ed] a receiver after he failed to act in accordance with commitments he had made to the court"); *Amerindo*, 2013 WL 1385013, at \*13 (appointing a receiver "[b]ased on the [i]ndividual [d]efendants' extensive fraudulent conduct, the risk that the value of restrained assets will irreversibly dissipate, and the risk of harm to the SEC, the individual victims, and other investors"); *see also* 15 U.S.C. § 78u(d)(5); *Eberhard*, 530 F.3d at

131; *Zacarias*, 945 F.3d at 895.  The Court does not exercise its discretion to convert the

monitorship to a receivership lightly, but, given the extreme circumstances of this case, it finds

that the requested relief is merited.[19]  *See, e.g.*, *Tabah*, 288 F.2d at 674 (affirming the district

court's appointment of a receiver despite appointment of a receiver being "a drastic remedy

usually imposed only where no lesser relief will be effective").

> **d.  Imposition of a litigation injunction is appropriate based on the facts of this case**

"The Second Circuit has recognized that an anti-litigation injunction or litigation stay in a

receiver order is a valid exercise of a district court's equitable powers."  *SEC. v. Callahan*, 2 F.

Supp. 3d 427, 436 (E.D.N.Y. 2014) (quoting *SEC v. Illarramendi*, No. 11-CV-78, 2012 WL

234016, at *4 (D. Conn. Jan. 25, 2012)); *see also Byers*, 609 F.3d at 92.  Although district courts

have "broad equitable powers in the context of an SEC receivership," the power to impose a

litigation injunction is one "to be exercised cautiously."  *Byers*, 609 F.3d at 91 (noting that "the

authority of a district court to issue an order staying a non-party from bringing litigation derived

from 'the inherent power of a court of equity to fashion effective relief'" (quoting *Wencke*, 622

---

[19]  The Objectors also argue that conversion of the monitorship to a receivership is inappropriate since "appointment of a receiver will be utilized to effectuate the liquidation of [GPB]."  (Gentile's Objs. 10; *see also* Schneider's Objs. 19.)  The Court understands the Second Circuit's "strong reservations as to the propriety of allowing a receiver to liquidate [an estate]," *Eberhard*, 530 F.3d at 131 (quoting *Lankenau*, 350 F.2d at 63), and its guidance that receivership "should not be used as an alternative to bankruptcy," *id.*  The Amended Proposed Order, however, adequately addresses the Objectors' concerns.  It provides that within forty-five days of the entry of the order, the receiver will "file and serve a full report and accounting of [r]eceivership [a]ssets," (Am. Proposed Order ¶ 42), and "propose to the Court a plan to distribute available [r]eceivership [a]ssets," (*id.* ¶ 6(P)).  At that time, the Court will determine whether distribution via receivership or bankruptcy is the appropriate course.  Accordingly, the fact that the SEC and GPB contemplate the possible liquidation of GPB via receivership does not prevent or undermine the appointment of a receiver at this time.  *See Skaff v. Progress Intern., LLC*, No. 12-CV-9045, 2014 WL 5454825, at *1 (S.D.N.Y. Oct. 28, 2014) (authorizing a receiver to "take possession of [the defendant company] and all its assets and conduct a thorough accounting, but not to liquidate or distribute such assets . . . absent further [c]ourt order").

F.2d at 1369)).  "An anti-litigation injunction is simply one of the tools available to courts to help further the goals of the receivership."  *Byers*, 609 F.3d at 92; *SEC v. Ahmed*, No. 15-CV-675, 2022 WL 7508962, at *2 (D. Conn. Oct. 13, 2022) (same).  "While such injunctions are to be used sparingly, there are situations in which they are entirely appropriate."  *Byers*, 609 F.3d at 92.  One such situation is where a receiver must "maintain maximum control over the assets" of a large complex entity to "prevent[] small groups of creditors from placing some entities into bankruptcy, thereby removing assets from the receivership estate to the potential detriment of all."  *Byers*, 609 F.3d at 93; *see also SEC v. Morgan*, No. 19-CV-661, 2019 WL 2385395, at *12 (W.D.N.Y. June 5, 2019) (concluding that a litigation injunction was warranted "to protect against the potential for disparate actions in other courts that could ultimately have a negative impact on the assets" in the receivership estate); *United States v. JHW Greentree Cap., L.P.*, No. 12-CV-116, 2014 WL 2608516, at *3–4 (D. Conn. June 11, 2014) (noting that "[a] receiver must be given a chance to do the important job of marshaling and untangling a company's assets without being forced into court by every investor or claimant" (quoting *United States v. Acorn Tech. Fund, L.P.*, 429 F.3d 438, 443 (3d Cir. 2005))).

Based on the facts of this case, the Court concludes that the imposition of a litigation injunction is appropriate, consistent with Judge Scanlon's finding.  (R&R 30)  The Second Circuit has noted that "while [litigation] injunctions are to be used sparingly, there are situations in which they are entirely appropriate."  *Byers*, 609 F.3d at 92.  Litigation injunctions "prevent[] small groups of creditors from placing some entities into bankruptcy, thereby removing assets from the receivership estate to the potential detriment of all."  *Id.* at 93.

The Amended Proposed Order contains a list of twenty-two litigations involving the receivership entities or their assets, (*see* Schedule 3 of Am. Proposed Order), and the Monitor

SPA-34

notes that these "pending litigation proceedings, including class action litigation . . . will require potential reserves, and there are limited funds available for these purposes," (Gardemal Decl. ¶ 29). Such litigations threaten to "remov[e] assets from the receivership estate to the potential detriment of all." *Byers*, 609 F.3d at 93. Accordingly, keeping in mind the Second Circuit's caution that such injunctions are to be applied "sparingly," *id.* at 92, the Court nevertheless finds that the facts of this case warrant the imposition of a litigation injunction. *See Morgan*, 2019 WL 2385395, at *1, *12 (imposing a litigation injunction in a securities fraud case involving $80 million in investor funds); *Callahan*, 2 F. Supp. 3d at 439–40 (declining to lift a litigation injunction contained in a receiver order imposed pursuant to a securities fraud action involving a Ponzi scheme); *see also Zacarias*, 945 F.3d at 897, 902–03 (affirming the district court's imposition of a litigation injunction with respect to a receiver's settlement of a $5 billion Ponzi scheme and noting that a court's powers in managing a receivership "can include . . . stays of claims in other courts against the receivership").

The Objectors do not provide sufficient support for their argument that a litigation injunction will run afoul of orders in the Delaware Action. In support of his objections, Schneider provides the Court with copies of the judgments and orders in the Delaware Action, including the order granting summary judgment and the two advancement orders. (*See* Colton Decl. ¶ 10; Final Order Granting Summ. J.; *Fitracks* Order; Judicial Action Form.) Schneider contends that since April 20, 2022, he has been "duly submitting invoices for fees and expenses pursuant to the [*Fitracks* Order]" which "GPB has been reviewing," and that "[t]he procedures set forth in the [*Fitracks* Order] have been working smoothly since April 2022." (Colton Decl.

¶ 11.)  Gentile makes the same arguments as Schneider pursuant to his advancement order from the Delaware Chancery Court.[20]  (Stipulation and Advancement Order.)

Schneider and Gentile do not indicate why their interests will not be protected by the terms of the Amended Proposed Order.  The Amended Proposed Order does not prohibit the payment of Schneider's legal expenses pursuant to the *Fitracks* Order or Gentile's legal expenses pursuant to the Stipulation and Advancement Order because it permits the receiver to dissipate assets by payments ordered by the Court.  (R&R 32; Am. Proposed Order ¶ 6(g) (authorizing payment without regard to a cap and without prior court order for "all other costs and expenses authorized by this Court pursuant to this Order or any other order of this Court").)  The terms of the Amended Proposed Order do not pose any bar to Schneider's and Gentile's rights under their advancement orders, since the receiver is required to comply with his legal obligations, including compliance of the existing orders of other courts.[21]

Accordingly, the Court finds that the objections by Gentile, Schneider, and Ascendant Capital to the imposition of a litigation injunction are without merit.

### e.  The Court adopts the Amended Proposed Order in its entirety

The Objectors also argue that the Court should not adopt paragraph 28 of the Amended Proposed Order, which transfers to the receiver "[a]ny and all attorney-client privilege, work product protection, common interest or joint defense privilege, or other privilege or immunity (collectively, the 'Privileges') of the [r]eceivership [e]ntities" and empowers the receiver with

---

[20]  Neither Schneider nor Gentile presented these documents to Judge Scanlon.

[21]  The Court does not understand the terms of the Amended Proposed Order to enjoin the reimbursement procedures pursuant to which Schneider and Gentile submit invoices and requests for reimbursement under their advancement orders.  The Court clarifies that the reimbursement procedures set forth in the *Fitracks* Order and the Stipulation and Advancement Order are exempted from the litigation injunction.

sole authority "to enforce, waive, assign or release any or all Privileges in the exercise of its

duties."  (Am. Proposed Order ¶ 28 (emphasis omitted); Gentile's Objs. 24–25; Schneider's

Objs. 21–25.)  The Objectors argue that neither Judge Scanlon nor the SEC provided "any basis

for a need to waive GPB's Privileges" and that "waiver authority is unnecessary to preserve

GPB['s] assets, and . . . threatens to impose great expense thereby actually reducing GPB's

assets while also imposing a substantial burden on this Court."  (Gentile's Objs. 24 (emphasis

omitted); *see also* Schneider's Objs. 21–24.)  Schneider also argues that GPB cannot unilaterally

waive a common interest privilege because such a privilege "cannot be waived without the

consent of all parties to the privilege."  (Schneider's Objs. 21–24 (citation omitted).)  In addition,

Schneider argues that if the receiver is empowered to waive GPB's privileges, the Court should

either "impose a condition that no governmental party may obtain access to any materials for

which a privilege has been waived unless they represent in writing to this Court that they will not

use the materials in any enforcement or criminal proceeding," (*id.* at 25), or require the receiver

to "make a motion on notice" if he believes there is a substantial need to waive privilege to fulfill

his duties, (Schneider's Reply 10 (emphasis omitted)).

### i. A receiver can waive the privileges of a corporation to perform its enumerated duties, including managing litigation on behalf of a corporation

It is settled law that privileges, such as the attorney-client privilege, work product

privilege, and common interest or joint defense privilege, may be invoked not just by

individuals, but by corporations as well.  *See, e.g.*, *CFTC v. Weintraub*, 471 U.S. 343, 348 (1985)

("[T]he attorney-client privilege attaches to corporations as well as to individuals." (citing

*Upjohn Co. v. United States*, 449 U.S. 383 (1981))); *United States v. Krug*, 868 F.3d 82, 86 (2d

Cir. 2017) ("'The joint defense privilege, more properly identified as the common[-]interest

rule,' is 'an extension of the attorney[-]client privilege.'" (alterations in original) (quoting *United*

*States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989))).  "[W]hen control of a corporation passes to new management . . . , the authority to assert and waive the corporation's attorney-client privilege passes as well." *United States v. Quest Diagnostics Inc.*, 734 F.3d 154, 167 (2d Cir. 2013) (quoting *Weintraub*, 471 U.S. at 349).  The Supreme Court has "recognized that ordinarily the authority to assert and waive the corporation's privileges 'rests with the corporation's management and is normally exercised by its officers and directors.'" *In re Grand Jury Proc.*, 219 F.3d 175, 183–84 (2d Cir. 2000) (quoting *Weintraub*, 471 U.S. at 348).  "The identity of the persons entitled to waive the privilege on behalf of a corporation becomes a considerably more complicated question where . . . the court appoints an outsider — such as a bankruptcy trustee or receiver — to manage the affairs of the corporation." *United States v. Shapiro*, No. 06-CR-357, 2007 WL 2914218, at *4 (S.D.N.Y. Oct. 1, 2007) (citing *Weintraub*, 471 U.S. at 349–56).  Courts in this Circuit have held that privilege waivers by receivers are valid "despite the attempts of former corporate officers and directors to shield their corporations' allegedly privileged communications from disclosure." *Id.* at *5; *see also SEC v. Ryan*, 747 F. Supp. 2d 355, 367–68 (N.D.N.Y. 2010) (finding that the attorney-client privilege did not prevent the receiver from obtaining records and information related to the corporation and, even if it did, "the [r]eceiver, as successor manager, would have the power to waive the privilege"); *CFTC v. Standard Forex, Inc.*, 882 F. Supp. 40, 44–45 (E.D.N.Y. 1995) (giving effect to a privilege waiver by a receiver after concluding, over the defendants' objections, that "no prejudice will result from granting the [r]eceiver control over the attorney-client privilege").

The Objectors do not provide legal support for their argument that (1) the power to waive GPB's privileges is "unnecessary to address the alleged basis for the receiver, *i.e.*, to preserve

assets,"[22] (Schneider's Objs. 21; *see also* Gentile's Objs. 24–25; Schneider's Reply 9), and (2) "the only apparent basis for the SEC's request is to achieve a tactical advantage in this case and the companion Criminal Action," (Schneider's Objs. 24–25; *see also* Schneider's Reply 9). Although a court will grant a receiver the power to waive privilege "only if there is some valid reason why the [r]eceiver needs to control [the corporation's] attorney-client privilege," *Standard Forex*, 882 F. Supp. at 43, courts have upheld privilege waivers by receivers who were performing their duties, *Ryan*, 747 F. Supp. 2d at 368 (finding that the receiver would have the power to waive privilege since he "was directed by the [p]reliminary [i]njunction to collect all business records" and "is within his rights to ask[] for these documents and data"); *Shapiro*, 2007 WL 2914218, at *6 & n.5 (rejecting the defendant's argument that the receiver does not have the power to waive privilege since the order appointing the receiver directed him to "preserve the status quo" because, if interpreted literally, "the [r]eceiver would have been unable to act on most of his enumerated powers," thus allowing the defendant and former officers "to 'use the privilege as a shield' to protect themselves from having to disgorge any ill-gotten gains" (emphasis omitted) (citing *Weintraub*, 471 U.S. at 353–54)); *Standard Forex*, 882 F. Supp. at 43 & n.3 (affirming the magistrate judge's order to a corporation's former attorney to turn over privileged pre-litigation files to the corporation's receiver because, *inter alia*, "the broad scope of its order appointing the [r]eceiver evidence[d] an intent to include the attorney-client privilege with it").

The Amended Proposed Order authorizes the receiver to, *inter alia*, ascertain the financial condition of the receivership entities and assets, oversee and manage the receivership

---

[22] The Objectors do not argue that a receiver does not have the power to waive a corporation's privileges, only that such power is unnecessary in this case.

entities and assets, prevent the encumbrance or disposal of the receivership assets, preserve the books, records, and documents of the receivership entities and assets, and manage litigation by and against the receivership entities and assets.  (*See, e.g.*, Am. Proposed Order ¶¶ 2, 6.)  The Amended Proposed Order authorizes the receiver to do more than merely "preserve assets," some of which may require the waiver of GPB's privilege, such as "manag[ing] litigation by and against the [r]eceivership."  (Am. Proposed Order ¶ 2); *see also Shapiro*, 2007 WL 2914218, at *7 ("[I]f the [r]eceiver is to be permitted to pursue litigation on [the corporation's] behalf, there is no reason why he should be unable to exercise his discretion to waive its corporate privileges in connection with that litigation or in other contexts.").

### ii.   GPB can waive its common interest privilege as to its own statements

"A client who is part of a joint defense arrangement is entitled to waive the privilege for his own statements, and his co-defendants cannot preclude him from doing so."  *United States v. Agnello*, 135 F. Supp. 2d 380, 383 (E.D.N.Y. 2001), *aff'd*, 16 F. App'x 57 (2d Cir. 2001); *see also United States v. Hatfield*, No. 06-CR-550, 2009 WL 3806300, at *12 (E.D.N.Y. Nov. 13, 2009) ("A member of a joint defense agreement can waive the privilege with respect to its own communications, but typically cannot disclose privileged information received from other joint defense agreement members." (first citing *Agnello*, 135 F. Supp. 2d at 383; then citing *United States v. Salvagno*, 306 F. Supp. 2d 258, 273 (N.D.N.Y. 2004); and then citing *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 922 (8th Cir. 1997))); *Sicurelli v. Jeneric/Pentron Inc.*, No. 03-CV-4934, 2005 WL 8156861, at *3 (E.D.N.Y. June 16, 2005) ("Thus, even if the [c]ourt had found the existence of a common interest work product privilege between plaintiffs and Ivoclar, Ivoclar, as the party that either independently commissioned or created [the documents],

was entitled to waive any privilege it may have over such documents." (citing *Agnello*, 135 F. Supp. 2d at 383)).

Schneider argues that the receiver cannot waive GPB's common interest privilege because "[a] common-interest privilege 'cannot be waived without the consent of all parties to the privilege.'" (Schneider's Objs. 22 (quoting *United States v. Napout*, No. 15-CR-252, 2017 WL 980323, at *2 (E.D.N.Y. Mar. 10, 2017)).) However, because GPB is the holder of the common interest privilege with respect to its own privileged communications, it is free to exercise or waive its rights as it chooses. *See Agnello*, 135 F. Supp. 2d at 383 ("All that [the co-defendants] would be entitled to do, to the extent that a joint defense privilege did attach to the conversations, is stop [the privilege waiving defendant] from directly or indirectly revealing the privileged communications of other participants." (first citing 2 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 188 (2d ed. 1994); and then citing *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d at 922)). To the extent the receiver seeks to waive privileged conversations of others, the receiver is required to "comply with applicable law in the exercise of such privileges or immunities." (R&R 33.) *See, e.g.*, *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 319 F.R.D. 100, 110 (S.D.N.Y. 2017) ("[W]hen two or more clients are jointly represented by a single law firm concerning a matter of common interest, one of them cannot unilaterally waive the privilege that attaches to communications that they jointly made for the purpose of seeking legal advice." (first citing *Lugosch v. Congel*, 219 F.R.D. 220, 238 (N.D.N.Y. 2003); and then citing *Johnson Matthey, Inc. v. Rsch. Corp.*, No. 01-CV-8115, 2002 WL 1728566, at *6 (S.D.N.Y. July 24, 2002))); *Hatfield*, 2009 WL 3806300, at *12 ("A member of a joint defense agreement . . . typically cannot disclose privileged information received from other joint defense agreement members." (citations omitted)).

The Court finds that GPB consented to appointment of the receiver and the entry of the Amended Proposed Order, including paragraph 28, which empowers the receiver to waive any and all privileges or immunities held by GPB.  (Am. Proposed Order 2 ("[T]he Chief Executive Officer of GPB CH and Highline consents to entry of this Order.").)  Because a receiver can waive a corporation's privileges and GPB consented to the appointment of the receiver, the objections by Gentile, Schneider, and Ascendant Capital to the Amended Proposed Order are without merit.[23]

### III.  Conclusion

For the reasons stated above, the Court (1) grants the SEC's motion to convert the monitorship into a receivership and impose a litigation injunction, (2) adopts the Amended Proposed Order, and (3) denies Gentile's motion as moot.

Dated: December 7, 2023
        Brooklyn, New York

SO ORDERED:


            s/ MKB
        MARGO K. BRODIE
        United States District Judge

---

[23]  Because the Court grants the SEC's motion, it does not address the SEC's and GPB's argument that Gentile and Schneider do not have standing to object to the appointment of a receiver.  (*See* SEC's Resp. 2 n.3; GPB's Resp. 1 n.1.)

SPA-42

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **21-cv-00583-MKB-VMS** |
| **v.** | **ECF CASE** |
| **GPB CAPITAL HOLDINGS, LLC; ASCENDANT CAPITAL, LLC; ASCENDANT ALTERNATIVE STRATEGIES, LLC; DAVID GENTILE; JEFFREY SCHNEIDER; and JEFFREY LASH,** | |
| **Defendants.** | |

**ORDER APPOINTING RECEIVER AND IMPOSING LITIGATION INJUNCTION**

     **WHEREAS** on February 23, 2021, this Court entered, upon consent of the Securities and Exchange Commission ("Commission") and defendant GPB Capital Holdings, LLC ("GPB CH" or "Defendant"), the Order Appointing Monitor (Dkt. 23), which appointed Joseph T. Gardemal III as independent Monitor (the "Monitor") in this action (the "Monitorship");

     **WHEREAS**, on April 14, 2021, this Court entered, upon consent of the Commission and GPB CH, the Amended Order Appointing Monitor (Dkt. 39);

     **WHEREAS**, GPB CH is the general partner or controls the general partner of eight (8) limited partnerships (the "GPB Funds"), which own or owned in their respective investment portfolios controlling interests in various operating companies (the "Portfolio Companies");

     **WHEREAS**, in total, the GPB Funds collectively have approximately 17,000 limited partner investors;

WHEREAS, pursuant to the limited partnership agreements governing the GPB Funds, GPB CH controls each of the GPB Funds, which GPB Funds possess the direct or indirect ability to control a majority of seats on the applicable boards of directors or managers of the respective Portfolio Companies that remain part of the respective investment portfolio; and

WHEREAS, Highline Management, Inc. ("Highline") is a wholly-owned subsidiary of GPB CH currently overseen by a majority independent board of directors, and provides certain consulting and management services to some or all of GPB CH and the GPB Funds;

WHEREAS, certain state regulatory authorities have filed administrative and/or civil enforcement actions against GPB CH, specifically, the state securities regulators of Alabama, Georgia, Illinois, Massachusetts, Missouri, New Jersey, New York and South Carolina listed in Dkt. 11-5 (the "State Securities Regulators");

WHEREAS, the Commission and the Monitor believe it is in the best interests of the Receivership Entities (as defined below), their investors and creditors, to terminate the Monitorship and appoint a receiver over (i) the entities set forth on Schedule 1 hereto, including, without limitation, GPB CH, each of the GPB Funds and Highline (such entities set forth on Schedule 1 hereto, collectively, the "Receivership Entities"), and (ii) the Receivership Assets (as defined below), in order to contain costs, effectuate distributions to investors and creditors and wind down the Receivership Entities in a timely, orderly and cost-efficient manner;

WHEREAS, the Chief Executive Officer of GPB CH and Highline consents to entry of this Order.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

**I. Exclusive Jurisdiction**

1. This Court hereby takes exclusive jurisdiction and possession of all of the assets

SPA-44

of the Receivership Entities together with all proceeds thereof (collectively, the "Receivership Assets") of whatever kind, wherever situated, or whenever obtained.

## II.  Appointment of Receiver and Termination of Monitor

2.   Until further Order of this Court, Joseph T. Gardemal III is hereby appointed to serve without bond as receiver (the "Receiver") for the receivership estate of the Receivership Entities (the "Receivership Estate"), including the Receivership Assets, to, among other duties and rights set forth in this Order and available under applicable law and without limiting any other provisions of this Order, (a) preserve the status quo to enable the Receiver to perform the duties specified hereunder; (b) ascertain the financial condition of the Receivership Entities and Receivership Assets; (c) oversee and manage, consistent with the relevant governing documents and applicable law, the Receivership Entities and Receivership Assets; (d) prevent the encumbrance or disposal of the Receivership Assets contrary to the Receiver's mandate; (e) preserve the books, records, and documents of the Receivership Entities and Receivership Assets; (f) manage litigation by and against the Receivership, the Receivership Entities and the Receivership Assets; (g) propose for Court approval a fair and equitable distribution of the remaining Receivership Assets; and (h) be available to respond to investor inquiries, all as further set forth in this Order.

3.   The Monitorship is hereby terminated.  Any unpaid fees, costs and expenses of the Monitor and its retained professionals may be paid by the Receiver from the Receivership Estate subject to approval by an Order of this Court.

## III. General Powers and Duties of Receiver

4.   The Receiver shall have all powers, authorities, rights and privileges heretofore possessed by the Receivership Entities, and any officers, directors, managers, managing

3

SPA-45

members, and general and limited partners of the Receivership Entities, under applicable state and federal law, by the governing charters, by-laws, articles and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959 and 1692, and Fed.R.Civ. P. 66, except that the Receiver shall conduct a cost/benefit analysis and consult with the Commission staff prior to commencing any affirmative litigation.

5.     All of the powers derived from any source of any and all officers, directors, managers, managing members, general and limited partners, employees, investment advisers, accountants, attorneys and other agents and advisers of the Receivership Entities are hereby suspended, except to the extent as may hereafter be expressly granted by the Receiver in its sole discretion and, to the extent necessary (in the sole determination of the Receiver), approved by the Court.  The Receiver shall assume and control the operation of the Receivership Entities, and shall preserve all of their assets and claims for the benefit of the Receivership Estate.  No person holding or claiming any position of any type with any of the Receivership Entities shall have any authority to act by or on behalf of any of the Receivership Entities, except as may be expressly authorized or delegated by the Receiver in writing.

6.     Without limiting the other provisions in this Order, the Receiver shall have the following general powers and duties:

A.     Take and retain immediate possession and control of all Receivership Assets and all books, records and documents of the Receivership Entities, wherever located, related to the Receivership Assets, and to sue for and collect, recover, receive and take into possession from third parties, all Receivership Assets and records relevant thereto;

B.     Manage, control, operate and maintain the Receivership Entities and hold in the

SPA-46

Receiver's possession by and through the Receivership Estate, custody and control of all Receivership Assets, subject to the other provisions of this Order;

C.    Take any action which, prior to the entry of this Order, could have been taken by the officers, directors, managers, managing members, and general and limited partners, and agents of the Receivership Entities, acting in their respective capacities;

D.    Take such action as necessary and appropriate for the preservation of the Receivership Estate and Receivership Assets and to prevent the dissipation or concealment of the Receivership Assets;

E.    Conduct an orderly liquidation of the Receivership Entities and the Receivership Assets in a manner and over a period of time calculated to maximize their value for investors and the Receivership Estate;

F.    Have exclusive control of, and be made the sole authorized signatory for, all accounts at any bank, brokerage firm or financial institution that has possession or control of any Receivership Assets; *provided, however,* that the Receiver may from time to time designate additional signatories as determined in the Receiver's sole discretion;

G.    Pay from the Receivership Assets necessary expenses required to preserve and administer the Receivership Assets and Receivership Estate, but in no event shall the Receiver, without prior order of the Court, make any payments or transfers of property of a value in excess of $50,000 (fifty-thousand dollars), except that the Receiver may pay the following fees, costs, expenses and other charges in the ordinary course without regard to the foregoing cap and without prior order of the Court: (i) compensation and benefits to employees, including temporary non-payroll staff, (ii) rent, (iii) insurance premiums and related costs, (iv) the fees and costs of Phoenix American Financial

5

SPA-47

Services related to administering the GPB Funds and all other expenses necessary to administer and operate the GPB Funds, (v) the fees and costs of TransPerfect related to records management, (vi) other routine costs and expenses of the Receivership Estate, including, without limitation, those related to: information technology (including maintenance of hardware and software), water, electric, telephone, sewage, garbage, trash removal and other utilities and services, and (vii) all other costs and expenses authorized by this Court pursuant to this Order or any other order of this Court;

H.      Locate and bring into the Receivership Estate by all reasonable means Receivership Assets that may have been conveyed to, or are under the possession and control of, third parties or otherwise concealed;

I.      Engage and employ agents, claim and noticing agents, persons, firms and other persons and entities, including accountants, attorneys, experts, liquidators, brokers, traders, or auctioneers (collectively, "Retained Personnel"), to assist in the carrying out of the Receiver's duties and responsibilities hereunder, subject to prior order of the Court, and pay Retained Personnel in accordance with the "Billing Instructions for Receivers in Civil Actions Commenced by the U.S. Securities and Exchange Commission" (the "Billing Instructions"), as modified by this Order;

J.      Engage and employ (i) the professionals set forth on Schedule 2 attached to this Order (the "Ordinary Course Professional Schedule"), who were previously retained by one or more of the Receivership Entities in the ordinary course and whom the Court hereby approves to be retained under this Order and (ii) such other professionals engaged by the Receiver after the date of entry of this Order date, as long as (a) without further order of this Court, each such professional incurs less than $15,000 in fees and costs on a

6

monthly basis, (b) without further order of this Court, the aggregate amount of all fees and expenses of each such professional does not exceed $300,000, and (c) with respect to any professional not set forth on the Ordinary Course Professional Schedule as it exists on this date, such professional is set forth on an amended Ordinary Course Professional Schedule that is filed with this Court promptly after such professional's engagement ("Ordinary Course Professionals").  The Receiver is hereby authorized to pay the reasonable fees and expenses of each Ordinary Course Professional on a monthly basis from Receivership Assets and the Receiver shall report such payments in the First Status Report and the Quarterly Status Reports (as each such term is defined below), as applicable.  To the extent an Ordinary Course Professional exceeds $15,000 in fees and costs in any one month, unless otherwise ordered by this Court, they will be required to submit a fee application to the Court with respect to such fees and costs and follow the procedures set forth below in paragraphs 51 through 56 for approval of compensation for Retained Personnel with respect to such fees and costs.  And, to the extent the aggregate amount of all fees and costs of an Ordinary Course Professional exceeds $300,000, unless otherwise ordered by this Court, such Ordinary Course Professional will be required to submit fee applications to the Court with respect to such fees and costs that exceed the aggregate cap and follow the procedures set forth below in paragraphs 51 through 56 for approval of compensation for Retained Personnel;

K.      Manage any litigation and claims against the Receivership Entities and/or the Receivership Assets;

L.      Recommend to the Commission whether litigation against third parties should be commenced to recover assets for the benefit of the Receivership Estate and how the

7

litigation fees and costs should be paid, including on a contingent fee basis;

M.      Commence, maintain, pursue, resist and defend all suits, actions, claims and

demands which may now be pending or which may be brought by or asserted against the

Receivership Entities (in the name of the Receivership Entities and/or the Receiver), the

Receivership Assets, the Receiver or the Receivership Estate;

N.      Bring all other legal actions based on law or equity in any state, federal, or foreign

court (including in the name of the Receivership Entities), as the Receiver deems

necessary or appropriate in discharging the Receiver's duties as Receiver and maximizing

recoveries for investors and creditors of the Receivership Entities;

O.      Sell, assign, transfer or otherwise dispose of any assets of the Receivership

Entities either directly or through one or more Retained Personnel, subject to approval by

this Court with respect to any material assets;

P.      No later than forty-five (45) days after entry of this Order, propose to the Court a

plan to distribute available Receivership Assets (subject to appropriate reserves) to

investors and creditors of the Receivership Entities that shall include provisions for (i) an

initial distribution to be made by the Receiver, (ii) interim distributions to be made by the

Receiver from time to time, (iii) a final distribution to be made by the Receiver, (iv) a bar

date for the filing of claims in the Receivership Estate against the Receivership Entities

and the Receivership Assets and/or for the filing of objections to a schedule of claims

prepared by the Receiver for the purpose of making distributions, except that no limited

partner shall be required to file a claim based solely upon such limited partner's equity

interest in any GPB CH Fund, (v) a claim review and reconciliation process, (vi) a

dispute resolution process for resolving any disputes concerning claims or proposed

SPA-50

distributions, (vii) creating and funding reserves, and (viii) such other matters as are determined by the Receiver to be reasonably necessary to facilitate or implement the claim and distribution processes, which plan shall be subject to Court approval;

Q.     Cause the Receiver and its agents to be named as an additional insured on any insurance policies covering the Receivership Estate or Receivership Assets;

R.     In its sole discretion, obtain and/or maintain insurance covering the Receivership Estate, the Receivership Entities and/or the Receivership Assets, and such insurance expense shall be deemed a normal, ordinary, and necessary operating expense of the Receivership Estate;

S.     Consult with any party in interest, including the Commission staff, the State Securities Regulators (who shall designate one or more contact persons to communicate with the Receiver, and shall notify the Receiver of any change to the designated contact(s)), the individual defendants, plaintiffs, creditors, and investors regarding any Receivership Estate matter; and

T.     Take such other action as may be approved by the Court.

### IV. Access to Information, Books, Records and Accounts

7.     The Receivership Entities and each of their (including former) officers, directors, managers, managing members, general and limited partners, agents, attorneys, accountants and employees, as well as those acting in their place, are hereby ordered and directed to preserve and turn over to the Receiver forthwith all paper and electronic information of, and/or relating to, the Receivership Entities and/or Receivership Assets; such information shall include but not be limited to books, records, documents, accounts and all other instruments and papers.

8.     The Receivership Entities and each of their (including former) officers, directors,

managers, managing members, general and limited partners, agents, attorneys, accountants and employees, as well as those acting in their place, shall cooperate fully with the Receiver in his or her efforts to carry out the obligations, duties and purposes set out in this Order, subject to and limited by their Fifth Amendment rights.

9.      The Receiver is authorized to open all electronic mail generated by, directed to, or received by the Receivership Entities and all mail directed to or received by or at the offices or post office boxes of the Receivership Entities, and to inspect all mail opened prior to the entry of this Order, to determine whether items or information therein fall within the mandates of this Order.

10.      All banks, brokerage firms, financial institutions, and other persons or entities which have possession, custody or control of any assets or funds held by, in the name of, or for the benefit, directly or indirectly, of the Receivership Entities that receive actual notice of this Order shall (i) not liquidate, transfer, sell, convey or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of the Receivership Entities except upon written instructions from the Receiver; (ii) not exercise any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control without the permission of this Court; and (iii) cooperate expeditiously in providing information and transferring funds, assets and accounts to the Receiver or at the direction of the Receiver.

**V.  Notice to Third Parties**

11.      The Receiver shall promptly give notice of the Receiver's appointment to all known past and present officers, directors, managers, managing members, general and limited partners, agents, attorneys, accountants, and employees of the Receivership Entities, as the

Receiver deems necessary or advisable to effectuate the operation of the receivership.

12.     All persons and entities owing any obligation or debt to any Receivership Entity shall, until further ordered by this Court, perform and/or pay all such obligations in accordance with the terms thereof to the Receiver and its receipt for such payments shall have the same force and effect as if the applicable Receivership Entity had received such performance or payment.

13.     The Receiver is authorized to communicate with, and/or serve this Order upon, any person, entity or government office that he deems appropriate to inform them of the status of this matter and/or the financial condition of the Receivership Estate.  All government offices which maintain public files of security interests in real and personal property shall, consistent with such office's applicable procedures, record this Order upon the request of the Receiver or the Commission.

14.     The Receiver is authorized to instruct the United States Postmaster to hold and/or reroute mail which is related, directly or indirectly, to the business, operations or activities of any of the Receivership Entities (the "Receiver's Mail"), including all mail addressed to, or for the benefit of, the Receivership Entities.  The United States Postmaster shall not comply with, and shall immediately report to the Receiver, any change of address or other instruction given by anyone other than the Receiver concerning the Receiver's Mail.  The Receivership Entities shall not open any of the Receiver's Mail and shall immediately turn over such mail, regardless of when received, to the Receiver.  All personal mail of any individuals, and/or any mail appearing to contain privileged information, and/or any mail not falling within the mandate of the Receiver, shall be released to the named addressee by the Receiver.  The foregoing instructions shall apply to any proprietor, whether individual or entity, of any private mailbox, depository, business or service, or mail courier or delivery service, hired, rented or used by the Receivership Estate.  The

SPA-53

Receivership Entities shall not open a new mailbox, or take any steps or make any arrangements to receive mail in contravention of this Order, whether through the U.S. mail, a private mail depository or courier service.

15.     Subject to payment for services provided, any entity furnishing space, water, electric, telephone, sewage, garbage, trash removal, or any other services to the Receivership Entities shall maintain such service and related account in the name of the Receivership Entity for the benefit of the Receiver and Receivership Estate, or transfer such account to the Receiver, unless instructed to the contrary by the Receiver.

### VI. Injunction Against Interference with Receiver

16.     The Receivership Entities, and all persons and entities receiving notice of this Order by personal service, mail, electronic mail, facsimile, regular mail, through electronic case filing notices, overnight courier, or in any other manner consistent with due process, are hereby restrained and enjoined from directly or indirectly taking any action or causing any action to be taken, without the express written agreement of the Receiver, that would:

A.     Interfere with the Receiver's efforts to take control, possession, or management of the Receivership Entities or any Receivership Assets; such prohibited actions include but are not limited to, taking any action to remove GPB CH as general partner of any GPB CH Fund or otherwise interfere with GPB CH's control over any GPB CH Fund, using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Receivership Assets;

B.     Hinder, obstruct or otherwise interfere with the Receiver in the performance of

SPA-54

the Receiver's duties; such prohibited actions include but are not limited to, concealing, destroying or altering records or information or interfering with any claim, distribution and/or wind-down plans or processes established by the Receiver;

C.      Dissipate or otherwise diminish the value of any Receivership Assets; such prohibited actions include but are not limited to, releasing claims or disposing, transferring, exchanging, assigning or in any way conveying any Receivership Assets, enforcing judgments, assessments or claims against the Receivership Entities or any Receivership Assets, attempting to modify, cancel, terminate, call, extinguish, revoke or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement or other agreement executed by the Receivership Estate or which otherwise affects any Receivership Assets; or,

D.      Interfere with or harass the Receiver, any Retained Personnel or any Ordinary Course Professional, or interfere in any manner with the exclusive jurisdiction of this Court over the Receiver, the Receivership Estate, the Receivership Entities, or the Receivership Assets.

17.     The Receiver shall promptly notify the Court, the Commission staff, and the State Securities Regulators, of any failure or apparent failure of any person or entity to comply in any way with the terms of this Order.

## VII. Stay of Litigation

18.     As set forth in detail below, the following proceedings, ***excluding*** (i) the instant proceeding, (ii) all police or regulatory actions and actions of the Commission related to the above-captioned enforcement action, (iii) all actions pending or to be brought by the United

13

SPA-55

States of America or any of its agencies, and (iv) all actions pending or to be brought by any state or commonwealth within the United States of America pursuant to such state's or commonwealth's police and regulatory power, are stayed and/or enjoined until further Order of this Court:[1]

> All existing or future civil legal proceedings of any nature, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature involving: (a) the Receiver, in the Receiver's capacity as Receiver; (b) the Retained Personnel and/or Ordinary Course Professionals, in their respective capacities as such; (c) the Receivership Estate; or (d) the Receivership Entities or any Receivership Assets, wherever located.  Any person or entity that seeks to put one or more of the Receivership Entities into voluntary or involuntary bankruptcy proceedings must seek leave of Court on motion upon no less than 14 (fourteen) days' notice to the Receiver and to the Commission staff.  Any such motion must show good cause for the filing of voluntary or involuntary bankruptcy proceedings for such Receivership Entities.  Any person or entity may seek leave of this Court to proceed against the Receiver, in such capacity; the Retained Personnel, in such capacity; the Ordinary Course Professionals, in such capacity; the Receivership Estate; the Receivership Entities; and the Receivership Assets.

19.     The foregoing stay and injunction shall not prohibit the Receiver from commencing or continuing any litigation in its own name or in the name of any Receivership Entity.  For any cause of action accrued or accruing in favor of the Receivership Estate against a third person or party, any applicable statute of limitation is tolled during the period in which this

---

[1] A non-exclusive list of litigations involving the Receivership Entities and Receivership Assets that are not otherwise excluded from the stay is set forth on <u>Schedule 3 hereto.</u>

stay of existing legal proceedings and injunction against commencement of new or expanded

legal proceedings is in effect as to that cause of action.

### VIII. Managing Assets

20.     The Receiver shall at all times administer the Receivership Assets with the care

and diligence that an ordinary prudent individual would use in handling such person's own

estate.

21.     Subject to the restrictions in paragraph 6(G), the Receiver may, without further

Order of this Court pay expenses that arise in the ordinary course of the Receivership Entities'

orderly wind down, on terms and in the manner the Receiver deems most beneficial to the

Receivership.

22.     The Receiver is authorized, without leave of Court, to take all actions to manage,

maintain, and/or wind-down business operations of the Receivership Entities, including making

legally required payments to creditors, employees, and agents of the Receivership Entities and

Receivership Estate, communicating with vendors, landlords, investors, governmental and

regulatory authorities, and others, and preparing and filing all necessary tax returns, as

appropriate and necessary for the orderly wind down of the Receivership Entities consistent

with 28 U.S.C. §959(b).

23.     To the extent required, the Receiver shall take all necessary steps to enable the

Receivership Estate to obtain and maintain the status of a taxable "Settlement Fund," within the

meaning of Section 468B of the Internal Revenue Code and of the regulations.

24.     In connection with the execution and performance of the Receiver's duties and

authorities provided for pursuant to this Order, at no point shall the Receiver be deemed to be

acting as an "investment adviser" as defined in Section 202(a)(11) of the Investment Advisers

Act of 1940, as amended (an "Investment Adviser"), or in any other capacity other than as Receiver for the Receivership Estate, and the performance of the Receiver's duties and authorities provided for pursuant to this Order shall not require the Receiver to register as an Investment Adviser with the Commission or any other agency or entity.

### IX.  Investigate and Prosecute Claims

25.     The Receiver is authorized, empowered and directed to, in its own name or in the name of the Receivership Entities, investigate, prosecute, commence, maintain, defend, intervene in or otherwise participate in, compromise, settle, and/or adjust actions in any state, federal or foreign court or proceeding of any kind as may, in the Receiver's sole discretion, be advisable or proper to recover and/or conserve Receivership Assets.

26.     The Receiver is authorized, empowered and directed to investigate the manner in which the financial and business affairs of the Receivership Entities were conducted and (after consultation with Commission staff) to institute such actions and legal proceedings, for the benefit and on behalf of the Receivership Estate, as the Receiver deems necessary and appropriate.  The Receiver may seek, among other legal and equitable relief, the imposition of constructive trusts, disgorgement of profits and fees, asset turnover, avoidance of fraudulent transfers, rescission and restitution, collection of debts, damages, injunctive relief, declaratory relief, and such other relief from this Court as may be necessary to enforce this Order.

27.     In furtherance of the Receiver's power to manage litigation and to conduct an investigation, the Receiver is authorized to issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure and Court orders without further leave of Court.

28.     Any and all attorney-client privilege, work product protection, common interest or

joint defense privilege, or other privilege or immunity (collectively, the "Privileges") of the Receivership Entities, the Monitor, the Monitorship, and/or attaching to or arising in or in connection with any of their documents, data or communications (whether written or oral), are hereby transferred and belong exclusively to the Receiver for the benefit of the Receivership Estate. The Receiver therefore has sole authority, and is hereby empowered, to enforce, waive, assign or release any or all Privileges in the exercise of its duties as Receiver.

## X.  Bankruptcy Filing

29.     The Receiver may seek authorization of this Court to file a voluntary petition for relief under Title 11 of the United States Code (the "Bankruptcy Code") for any or all of the Receivership Entities. If any Receivership Entity or any Receivership Asset is placed into a bankruptcy proceeding, the Receiver may become, and may be empowered to operate the entity or asset, as a debtor in possession. In such a situation, the Receiver shall have all of the powers and duties as provided a debtor in possession under the Bankruptcy Code to the exclusion of any other person or entity. The Receiver is vested with management authority for the Receivership Entities and the Receivership Assets and may therefore file such Chapter 11 petitions and have all of the powers and duties as provided a debtor in possession under the Bankruptcy Code. *See*, *In re Bayou Group, LLC,* 564 F.3d 541, 548-49 (2nd Cir. 2009).

30.     The provisions of Article VII above bar any person or entity, other than the Receiver, from placing any Receivership Entity or any Receivership Asset into bankruptcy without prior leave of Court on motion providing no less than 14 (fourteen) days' notice to the Receiver and to the Commission.

## XI. Conflicts; Liability of the Receiver

31.     The Receiver has a continuing duty to ensure that there are no conflicts of interest

between the Receiver, on the one hand, and the Receivership Estate and Receivership Assets, on the other hand.

32.     Notwithstanding the foregoing, it is understood that the Receiver is a Managing Director with Alvarez & Marsal Disputes and Investigations, LLC ("A&M DI").  A&M DI together with certain of its affiliates make up the global consulting firm known as Alvarez & Marsal ("A&M").  This Court recognizes that A&M may have relationships with parties in interest in this Receivership Estate (including stakeholders, Retained Personnel, Ordinary Course Processionals and others with an interest in and/or connection to the Receiver and/or Receivership Estate), and it shall not be a conflict of interest for the Receiver or A&M for A&M to act for or adverse to any such parties in interest in matters unrelated to the Receiver's duties hereunder.

33.     Until further Order of this Court, the Receiver shall not be required to post bond or give an undertaking of any type in connection with the Receiver's fiduciary obligations in this matter, and, if so ordered, all costs and expenses of procuring any such bond or undertaking shall be deemed expenses reimbursable to the Receiver from the Receivership Estate.

34.     The Receiver, Retained Personnel and Ordinary Course Professionals are entitled to rely on all outstanding rules of law and Orders of this Court and shall not be liable to any person or entity for their own good faith compliance with any order, rule, law, judgment, or decree.  In no event shall the Receiver, Retained Personnel or Ordinary Course Professionals be liable to anyone for their good faith compliance with their respective duties and responsibilities.

35.     The Receiver, Retained Personnel and Ordinary Course Professionals may rely, and shall be fully protected personally in acting upon any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that

the Receiver or such Retained Personnel or Ordinary Course Professionals have no reasonable

belief to be other than genuine and to have been signed or presented other than by the proper

party or parties or, in the case of facsimile transmissions, to have been sent other than by the

proper party or parties, in each case without obligation to satisfy themselves that the same was

given in good faith and without responsibility for errors in delivery, transmission or receipt.  In

the absence of Receiver's, Retained Personnel's, or Ordinary Course Professional's bad faith, the

Receiver, Retained Personnel, or Ordinary Course Professional, as applicable, may rely as to the

truth of statements and correctness of the facts and opinions expressed therein and shall be fully

protected personally in acting thereon.  The Receiver may consult with legal counsel, Retained

Personnel and Ordinary Course Professionals and shall be fully protected in respect of any action

taken or suffered by the Receiver in accordance with the opinion or advice of legal counsel,

Retained Personnel or Ordinary Course Professionals (whether or not written).  The Receiver

may at any time seek instructions from this Court concerning the acquisition, management or

disposition of the Receivership Assets.  None of the Receiver, nor any Retained Personnel or

Ordinary Course Professionals, nor their respective affiliates shall be liable (personally or

otherwise) to any person (or any predecessor or successor thereto) for any reason whatsoever

arising out of matters relating to the Receivership Estate, the execution of or failure to execute

the Receiver's duties or the performance or nonperformance of services for the Receivership

Estate or the Receiver, except for any liability that is determined by a final order of this Court

that is no longer subject to appeal, to have arisen primarily from the gross negligence, willful

misconduct, fraud, or willful breach of fiduciary duty of such person, and, for the avoidance of

doubt, in no event shall A&M be responsible or liable for the acts or omissions of the Receiver.

Without limiting the generality of the foregoing, the Receiver shall have no liability on account

SPA-61

of the Receiver's investment or non-investment of any Receivership Assets or any losses with respect to any such investments of Receivership Assets, provided that such investments are made, or the Receiver's decision not to invest Receivership Assets in any case is made, in accordance with any express Orders of this Court relating directly to investment of assets.

36.     The Receiver and Retained Personnel (each, an "Indemnified Party" and collectively, the "Indemnified Parties") shall be defended, indemnified and held harmless by each of the Receivership Entities and the Receivership Estate, from and against all losses, claims, judgments, costs, expenses, liabilities and reasonable expenses including legal fees (which shall be paid promptly under the indemnity after Court approval as they arise) which such Indemnified Party may incur or may become subject to in connection with any action, suit, proceeding or investigation that is brought or threatened against such Indemnified Party in respect of their actions or inactions regarding the implementation or administration of the Receivership Estate, or the discharge of its duties hereunder, except for any actions that are determined by a final order of this Court that is no longer subject to appeal, to have arisen primarily from the gross negligence, willful misconduct, fraud, or willful breach of fiduciary duty of such person; *provided, however,* that nothing herein shall limit the immunity of the Receiver and Retained Personnel allowed by law or deprive the Receiver or the Retained Personnel of indemnity for any act or omission for which they have immunity.

37.     This Court shall retain exclusive jurisdiction over any action filed against the Receiver, Retained Personnel and/or Ordinary Course Professionals based upon acts or omissions committed in their representative capacities or in connection with any action filed by any of them asserting an indemnity claim.

38.     In the event the Receiver decides to resign, the Receiver shall first give written

SPA-62

notice to the Commission's counsel of record, the State Securities Regulators, and the Court of its intention, and the resignation shall not be effective until the earlier of the date on which the Court appoints a successor and thirty (30) days from the date the Receiver shall have given such notice.  The Receiver shall then follow such instructions as the Court may provide.

39.     No provision of this Order shall require the Receiver to expend or risk his or their own funds or otherwise incur any financial liability in the performance of any of its duties as Receiver hereunder, or in the exercise of any of its rights or powers.

40.     Prior to taking any action against the Receiver regarding the Receiver's conduct in his capacity as the Receiver, a person must seek and receive leave of this Court.  This Court shall retain exclusive jurisdiction over any action or controversy regarding any matters relating to or arising from the Receiver's role and conduct in such role.

41.     This Article XI shall survive the resignation or removal of Joseph T. Gardemal III as Receiver, any Retained Personnel and/or any Ordinary Course Professionals and the termination of the receivership.

## XII. Recommendations and Reports

42.     No later than forty-five (45) days after the entry of this Order, the Receiver shall file and serve a full report and accounting of Receivership Assets (the "First Status Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the existence, value, and location of all Receivership Assets, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of the Receivership.

43.     The First Status Report shall contain the following:

A.     A summary of the operations of the Receiver;

21

B. The amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

C. A schedule of all the Receiver's receipts and disbursements, including payments to Ordinary Course Professionals (attached as Exhibit A to the First Status Report), with one column for the quarterly period covered and a second column for the entire duration of the receivership;

D. A description of all known Receivership Assets;

E. A description of liquidated and unliquidated claims held by the Receivership Estate and approximate valuations of claims;

F. The Receiver's recommendations for a continuation or discontinuation of the receivership and the reasons for the recommendations; and

G. Any other information that the Receiver reasonably deems appropriate to include in the First Status Report.

44. For good cause shown, the Receiver may seek leave of Court to extend the time set for the filing of the First Status Report and any Quarterly Status Report.  In addition, if requested by the Commission or a State Securities Regulator, the Receiver is hereby authorized to share with each of them a list of all known investors and creditors and the amount of their investments and claims, as applicable, redacted to exclude personally identifiable information.

45. Subsequent to the filing of the First Status Report, the Receiver shall file a quarterly status report (the "Quarterly Status Report") containing substantially the same type of information required to be set forth in the First Status Report.  The Quarterly Status Report shall be filed within twenty (20) days of the end of each quarter, except that, the first Quarterly Status Report shall be filed upon the passing of the first full quarter after the First Status Report is filed.

SPA-64

46.     On the request of the Commission or a State Securities Regulator, the Receiver shall provide any documentation that the requester deems necessary to meet its reporting requirements, that is mandated by statute or Congress, or that is otherwise necessary to further the Commission's or State Securities Regulator's mission.

### XIII. Fees, Expenses and Accountings

47.     Subject to the specific provisions of this Order, the Receiver need not obtain Court approval prior to the disbursement of Receivership Assets for expenses in the ordinary course of the wind down of the Receivership Estate.

48.     Subject to the specific provisions of this Order, the Receiver is authorized to solicit Retained Personnel and Ordinary Course Professionals to assist the Receiver in carrying out the duties and responsibilities described in this Order.  The Retained Personnel may include, without limitation, A&M DI or other A&M entities.  The Receiver is hereby expressly authorized to utilize the services of A&M as Retained Personnel (rather than utilizing other similarly situated or available personnel or professional services firms).  In no event shall the Receiver or A&M be subject to a claim of a conflict of interest or breach of fiduciary duty or any other claim arising as a result of the appointment of any such person in accordance with this provision.

49.     With the exception of Hogan Lovells US LLP and A&M, who were previously retained by the Monitor in this case and whom the Court hereby approves as Retained Personnel under this Order, the Receiver shall not engage any Retained Personnel without first obtaining an Order of the Court authorizing such engagement.  For the avoidance of doubt, the term "Retained Personnel" shall include any professionals retained to provide services to or for any Receivership Entity, any Receivership Asset, the Receiver, or the Receivership Estate, and any counsel

23

retained for any purpose, but shall exclude all Ordinary Course Professionals.

50.     Within thirty (30) days of entry of this Order, each of Hogan Lovells US LLP and A&M shall file with the Court sworn declarations disclosing any and all material connections that they may have to this case.  With respect to the limited partner investors in the GPB Funds, Hogan Lovells US LLP and A&M are not required to disclose any connections to any such investors to the extent revenue derived from such investor does not exceed one percent (1%) of net revenue of Hogan Lovells US LLP or A&M, as applicable.

51.     The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receivership Assets as described in the Billing Instructions agreed to by the Receiver, as modified by this Order, a copy of which is available at https://www.sec.gov/oiea/Article/billinginstructions.pdf,.  Such compensation shall require the prior approval of the Court.

52.     Within forty-five (45) days after the end of each calendar quarter, the Receiver and Retained Personnel shall apply to the Court for compensation and expense reimbursement from the Receivership Assets (the "Quarterly Fee Applications").  At least thirty (30) days prior to filing each Quarterly Fee Application with the Court, the Receiver and Retained Personnel will serve upon counsel for the Commission a complete copy of its proposed Quarterly Fee Application, together with all exhibits and relevant billing information in a format to be provided by Commission staff.

53.     All Quarterly Fee Applications will be interim and will be subject to cost benefit and final reviews at the close of the Receivership Estate.  Such cost benefit review may include an evaluation of the results achieved in relation to the costs associated with any particular Receivership Asset.  At the close of the Receivership Estate, the Receiver and Retained

Personnel will each file a final fee application, describing in detail the costs and benefits associated with all litigation and other actions pursued by the Receiver or Retained Personnel, as applicable, during the course of the Receivership Estate.

54.    Quarterly Fee Applications may be subject to a holdback in the amount of 20% of the amount of fees and expenses for each application filed with the Court in the Commission staff's discretion or such other percentage holdback as the Court may order on its own motion or on the request of the Commission.  The Receiver and Retained Personnel may seek authorization for payment of the applicable holdback amount as part of a subsequent Quarterly Fee Application.  Upon approval by the Court of a request to pay any applicable holdback amount, the Receiver shall be authorized pay from the Receivership Assets such approved holdback amount from the Receivership Assets.  To the extent any fees or expenses are not approved by the Court, they must be offset against the 20% holdback or be disgorged from the professional as appropriate.

55.    Each Quarterly Fee Application shall:

A.    Comply with the terms of the Billing Instructions agreed to by the Receiver, as modified by this Order; and

B.    Contain representations (in addition to the Certification required by the Billing Instructions) that: (i) the fees and expenses included therein were incurred in the best interests of the Receivership Estate; and, (ii) with the exception of the Billing Instructions, as modified by his Order (and the fact that the Receiver may benefit (directly or indirectly) from the compensation paid to A&M), the Receiver or Retained Personnel, as applicable, has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of

compensation paid or to be paid from the Receivership Assets, or any sharing thereof.

56.    At the close of the Receivership, the Receiver shall submit a Final Accounting, in a format to be provided by Commission staff, and the Receiver and each Retained Personnel shall submit a final application for compensation and expense reimbursement.

57.    With respect to any motion or application filed in this case by the Receiver, if no party in interest objects prior to the objection deadline applicable thereto, the Receiver may file a notice of no objection with this Court and request that the Court enter the corresponding order without the need for a hearing.

SO ORDERED:
s/ MKB 12/07/2023

_____
MARGO K. BRODIE
United States District Judge

SPA-68

**Schedule 1 – "Receivership Entities"**

| Name | Entity |
|---|---|
| Armada Waste Management GP, LLC (fka GPB Waste Management GP, LLC) | General Partner |
| Armada Waste Management, LP (fka GPB Waste Management, LP) | LP (GPB Fund) |
| Armada WM SLP, LLC (fka GPB WM SLP, LLC) | SLP |
| GPB Auto SLP, LLC | SLP |
| GPB Automotive Income Fund, Ltd. | Cayman Islands Exempted Company |
| GPB AUTOMOTIVE INCOME SUB-FUND, LTD. | Cayman Islands Exempted Company |
| GPB Automotive Portfolio, LP | LP (GPB Fund) |
| GPB Capital Holdings, LLC | General Partner |
| GPB Cold Storage, LP | LP (GPB Fund) |
| GPB H2 SLP, LLC | SLP |
| GPB H3 SLP, LLC | SLP |
| GPB Holdings II, LP | LP (GPB Fund) |
| GPB Holdings III GP, LLC | General Partner |
| GPB Holdings III, LP | LP (GPB Fund) |
| GPB Holdings Qualified, LP | LP (GPB Fund) |
| GPB Holdings, LP | LP (GPB Fund) |
| GPB NYC Development, LP | LP (GPB Fund) |
| GPB NYCD SLP LLC | SLP |
| GPB SLP, LLC | SLP |
| Highline Management Inc. | Service Provider (to GP) |

SPA-69

**Schedule 2 - "Ordinary Course Professionals"**

| Professional | Type |
|---|---|
| Akerman LLP | Legal Advisor |
| Brown Gibbons Lang & Company LLC | Financial Advisor/ Investment Bank |
| Chimento & Webb, P.C. | Legal Advisor |
| Cole-Frieman & Mallon LLP | Legal Advisor |
| Configure Partners, LLC | Financial Advisor/ Investment Bank |
| EisnerAmper LLP | Audit Services |
| Goldberg Segalla LLP | Legal Advisor |
| Gordon & Rees LLP | Legal Advisor |
| Grant Thornton LLP | Forensic Accounting Services |
| Greenspoon Marder LLP | Legal Advisor |
| Grub Brugger | Legal Advisor (Germany) |
| Herrick Feinstein LLP | Legal Advisor |
| Heyman Enerio Gattuso & Hirzel LLP | Legal Advisor |
| Houlihan Lokey, Inc. | Valuation Services |
| Hunton Andrews Kurth LLP | Legal Advisor |
| KPMG | Tax Services |
| Mayer Brown LLP | Legal Advisor |
| McGuireWoods LLP | Legal Advisor |
| Morgan, Lewis & Bockius, LLP | Legal Advisor |
| Nixon Peabody LLP | Legal Advisor |
| Phoenix American Financial Services | Fund Administrator |
| Potter Anderson & Corroon LLP | Legal Advisor |
| Pullman & Comley, LLC | Legal Advisor |
| Reeves & Brightwell LLP | Legal Advisor |
| Risa Heller | Communications Consulting |
| Ropers Majeski PC | Legal Advisor |
| Rosenfeld & Kaplan LLP | Legal Advisor |
| SGC Associates LLP | Tax Services |
| Shapiro Ramos (Jeffrey Shapiro) | Legal Advisor |
| Shearman Sterling LLP | Legal Advisor |
| Skadden Arps Slate M | Legal Advisor |
| Stroock & Stroock & Lavan LLP | Legal Advisor |
| TripleTree | Financial Advisor/Investment Bank |
| Walkers | Legal Advisor (Cayman Islands) |

SPA-70

**Schedule 3 –**
**Non-Exclusive List of Litigation Involving the**
**Receivership Entities and Receivership Assets**

| | |
|---|---|
| 1 | *Tom Alberto, et al. v. GPB Capital Holdings, LLC, GPB Automotive Portfolio, LP, GPB Cold Storage, LP, GPB Holdings, LP, GPB Holdings II, LP , GPB Holdings Qualified, LP, GPB Holdings III, LP, GPB NYC Development, LP, GPB Waste Management, LP, and others* (AAA, Number 01-22-0001-5433) |
| 2 | *Tom Alberto, et al. v. GPB Capital Holdings, LLC, GPB Automotive Portfolio, LP, GPB Cold Storage, LP, GPB Holdings, LP, GPB Holdings II, LP , GPB Holdings Qualified, LP, GPB Holdings III, LP, GPB NYC Development, LP, GPB Waste Management, LP, Ascendant Capital, AAS, Axiom, DJ Partners, MR Ranger, Gentile, Schneider, Lash, Mark Martino*, Case No. 651143-2023 (New York Supreme Court, New York County) |
| 3 | *Phillip J. Cadez v. GPB Holdings LP et al., Case No. 2020-0402-SG* (Court of Chancery, DE) |
| 4 | *Ceiba Palm LLC v. GPB Capital Holdings, LLC et al., Case No. 2020-021788-CA-01* (Miami Dade Circuit Court, FL) |
| 5 | *Concorde Investment Services, LLC v. GPB Capital Holdings, LLC, et al.*, Case No. 650928/2021 (New York Supreme Court, New York County) |
| 6 | *Barbara Deluca and Drew R. Naylor, et al. v. GPB Holdings LP et al.*, Case No. 1:19-cv-10498 (S.D.N.Y) |
| 7 | *Doctor's Emergency Service, P.A. v. Professional Management, Inc. and Advantedge Healthcare Solutions, Inc.* (Circuit Court for Baltimore City, No. 24-C-23-001840 CN) |
| 8 | *David Gentile v. GPB Capital Holdings, LLC et al.*, Case No. 2021-1102-SG (Court of Chancery, DE) |
| 9 | *David Gentile v. GPB Capital Holdings, LLC et al.*, Case No. 2023-0273-PAF (Court of Chancery, DE) |
| 10 | *In Re GPB Capital Holdings LLP Litigation* (formally: *Adam Younker et al. v. GPB Capital Holdings, LLC, et al.*), Case No. 157679/2019 (New York Supreme Court, New York County) |
| 11 | *Jeff Lipman and Carol Lipman v. GPB Capital Holdings, LLC et al.*, Case No. 2020-0054-SG (Court of Chancery, DE) |
| 12 | *Kinnie Ma et al. v. Ascendant Capital, LLC et al.*, Case No. 1:19-cv-01050 (W.D. Tex) |
| 13 | *Alfredo J. Martinez v. GPB Capital Holdings, LLC*, Case No. 2019-1005 (Court of Chancery, DE) |
| 14 | *Alfredo J. Martinez v. GPB Capital Holdings, LLC*, Case No. 2020-0545 (Court of Chancery, DE) |
| 15 | *Galen G. Miller et al. v. GPB Capital Holdings, LLC et al.*, Case No. 656982/2019 (New York Supreme Court, New York County) |
| 16 | *Parkcar, LLC II v. GPB Capital Holdings, LLC*, Case No. 656113/2020 (New York Supreme Court, New York County) |
| 17 | *Michael Peirce, derivatively on behalf of GPB Automotive Portfolio, LP v. GPB Capital Holdings, LLC et al.*, Case No. 652858/2020 (New York Supreme Court, New York County) |
| 18 | *Mary Purcell et al. v. Rodney Potratz, GPB Capital Holdings, LLC et al.*, Case No. 30-2019-01115653-CU-FR-CJC (California Superior Court, Orange County) |

SPA-71

**Schedule 3 –**
**Non-Exclusive List of Litigation Involving the**
**Receivership Entities and Receivership Assets**

| | |
|---|---|
| **19** | *Ismo J. Ranssi, derivatively on behalf of Armada Waste Management, LP v. GPB Capital Holdings, LLC et al.*, Case No. 654059/2020 (New York Supreme Court, New York County) |
| **20** | *Jeffry Schneider v. GPB Capital Holdings, LLC et al.*, Case No. 2021-0963 (Court of Chancery, DE) |
| **21** | *Shareholder Representative Services LLC v. HPI Holdings, LLC*, Case No. 2022-0166 (Court of Chancery, DE) |
| **22** | *Subaru of New England, Inc. v. AMR Auto Holdings-SM LLC d/b/a Prime Subaru Manchester* (Hillsborough Superior Court Northern District, New Hampshire, 216-2022-CV-00786) |