# 23-8010(L)

### 23-8035(CON)

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,
Plaintiff-Appellee,

GPB CAPITAL HOLDINGS, LLC,
Defendant-Appellee.

v.

ASCENDANT CAPITAL, LLC, JEFFRY SCHNEIDER, DAVID GENTILE,
Defendants-Appellants,

ASCENDANT ALTERNATIVE STRATEGIES, LLC, JEFFREY LASH,
Defendants,

U.S. ATTORNEY'S OFFICE FOR THE EASTERN DISTRICT OF NEW YORK,
Intervenor.

On Appeal from the United States District Court for the
Eastern District of New York, No. 21-cv-583 (Hon. Margo K. Brodie)

## BRIEF OF THE SECURITIES AND
## EXCHANGE COMMISSION, APPELLEE

MEGAN BARBERO
General Counsel

MICHAEL A. CONLEY
Solicitor

DANIEL STAROSELSKY
Assistant General Counsel

MORGAN BRADYLYONS
Bankruptcy Counsel

SAMUEL B. GOLDSTEIN
Counsel to the General Counsel

Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549
202-551-7926 (Bradylyons)
bradylyonsm@sec.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................iv

INTRODUCTION ................................................................................ 1

COUNTERSTATEMENT OF JURISDICTION ........................................ 4

COUNTERSTATEMENT OF THE ISSUE ............................................. 5

COUNTERSTATEMENT OF THE CASE............................................... 5

    A.    The Enforcement Proceedings ................................................ 5

        1.    The Commission alleged that defendants defrauded thousands of retail investors out of more than a billion dollars. ........................................................................ 5

        2.    Gentile, Schneider, and Lash have been criminally charged with securities fraud, and Lash pleaded guilty to wire fraud. ................................................................ 9

        3.    The court entered an order appointing the Monitor, which provided for conversion to a receivership upon certain violations............................................................ 10

        4.    The monitorship has succeeded in marshaling and preserving assets, but Gentile has hindered efforts to return funds to investors. ............................................ 13

    B.    The Motion to Convert the Monitorship to a Receivership .. 14

        1.    Gentile caused GPB Capital to violate the Amended Monitor Order. ................................................................ 14

        2.    The Commission moved to convert the monitorship to a receivership. ................................................................ 15

    C.    The Magistrate Judge's Report and Recommendation and the District Court Order Appointing a Receiver ................. 18

i

1.    The Report and Recommendation urged the district court to grant the Receiver Motion. ............................. 18

2.    The District Court appointed a receiver. ...................... 20

D.    Defendants-Appellants appealed the receivership order, and the Commission moved to set a briefing schedule that would enable a distribution to investors as soon as possible. ......... 24

STANDARD OF REVIEW ..................................................................... 25

SUMMARY OF ARGUMENT ................................................................ 25

ARGUMENT ........................................................................................... 27

The district court acted within its discretion in appointing a receiver .. 27

A.    The district court reasonably exercised its express power under the Amended Monitor Order to convert the monitorship to a receivership. ................................................ 27

1.    The district court reasonably found that Gentile violated the Amended Monitor Order. .......................... 27

2.    The district court reasonably rejected Gentile's arguments that he did not cause GPB Capital to violate the order. ..................................................... 31

B.    The district court reasonably appointed a receiver under its equitable authority ................................................................ 35

1.    The district court acted within its discretion in determining that a receivership was warranted. ......... 35

a.    District courts have broad discretion to appoint receivers under their equitable authority .............. 35

b.    The district court acted within its discretion in appointing a receiver under its equitable authority. ................................................................. 37

2. Gentile's contrary arguments lack merit....................40

    a. The district court was not required to find a likelihood of success on the merits, and regardless, the record supports such a finding.........................40

    b. The district court reasonably found that a receivership was necessary.....................................45

    c. Gentile shows no clear error in the district court's factual findings........................................................46

CONCLUSION .........................................................................52

CERTIFICATIONS

# TABLE OF AUTHORITIES

<u>**Cases**</u> <u>**Page(s)**</u>

*Atl. Tr. Co. v. Chapman,*
208 U.S. 360 (1908) ..................................................................... 36, 43

*Buon v. Spindler,*
65 F.4th 64 (2d Cir. 2023) ................................................................ 25

*City of N.Y. v. Golden Feather Smoke Shop, Inc.,*
597 F.3d 115 (2d Cir. 2010) .............................................................. 41

*Donell v. Kowell,*
533 F.3d 762 (9th Cir. 2008) ............................................................ 52

*Eberhard v. Marcu,*
530 F.3d 122 (2d Cir. 2008) ............................................ 35, 36, 41, 43

*Esbitt v. Dutch-Am. Mercantile Corp.,*
335 F.2d 141 (2d Cir. 1964) .............................................................. 42

*Ex parte Tyler,*
149 U.S. 164 (1893) ...................................................................... 36, 43

*Freedom Holdings, Inc. v. Cuomo,*
624 F.3d 38 (2d Cir. 2010) ................................................................ 44

*Highland Ave. & B.R. Co. v. Columbian Equip. Co.,*
168 U.S. 627 (1898) .......................................................................... 42

*Kansas v. Nebraska,*
574 U.S. 445 (2015) .......................................................................... 41

*Lankenau v. Coggeshall & Hicks,*
350 F.2d 61 (2d Cir. 1965) ................................................................ 35

*Liu v. SEC,*
140 S. Ct. 1936 (2020) ...................................................................... 41

*Rosen v. Siegel,*
106 F.3d 28 (2d Cir. 1997) .................................................... 45, 46, 49

iv

*Scholes v. Lehmann,*
  56 F.3d 750 (7th Cir. 1995) ........................................................ 51, 52

*SEC v. Alan F. Hughes, Inc.,*
  461 F.2d 974 (2d Cir. 1972) .................................................. 36, 41, 48

*SEC v. Am. Bd. of Trade, Inc.,*
  830 F.2d 431 (2d Cir. 1987) .............................................. 25, 36, 37, 40

*SEC v. Byers,*
  609 F.3d 87 (2d Cir. 2010) ................................................................ 35

*SEC v. Complete Bus. Sols. Gr., Inc.,*
  44 F.4th 1326 (11th Cir. 2022) ........................................................ 35

*SEC v. Hardy,*
  803 F.2d 1034 (9th Cir. 1986) ......................................................... 43

*SEC v. Malek,*
  397 F. App'x 711 (2d Cir. 2010) ...................................................... 37

*SEC v. Manor Nursing Centers, Inc.,*
  458 F.2d 1082 (2d Cir. 1972) ..................................................... 35, 41

*SEC v. Rajaratnam,*
  622 F.3d 159 (2d Cir. 2010) ............................................................ 46

*SEC v. Unifund SAL,*
  910 F.2d 1028 (2d Cir. 1990) .......................................................... 42

*Tronox Inc. v. Kerr-McGee Corp.* (*In re Tronox Inc.*),
  855 F.3d 84 (2d Cir. 2017) ......................................................... 25, 28

*U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC,*
  583 U.S. 387 (2018) ......................................................................... 25

*Winter v. NRDC, Inc.,*
  555 U.S. 7 (2008) ............................................................................ 42

v

## Statutes

Securities Act of 1933, 15 U.S.C. 77a, et seq.

    Section 15(b), 15 U.S.C. 77o(b) ......................................... 9

    Section 17(a), 15 U.S.C. 77q(a) ......................................... 8

    Section 22(a), 15 U.S.C. 77v(a)......................................... 4

Securities Exchange Act of 1934, 15 U.S.C. 78a, et seq.

    Section 27, 15 U.S.C. 78aa ........................................ 4, 35

    Section 12(g), 15 U.S.C. 78l(g) ...................................8, 9

    Section 10(b), 15 U.S.C. 78j(b) ......................................... 8

    Section 20(e), 15 U.S.C. 78t(e) ......................................... 9

    Section 21(d)(1), 15 U.S.C. 78u(d)(1) ............................... 35

    Section 21(d)(5), 15 U.S.C. 78u(d)(5) ...............................35

    Section 21F, 15 U.S.C. 78u-6 ......................................... 9

Investment Advisers Act of 1940

    Section 206(1), 15 U.S.C. 80b-6(1) ................................... 8

    Section 206(2), 15 U.S.C. 80b-6(2) ................................... 8

    Section 206(4), 15 U.S.C. 80b-6(4) ................................... 8

    Section 214, 15 U.S.C. 80b-14 ......................................... 4

28 U.S.C. 1292(a)(2) ........................................................... 5

## Rules and Regulations

Rule 206(4)-2, 17 C.F.R. 275.206(4)-2 ...................................... 8

Rule 206(4)-7, 17 C.F.R. 275.206(4)-7 ...................................... 8

Rule 10b-5, 17 C.F.R. 240.10b-5 ............................................ 8

Federal Rule of Civil Procedure 60(b) ............................... 20, 33

## Other Authorities

1 Dan B. Dobbs, Law of Remedies § 1.4 (1993) ..................... 41

9 Wright & Miller, Federal Practice and Procedure § 2983 ................. 46

Nos. 23-8010(L), 23-8035(CON)

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

GPB CAPITAL HOLDINGS, LLC,

Defendant-Appellee.

v.

ASCENDANT CAPITAL, LLC, JEFFRY SCHNEIDER, DAVID GENTILE,

Defendants-Appellants,

ASCENDANT ALTERNATIVE STRATEGIES, LLC, JEFFREY LASH,

Defendants,

U.S. ATTORNEY'S OFFICE FOR THE EASTERN DISTRICT OF NEW YORK,

Intervenor.

On Appeal from the United States District Court for the
Eastern District of New York, No. 21-cv-583 (Hon. Margo K. Brodie)

BRIEF OF THE SECURITIES AND
EXCHANGE COMMISSION, APPELLEE

## INTRODUCTION

The Securities and Exchange Commission brought this civil law enforcement action to remedy a massive securities fraud perpetrated by David Gentile, GPB Capital Holdings, LLC—a registered investment

1

adviser that Gentile owned and used to perpetrate the fraud—as well as other individuals and entities. Upon the Commission's motion and with GPB Capital's consent, the district court appointed a monitor (the "Monitor") to oversee GPB Capital and to prevent Gentile from further looting the company to benefit himself at investors' expense. The monitorship order expressly provides that, in the event of a violation of that order that is not cured within 10 business days, "the Monitorship shall convert to a receivership." A-193.[1]

Despite this clear notice and while represented by counsel, Gentile perpetrated what GPB Capital itself termed an "attempted corporate coup." A-695. Without the Monitor's knowledge, Gentile directed his successor to "immediately cease any and all actions" as GPB Capital's manager. A-294; D. Ct. Dkt. 102-3. Gentile also purported to install three of his confederates to manage GPB Capital and amended GPB Capital's operating agreement to pay the interloper managers hundreds

---

[1] "A-[]" refers to the Joint Appendix, filed with the Defendants-Appellants' opening brief on February 16, 2024. "SPA-[]" refers to the Special Appendix, filed with the Defendants-Appellants' opening brief. "D. Ct. Dkt. []" refers to documents filed in the district court below. *See SEC v. GPB Capital Holdings, LLC, et al*, Case No. 21-00583 (E.D.N.Y.). "Br. []" refers to Defendants-Appellants' opening brief.

of thousands of dollars. Rather than promptly cure this breach of the monitorship order, Gentile persisted in his improper attempted takeover after the Monitor objected to it.

Following Gentile's egregious violation of the consented-to monitorship order, the district court converted the monitorship to a receivership, as expressly contemplated by that order. The court based the conversion to a receivership on two independent grounds: (1) the court enforced the express language of the monitorship order (SPA-12-13); and (2) the court exercised its inherent equitable authority to impose a receivership based on its finding that "Gentile's actions constituted a real and imminent threat of financial harm to GPB and its investors." SPA-29.

At this juncture, a receivership is in the best interests of GPB Capital, its investors, and the company's other creditors. During the monitorship, GPB Capital and the Monitor have sold nearly all of the company's operating assets, but they have been unable to distribute the more than $1 billion in available proceeds. As a result, most of GPB Capital's investors—including thousands of senior citizens—have not received a penny in distributions since 2018, despite incurring

3

significant tax liability during that time. GPB Capital itself supports the receivership, as do the half-dozen state securities regulators who have sued defendants. Yet despite claiming to support returning money to investors under unspecified "appropriate" conditions (Br. 57), Gentile and certain of the other defendants have declined to draft a distribution plan while GPB Capital and its subsidiaries are incurring approximately $7 million per fiscal quarter in management fees and operating expenses. In contrast, the Monitor is prepared to propose a claims process and distribution plan within 45 days of his appointment as receiver.

To best serve all but Gentile's illicit interests, this Court should affirm the district court's discretionary determination to convert the monitorship into a receivership.

## COUNTERSTATEMENT OF JURISDICTION

The district court had jurisdiction over the Securities and Exchange Commission's civil enforcement action under Section 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. 77v(a), Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. 78aa, and Section 214 of the Investment Advisers Act of 1940 ("Advisers

Act"), 15 U.S.C. 80b-14.  This Court has jurisdiction over Appellants'
timely appeal pursuant to 28 U.S.C. 1292(a)(2).

## COUNTERSTATEMENT OF THE ISSUE

Whether the district court reasonably converted the monitorship
to a receivership.

## COUNTERSTATEMENT OF THE CASE

### A. The Enforcement Proceedings

#### 1. The Commission alleged that defendants defrauded thousands of retail investors out of more than a billion dollars.

On February 4, 2021, the Commission brought this civil law
enforcement action against GPB Capital Holdings, LLC ("GPB
Capital"), Ascendant Capital, LLC ("Ascendant Capital"), Ascendant
Alternative Strategies, LLC ("AAS"), David Gentile, Jeffry Schneider,
and Jeffrey Lash ("Defendants").  GPB Capital is a registered
investment adviser founded and owned by Gentile.  Ascendant Capital
serves as the placement agent for GPB Capital and is a branch office of
AAS, a registered broker-dealer.  Schneider is a minority owner of AAS
and the sole owner and CEO of Ascendant Capital.  From 2013 through

early 2018, Lash served as a managing partner of GPB Capital.  A-28-34.

GPB Capital described itself as an alternative asset management firm that acts as a general partner and fund manager for limited partnership funds.  The limited partnership funds invested in various businesses, with a focus on automotive retail, waste management, and healthcare.  A-28.  GPB Capital is the general partner of each of the GPB Capital funds and, in such capacity, possesses management control over each of the GPB Capital funds in accordance with the applicable limited partnership agreement.  A-291.  In 2019, GPB Capital formed Highline Management, Inc. ("Highline"), a wholly owned subsidiary of GPB Capital, to provide certain management and operational services for the GPB Capital funds.  A-291-292.

As alleged in the complaint, Defendants perpetrated a long-running and multi-faceted fraudulent securities scheme that raised more than $1.7 billion for at least five limited partnership funds from approximately 17,000 retail investors, approximately 4,000 of whom are senior citizens.  GPB Capital told investors that it consistently paid an 8% annualized distribution, as well as periodic "special distributions"

6

ranging from 0.5% to 3%, from the funds generated by the operations of its portfolio companies.  In reality, GPB Capital used investor funds to pay distributions when the operating funds were insufficient.  A-28-29.

Throughout the alleged fraud, Defendants concealed the truth from investors in various ways.  GPB Capital and Gentile manipulated the financial statements for two of the limited partnership funds to give the false appearance that the portfolio company income was sufficient to fund the investor distributions.  In addition, GPB Capital and Ascendant Capital deceived investors about fees and compensation paid to Gentile, Schneider, and Ascendant Capital, while GPB Capital and Gentile failed to disclose Gentile's and Schneider's conflicts of interest in executing acquisitions because of undisclosed fees.  A-28-29.  And GPB Capital impeded former employees from communicating directly with the Commission and retaliated against a known whistleblower who raised concerns about GPB Capital's use of investor funds to make distribution payments to investors.  A-50-53.

In 2018, GPB Capital suspended all redemptions and distributions.  A-28.  Even before the suspension, GPB Capital had failed to deliver audited financial statements for the limited

7

partnership funds to investors, and, at the time the Commission filed its action, it was more than three years delinquent in registering two of the limited partnership funds with the Commission, as required by Section 12(g) of the Exchange Act.  A-28-29.  According to a 2020 regulatory filing, GPB Capital had approximately $238,637,198 in assets under management, A-33, though its assets have since grown under the Monitor's oversight.  *See* A-859.

As relevant here, the Commission alleged that, through the foregoing conduct, Defendants (other than Lash) violated antifraud provisions of Section 17(a) of the Securities Act, 15 U.S.C. 77q(a), and Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. 78j(b), 17 C.F.R. 240.10b-5.  The Commission also alleged that GPB Capital and Gentile violated antifraud provisions of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. 80b-6(1) and (2), and that GPB Capital violated Section 206(4) of the Advisers Act, 15 U.S.C. 80b-6(4), and Rules 206(4)-2 and 206(4)-7 thereunder, 17 C.F.R. 275.206(4)-2 and 206(4)-7.[2]  A-30-31.

---

[2]     The Commission also alleged that GPB Capital violated whistleblower-protection and reporting and disclosure requirements

The Commission sought permanent injunctions against each Defendant, disgorgement of Defendants' ill-gotten gains, together with prejudgment interest, and civil penalties.  A-61-62.

### 2. Gentile, Schneider, and Lash have been criminally charged with securities fraud, and Lash pleaded guilty to wire fraud.

On the same date that the Commission brought its civil law enforcement action against Defendants, the district court unsealed a grand-jury indictment charging Gentile, Schneider, and Lash with conspiracy to commit securities fraud, conspiracy to commit wire fraud, securities fraud, and, as to Gentile and Lash, wire fraud.  *USA v. Gentile, et. al.*, Case No. 21-cr-00054 (E.D.N.Y.) Dkt. 1.  On July 24, 2023, the court accepted Lash's guilty plea, in which he pleaded guilty to wire fraud:

> On April 28, 2016, I, along with David Gentile, initiated an interstate wire payment of approximately $1,050,000 from my personal Chase bank account to the Gentile Prime

---

under Sections 21F and 12(g) of the Exchange Act, 15 U.S.C. 78u-6 and 78l(g).  The Commission further alleged, in the alternative, that Gentile and Schneider aided and abetted certain antifraud violations by the entity defendants.  *See* Section 15(b) of the Securities Act, 15 U.S.C. 77o(b), and Section 20(e) of the Exchange Act, 15 U.S.C. 78t(e).  Finally, the Commission alleged various aiding and abetting antifraud violations by non-appealing Defendant Lash.

Brokerage Automotive Portfolio Chase bank account. I knew that the money would be booked and falsely be represented as revenue in the financial statements of the Automotive Portfolio. I was aware at the time that such funds were not revenue and would be provided to investors and prospective investors to induce them into investing money in the Automotive Portfolio.

*USA v. Gentile, et. al.*, Case No. 21-cr-00054 (E.D.N.Y.) Dkt. 214.

On the day after civil and criminal charges were announced, Gentile resigned as the sole manager of GPB Capital and appointed Rob Chmiel as his successor. Gentile also resigned as GPB Capital's CEO, and Chmiel was appointed as interim CEO and later CEO. SPA-3 n.2.

### 3. The court entered an order appointing the Monitor, which provided for conversion to a receivership upon certain violations.

On February 8, 2021, the Commission applied to the district court for an order directing GPB Capital to show cause why an order should not be entered, pending a final disposition of this action, appointing Joseph T. Gardemal III as the independent Monitor for GPB Capital. A-64-65. The Commission explained that the primary source of potential investor recovery was the automobile dealerships owned by the limited partnership funds. But the dealerships' contractual relationships with lenders and manufacturers were at risk of damage or

10

termination as a result of, among other things, Gentile's arrest. The appointment of an independent monitor to vet significant transactions therefore would be in the best interest of the investors. A-158-59. The Commission and GPB Capital agreed to the entry of the order appointing Gardemal as the Monitor, which was later amended in respects not relevant here (the "Amended Monitor Order"). D. Ct. Dkt. 21, A-168-210; *see also* D. Ct. Dkts. 38, 39.

To protect investors and GPB Capital's ability to operate, the Amended Monitor Order authorizes the Monitor to approve or disapprove various actions, including: (i) material corporate transactions by GPB Capital, Highline, the GPB funds, or the portfolio companies; (ii) any material change to compensation of any executive officer, affiliate, or related party of GPB Capital, Highline, the GPB funds, or the portfolio companies; (iii) "any retention by GPB [Capital], Highline, the GPB Funds, or the Portfolio Companies of any management-level professional or person . . . subject to an acceptable procedure agreed to with the Monitor"; and (iv) "any decision to resume distributions to investors in any of the GPB Funds, consistent with the investment objectives of the GPB Funds[.]" A-188-89. Notwithstanding

11

the monitorship, Gentile continues to hold 99% of the membership interests in GPB Capital.  A-291.

Particularly relevant here, the Amended Monitor Order expressly contemplates that a violation can result in the monitorship converting to a receivership.  If the Monitor believes that GPB Capital is "not materially in compliance with the terms of this Order, upon notice of noncompliance to GPB [Capital], GPB [Capital] shall have 10 business days in which to cure any claimed material noncompliance[.]"  A-193.  If GPB Capital fails to make the requested changes within the cure period, "upon motion of the SEC resulting in a Court Order, the Monitorship shall convert to a receivership."  A-193.

After the court entered the monitorship, it granted the United States' motion to intervene in and stay this civil case until the conclusion of the related criminal case and the ongoing grand jury investigation.  A-11.  All parties consented to the United States' motion. *Id.*  The court excluded from the stay "any work performed by the Monitor, matters related to the Monitorship, or any future expansion of the Monitorship."  *Id.*

### 4. The monitorship has succeeded in marshaling and preserving assets, but Gentile has hindered efforts to return funds to investors.

During the monitorship, GPB Capital and the Monitor have successfully sold nearly all of the operating assets, but they have been unable to distribute money to investors, many of whom have lacked any access to their funds since 2018. GPB Capital has generated approximately $1.3 billion in gross proceeds from the sale of assets, and GPB Capital management continues to market the limited remaining assets. In mid-January 2024, GPB Capital closed on the sale of the largest remaining operating company held by the funds, and it now holds only a few small operating companies. D. Ct. Dkt. 195.

Yet despite the Monitor's repeated requests that GPB Capital and Highline management evaluate distribution plans to return funds to investors, management has never presented such a plan for the Monitor's approval. In the Monitor's view, "[t]he current framework between GPB [Capital] and the monitorship, under which the Monitor is not authorized under the [Amended Monitor] Order to propose and / or implement a distribution plan, has simply proved incapable of

13

achieving a viable, timely plan of distribution and execution thereof."

A-299.

## B. The Motion to Convert the Monitorship to a Receivership

### 1. Gentile caused GPB Capital to violate the Amended Monitor Order.

In May 2022, Gentile triggered GPB Capital's violation of the

Amended Monitor Order by attempting unilaterally to seize control of

GPB Capital and to use its funds to pay favored associates. In

particular, on May 29, 2022, GPB Capital's counsel informed the

Monitor that Gentile had delivered documents to GPB Capital

indicating that he had purportedly taken the following steps on May 27,

2022, in his capacity as holder of 99% of the membership interests in

GPB Capital: (i) expanding the number of managers of GPB Capital

from one to four and appointing Rick Murphy, Michael Fasano, and

Matt Judkin as managers; and (ii) together with the new managers,

amending the existing GPB Capital operating agreement (the

"Operating Agreement"). A-294. Gentile wrote a letter to Chmiel,

Gentile's successor upon his arrest, demanding that "[a]lthough you

retain your role as CEO, you should immediately cease any and all

actions taken or to be taken in the capacity of a Manager, and you

14

should seek consensus with Rick, Michael, and Matt regarding the course of GPB [Capital] and any actions to be taken by the Managers." A-294; D. Ct. Dkt. 102-3.

In addition, Gentile and the new managers purported to amend the Operating Agreement, *inter alia*, to provide that: (i) GPB Capital's new managers would now be entitled to be paid between $10,000 and $35,000 per month; (ii) future amendments to the Operating Agreement could be made by Gentile *unilaterally*; and (iii) certain quarterly tax distributions to *Gentile* would now be mandatory for the ongoing tax year. A-295.

On May 31, 2022, the Monitor notified GPB Capital that the May 27, 2022 purported actions, among other things, violated the provisions of the Amended Monitor Order requiring Monitor approval of compensation changes and retention of managers. A-296; D. Ct. Dkt. 102-6.

### 2. The Commission moved to convert the monitorship to a receivership.

In response to Gentile's attempts to interfere with GPB Capital, the Commission applied for an order directing Defendants to show

15

cause why the Monitor should not be appointed as receiver (the "Receiver Motion"). A-270-71. The Commission argued that converting the monitorship to a receivership was authorized under the Amended Monitor Order, and that it was necessary to ensure the return of nearly $1 billion in funds to investors, instead of to Gentile's control. A-275-76. The Commission explained that, despite incurring about $7 million per quarter in management fees and operating expenses, GPB Capital and Highline management did not appear able to draft and execute a distribution plan. A-276-277. By contrast, the Monitor stated that he would be prepared to propose a claims process and distribution plan within 45 days of his appointment as receiver. A-283. Thus, the appointment of a receiver was necessary and in investors' best interest. A-276-277.

GPB Capital, by its CEO, consented to entry of the requested receivership. The state securities regulators of Alabama, Georgia, Illinois, Massachusetts, Missouri, New Jersey, New York, and South Carolina, each of whom have filed administrative and / or civil enforcement actions against GPB Capital, likewise supported the receivership. A-275.

Gentile and the new managers he tried to appoint persisted in
their improper attempted takeover of GPB Capital even after the
Monitor objected to their misconduct and while the Receiver Motion was
pending.  On July 7, 2022, the Monitor informed the court that he was
not aware of any actions taken by Gentile to cure GPB Capital's
violations of the Amended Monitor Order, despite the lapse of the 10
business day cure period.  A-433.  To the contrary, in a June 30, 2022
letter to counsel for GPB Capital and the Monitor, counsel for the
purported new managers continued to describe his clients as "the newly
appointed managers of GPB Capital[.]"  A-435.  The purported
managers' counsel further claimed that "until GPB [Capital]'s current
manager confers with the newly appointed managers and allow[s]
[them] to participate in GPB [Capital] governance and management
oversight, . . . liquidation of GPB portfolio company assets, distributions
of capital, and major decisions that will affect the course of the GPB
funds should not take place."  A-437.  He also requested the
reinstatement of certain recently terminated executives of Highline—a
GPB Capital subsidiary—with annual salaries totaling more than $1.7
million.  A-433, 436-37.

17

In May 2023, after Magistrate Judge Scanlon issued an order permitting the parties to each file a letter with any fact-based updates related to the Receiver Motion, GPB Capital explained that the basis to grant the Receiver Motion had strengthened during the past year. GPB Capital noted that most investors had still received no distributions since 2018, despite incurring significant tax liability during that time. Finally, GPB Capital underscored that because of "Mr. Gentile's continued ownership of GPB [Capital] and the financial institutions' concerns about the limited controls offered by the Amended Monitor Order," GPB Capital has had difficulty establishing new banking relationships, which could put its assets at risk. A-565-566.

## C. The Magistrate Judge's Report and Recommendation and the District Court Order Appointing a Receiver

### 1. The Report and Recommendation urged the district court to grant the Receiver Motion.

On July 28, 2023, Judge Scanlon issued a report and recommendation urging the district court to grant the Commission's Receiver Motion on two independent grounds. *First*, Judge Scanlon determined that GPB Capital, through the actions of Gentile and the new managers he purportedly appointed, violated the Amended Monitor

18

Order.  A-587-594.[3]  *Second*, Judge Scanlon recommended that a receivership was appropriate under the court's equitable authority to protect investors, conserve the existing estate, protect GPB Capital from the "precarious" position in which Gentile had placed it, and "to cabin the damages" from Gentile's misconduct.  A-599-600.

Ascendant Capital, Schneider, and Gentile filed objections to Judge Scanlon's Report and Recommendation (the "R&R").  A-608-68.  The Commission responded (A-669-89), noting that the confusion about GPB Capital's management authority caused by Gentile's actions continued to prevent GPB Capital from proposing a distribution plan.  A-674.

GPB Capital also responded to the objections (A-690-715) and rejected as "absurd" the "no harm, no foul" argument Gentile had made about his conduct vis-à-vis the company.  A-694; *see* A-644-645 (Gentile's argument).  GPB Capital explained that the Amended Monitor Order's provision allowing conversion to a receivership did not require harm.  A-694.  Moreover, Gentile's "attempted corporate coup …

---

[3]    Judge Scanlon also determined that the purported new managers' compensation packages violated the Amended Monitor Order.  A-594.

indisputably *did* cause harm" by requiring GPB Capital to devote resources to addressing corporate governance issues and leaving the company unable to distribute money to investors. A-694-695. And even though the new managers purportedly resigned and Gentile claimed to withdraw their appointments after the R&R was issued, the company continued to face corporate uncertainty because Gentile could try similar chicaneries in the future. A-702-703.

### 2. The District Court appointed a receiver.

On December 7, 2023, the district court granted the Commission's Receiver Motion and adopted its amended proposed order appointing the receiver. SPA-2.[4]

*First*, the court converted the monitorship to a receivership "pursuant to the terms of the Amended [Monitor] Order based on GPB [Capital]'s violation of the order, caused by Gentile's actions, and GPB [Capital]'s failure to cure the violations." SPA-13. The court observed

---

[4] The district court also denied as moot Gentile's Rule 60(b) motion to modify the Amended Monitor Order and imposed a litigation injunction to centralize all claims to GPB Capital's assets before the district court to facilitate an efficient and orderly distribution process. SPA-2, 32-35. Defendants-Appellants do not challenge these rulings on appeal.

that Gentile did not dispute that he appointed new managers and altered the Operating Agreement. The court then found that "Gentile's actions caused GPB [Capital] to violate the Amended [Monitor] Order when he appointed the new managers, instructed GPB [Capital]'s CEO to recognize and work with the managers, and the new managers modified the Operating Agreement, all without the approval of the Monitor." SPA-20. Gentile also caused GPB Capital to violate the Amended Monitor Order when he and the new managers awarded the new managers compensation without the Monitor's approval. SPA-20-21. The court further found that it was undisputed that GPB Capital received notice of the noncompliance and that Gentile, the only party able to cure, did not take any curative action within ten days of notification of the violations. SPA-21-22.

In light of the plain terms and the purpose of the appointment of the Monitor, the court found unpersuasive Gentile's argument that the "management-level professionals" referred to in the Amended Monitor Order are somehow different than the "managers" referred to in the Operating Agreement. SPA-14-15. The court also rejected Gentile's argument that GPB Capital could not limit his authority under

21

Delaware law and the Operating Agreement to appoint additional
managers, reasoning that it was the court, not GPB Capital, that
properly limited Gentile's rights.  SPA-19.

*Second*, and independently, the district court exercised "its
statutory and equitable power to convert the monitorship to a
receivership."  SPA-31.  The court found that Gentile's actions and
sworn testimony raised significant concerns about his credibility and
prior mishandling of investor funds.  SPA-27.  The court also found an
imminent risk that the GPB Capital assets would diminish in value, to
the investors' detriment, based on Gentile's prior conduct, including his
efforts to compensate the new managers and the new managers' efforts
to reverse a reduction in force implemented by GPB Capital.  SPA-29.
And the court found that the probability of harm to the SEC, GPB
Capital, and GPB Capital's investors from denial of the receivership
would be greater than the injury to the objectors, in part because the
reimbursement procedures set forth in the Delaware state court orders
are exempt from the proposed litigation injunction.  SPA-30.  The court
believed that it lacked "enough information to determine the
[Commission's] probability of success" at the time, but it noted that this

consideration is not dispositive. SPA-31. Ultimately, after considering alternatives, the court concluded that, "given the extreme circumstances of this case," a receivership was appropriate. SPA-32.

Finally, the district court adopted the magistrate judge's recommendation to transfer to the receiver any and all attorney-client privileges that GPB Capital may have, despite Defendants-Appellants' objections that the Commission demonstrated no need to waive GPB Capital's privileges and Schneider's concerns that the government may use otherwise privileged materials in enforcement or criminal proceedings. SPA-36. The court reasoned that, because the receiver will be authorized to manage litigation by and against the receivership, the receiver may need to waive GPB Capital's privilege.[5] SPA-39.

---

[5] While the district court declined to address the Commission's and GPB Capital's argument that Gentile and Schneider lacked standing to object to the appointment of the receiver, the court did note that GPB Capital consented to the appointment of the receiver and the entry of the related order, which explicitly empowered the receiver to waive any and all privileges held by GPB Capital. SPA-41.

**D. Defendants-Appellants appealed the receivership order, and the Commission moved to set a briefing schedule that would enable a distribution to investors as soon as possible.**

Gentile, Schneider, and Ascendant Capital filed notices of appeal from the district court order (A-889-94) and applied to the district court for an order directing the Commission to show cause why the order should not be stayed pending appeal.  D. Ct. Dkt. 189.  The district court denied the motion to show cause, but it granted a temporary stay to allow the parties to seek a stay from the Second Circuit.  A-26.  Gentile, Schneider, and Ascendant Capital then moved for a stay in the Second Circuit.  Dkt. 18.

Although the Commission did not oppose the stay motion (which remains pending), it moved this Court to set a briefing schedule that would resolve the receivership dispute and "enable a distribution to the investors as soon as possible[.]"  Dkt. 37.  Defendants-Appellants agreed to the briefing schedule and claimed to support "appropriate" distributions to investors, but they "dispute[d] any suggestion that there is a basis to expedite the appeal."  Dkt. 38.  This Court granted the Commission's proposed briefing schedule.  Dkt. 40.

24

## STANDARD OF REVIEW

A district court's decision as to how to enforce its own prior order is reviewed for abuse of discretion. *In re Tronox Inc.*, 855 F.3d 84, 112 (2d Cir. 2017). This Court also reviews for abuse of discretion a district court's decision to appoint a receiver. *SEC v. American Bd. of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987). "A district court abuses its discretion when '(1) its decision rests on an error of law . . . or a clearly erroneous factual finding, or (2) its decision . . . cannot be located within the range of permissible decisions.'" *Buon v. Spindler*, 65 F.4th 64, 74 (2d Cir. 2023) (quoting *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001)). The standard of review for mixed questions of law and fact may be *de novo* or may be clear error, depending on whether the question is primarily legal or factual. *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Management LLC v. Village at Lakeridge, LLC*, 583 U.S. 387, 396-98 (2018).

## SUMMARY OF ARGUMENT

The district court reasonably exercised its discretion to appoint a receiver on two independent grounds: (1) the court secured compliance with its consented-to Amended Monitor Order, which expressly permits

conversion to a receivership if GPB Capital violates the order and fails to cure its violation; and (2) the appointment of a receiver was warranted under the court's equitable authority. Both bases are amply supported by the law and the facts.

First, Gentile violated the Amended Monitor Order when he purportedly appointed new managers, instructed GPB Capital's CEO to work with them, and, with the purported new managers, amended the Operating Agreement to, *inter alia,* provide them with significant compensation. After the Monitor notified GPB Capital that these changes violated the Amended Monitor Order, Gentile and the purported new managers behaved as if their actions were valid until after the cure period had lapsed, inflicting harm on GPB Capital and its investors. Under these circumstances, the district court reasonably found that Gentile caused GPB Capital to violate the Amended Monitor Order and failed to cure that violation, triggering that order's provision permitting the conversion of the monitorship to a receivership. SPA 21-22.

Second, the court reasonably found that a receivership was appropriate under the court's equitable powers because Gentile's

misconduct created an imminent risk of dissipation of GPB Capital's assets, fractured GPB Capital's leadership, and threatened the company's financial health. The court also reasonably found that several other factors supported the need for a receivership, including: (1) the gravity of the allegations against Defendants; (2) the equities as between the Defendants-Appellants and GPB Capital investors, most of whom have been unable to access their funds for years; and (3) the inadequacy of alternative remedies. SPA-27-32.

## ARGUMENT

**The district court acted within its discretion in appointing a receiver.**

> ### A. The district court reasonably exercised its express power under the Amended Monitor Order to convert the monitorship to a receivership.

> > #### 1. The district court reasonably found that Gentile violated the Amended Monitor Order.

The Amended Monitor Order states explicitly that the Monitorship "shall" convert to a receivership if GPB Capital falls out of compliance with the order and fails to cure its violation.[6] A-193. *See*

---

[6]     Although Defendants-Appellants do not dispute these legal principles, they erroneously argue that "conversion to a receivership . . . rests solely upon the Monitor's subjective 'belief' of GPB's

27

*also* SPA-12 ("A court can take any reasonable action . . . to secure compliance [with a court order], and the scope of a district court's equitable powers to remedy past wrongs is broad." (quoting *In re Tronox Inc.*, 855 F.3d 84, 112 (2d Cir. 2017) (internal quotation marks omitted)). By authorizing the Monitor to oversee "material changes that would fundamentally affect the structure, assets, or liabilities of GPB [Capital,]" the monitorship seeks to "prevent Gentile from retaining control over GPB [Capital]—whether on his own or through others selected by him—at the expense of investors." SPA-17.

Despite this clear, consented-to language, Gentile engaged in what GPB Capital itself recognized was an "attempted corporate coup." A-695. Without seeking approval from the Monitor, Gentile commanded the GPB Capital CEO to "immediately cease any and all actions taken or to be taken in the capacity of a Manager," purported to appoint new managers, and demanded that GPB Capital's CEO work

---

noncompliance with the AMO." Br. at 58. In fact, the conversion rests on the district court's well-supported findings that GPB Capital violated the Amended Monitor Order. On appeal, Gentile has abandoned the argument that the Amended Monitor Order did not govern the type of managers he purportedly appointed. As the district court thoroughly explained, any such challenge would be meritless. SPA-14-19.

with them.  SPA-20; A-294; D. Ct. Dkt. 102-3.  The new managers whom Gentile installed then "immediately exercised their managerial powers by modifying the Operating Agreement upon appointment," (SPA-20) including by providing that it pay them "up to $400,000 per year."  SPA-14.  Thus, as the district court summarized, Gentile "caused GPB [Capital] to violate the Amended [Monitor] Order when he appointed the new managers, instructed GPB [Capital]'s CEO to recognize and work with the managers, and the new managers modified the Operating Agreement, all without the approval of the Monitor." SPA-20.[7]

The district court further reasonably found that, at the time Judge Scanlon issued the R&R, there was no dispute that Gentile "did not take any curative action within ten days of notification of the violations," even though Gentile "alone was able to do so."  SPA-22. Even after the Monitor had disapproved of Gentile's changes and the cure period had lapsed, the illegitimate new managers continued to defy

---

[7]     In the Commission's view, the mixed question of fact and law at issue here is primarily factual, and it should thus be reviewed for clear error.  But the district court's findings should also be affirmed under a *de novo* review.

29

the Monitor and to behave as if their actions were valid by purporting to direct GPB Capital's management not to undertake any "major decisions that will affect the course of the GPB funds." A-437.

Gentile's blatant misconduct impaired GPB Capital's ability to act as a fiduciary to its investors, as well as its relationship with other creditors, inflicting the very harms that the monitorship was designed to prevent: "a fracture in GPB [Capital]'s leadership" and the "resulting uncertainty" about GPB [Capital]'s position created "significant consequences," which "damag[ed] its financial health and, by extension, the finances of its investors." SPA-28 (internal quotation marks omitted). As GPB Capital has confirmed, because of Gentile's misconduct, the company experienced difficulty establishing new banking relationships, imperiling GPB Capital's significant assets during a time of banking sector instability. For example, after its primary bank closed, five major financial institutions denied GPB Capital's applications to open new accounts because of Gentile's continued ownership interests and the limited controls provided by the Amended Monitor Order. A-566.

30

And Gentile's intransigence bodes ill for investors' prospects of obtaining the money that is rightfully theirs. Although Gentile and Schneider claim to support returning money pursuant to some undefined "reasonable and prudent plan," Br. 14, n.6, they have failed to take any action to facilitate the return of approximately $1 billion in funds to investors despite the availability of those funds. Gentile's brazen attempt to funnel hundreds of thousands of dollars to his cronies—while giving investors nothing—only underscores the district court's finding that court intervention is necessary to thwart "Gentile and his handpicked management team from having unchecked authority over incoming cash that could be used to redeem investors." SPA-18 (internal quotation marks omitted).

### 2. The district court reasonably rejected Gentile's arguments that he did not cause GPB Capital to violate the order.

Contrary to Gentile's arguments,[8] Br. 59-61, whether Gentile was permitted to appoint new managers under Delaware law or the terms of

---

[8] While counsel for Gentile filed Defendants-Appellants' opening brief, Ascendant Capital, LLC and Jeffry Schneider also appear on the brief, and their counsel submitted a letter to this Court seeking to join in the brief. We refer to the arguments in the brief as made by "Gentile" as a matter of convenience.

the Operating Agreement "is not the issue." SPA-19. "The issue is whether any such appointed managers may be retained by GPB [Capital] without the Monitor's approval." *Id.* The plain terms and unmistakable objective of the Amended Monitor Order demonstrate that the answer is "no." SPA-20.

Similarly, Gentile's characterization of his appointments as mere suggestions that were immediately and effectively rejected by the Monitor and not recognized by GPB Capital is belied by the facts. Despite his insistence that he did everything "in plain view of the Monitor, the SEC, the Department of Justice, GPB [Capital], its investors, and the District Court" (Br. at 60), Gentile sought court authority to amend the Amended Monitor Order only *after* he had appointed new managers and they had amended the Operating Agreement, and at the same time that he notified GPB Capital—*not* the Monitor. A-211-239, 294, 698; D. Ct. Dkt. 102-3.

Two days after learning of these developments, the Monitor informed GPB Capital that Gentile's actions violated the Amended Monitor Order. A-296; D. Ct. Dkt. 102-6. Gentile now attempts to characterize this interaction as consistent with the language and intent

of the order: "Rather than usurp the Monitor's function, Gentile notified the Monitor" of his actions and the Monitor, in turn, "exercised his core authority to review and reject" such material changes under the Amended Monitor Order.  Br. at 61.  But Gentile did not solicit the Monitor's views before making the appointments.  *See* A-412 ("Gentile notified the Company and Mr. Chmiel with written notice as required by the Operating Agreement at the same time he filed his Rule 60(b) motion, which informed the court of his appointments.")  Nor did he accept the Monitor's determination and withdraw his purported appointments and the purported amendment of the Operating Agreement until after the R&R was issued, *more than a year later*.  SPA-21 n.14.  And, in their letter to counsel to GPB Capital and the Monitor, his purported new managers continued to assert their authority as managers and to attempt to interfere with the operation of GPB Capital a month after the Monitor's notice that their appointments violated the Amended Monitor Order, long after the cure period had lapsed.  A-435-437.

Gentile claims that it was unnecessary to withdraw his appointments because the Monitor and GPB Capital had rejected them

immediately (*see* D. Ct. Dkt. 168-3), and therefore the new managers were never appointed. Br. at 62-64. But this argument is inconsistent with the actions of Gentile and his managers at the time, as well as with Gentile's representations to the district court. The purported new managers represented themselves as managers for weeks after the Monitor notified GPB Capital that their appointments violated the Amended Monitor Order. A-435-37. And Gentile continued to take the position that his managers had been properly appointed after the cure period had lapsed. *See, e.g.*, A-354; A-417. Gentile's position is also inconsistent with his ultimate withdrawal of the purported appointments and the amendments to the Operating Agreement. Br. 63 n.21. In any event, he should not now be allowed to benefit from his failure to interfere effectively with GPB Capital when he repeatedly took the position that his efforts were successful during the time available to him to cure, inflicting real harm on GPB Capital as a result.[9]

---

[9]    Gentile complains that the district court demonstrated internal inconsistency by concluding that only GPB Capital could violate the Amended Monitor Order as Gentile is not a party to it, but that only Gentile could somehow cure GPB Capital's violation. Br. at 63. As the district court reasoned, Gentile caused GPB Capital's violations through

34

**B.** **The district court reasonably appointed a receiver under its equitable authority.**

    **1. The district court acted within its discretion in determining that a receivership was warranted.**

        **a. District courts have broad discretion to appoint receivers under their equitable authority.**

As the district court recognized, it is well established that courts' equitable authority in Commission actions (*see* 15 U.S.C. 78u(d)(1), (d)(5), 78aa) includes the power to appoint a receiver. SPA-22-24; *see, e.g.*, *SEC v. Byers*, 609 F.3d 87, 92 (2d Cir. 2010); *see Eberhard v. Marcu*, 530 F.3d 122, 131 (2d Cir. 2008) *Lankenau v. Coggeshall & Hicks*, 350 F.2d 61, 63 (2d Cir. 1965); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972), *abrogated on other grounds by SEC v. Ahmed*, 72 F.4th 379 (2d Cir. 2023); *SEC v. Complete Business Solutions Gr., Inc.*, 44 F.4th 1326, 1334 (11th Cir. 2022). A receiver is a neutral court officer appointed by the district court, and the district

---

Gentile's unilateral action. SPA-21 n.14. The Monitor did clearly notify GPB Capital that the appointments and amendments violated the Amended Monitor Order, but that did not convince Gentile or his managers that Gentile's actions were not effective. That Gentile did cure his violations after the R&R was issued further undermines his argument that only GPB Capital could cure the violations. *Id.*

court has supervision over the receiver and jurisdiction over the property in receivership. *See Atlantic Trust Co. v. Chapman*, 208 U.S. 360, 371 (1908); *Ex parte Tyler*, 149 U.S. 164, 181 (1893).

District courts generally equip receivers with a variety of tools to marshal assets and to preserve the status quo by preventing their dissipation. *Eberhard*, 530 F.3d at 131-32. For instance, in *SEC v. Alan F. Hughes, Inc.*, this Court held that the Commission had "presented ample evidence to support its claim that the appointment of a receiver was necessary to protect public investors." 461 F.2d 974, 983 (2d Cir. 1972). It noted that the defendant company's director had "apparent[ly] diver[ted] . . . a customer's funds to his own account" and had engaged in "other apparently fraudulent activities which jeopardized the interests of the broker-dealer's customers." *Id.* This Court thus determined that the district court "was justified in concluding that to permit [the director] to continue in control of the company would endanger the interests of the broker-dealer's customers." *Id.*; *see also, e.g.*, *SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987) (upholding appointment of receiver "[i]n light of the [defendants'] deteriorating financial condition" to "prevent the

further diversion of [defendants'] commercial paper assets") (internal quotation marks omitted).

### b. The district court acted within its discretion in appointing a receiver under its equitable authority.

The district court acted well within its broad equitable discretion when it carefully assessed all the facts and circumstances and found that a receivership was necessary to protect investors by preventing Gentile from further dissipating GPB Capital's assets and engaging in other misconduct that undermined the company. *See Am. Bd. of Trade*, 830 F.2d at 436; *SEC v. Malek*, 397 F. App'x 711, 713 (2d Cir. 2010) (summary order). To start, the court reasonably found that a receivership was needed because Gentile's conduct created an "imminent risk that the assets of GPB [Capital] will diminish in value," which would "harm[] investors." SPA-27. For example, Gentile's purported new managers could receive "up to $400,000 per year in compensation." SPA-28. And if the new managers had been successful in reversing the reduction in force of certain executives of a GPB Capital subsidiary, they would have undone savings of "more than $1.7 million per year." SPA-28. Further, the court noted that Judge Scanlon

37

found that Gentile's appointments had "resulted in a fracture in GPB [Capital]'s leadership," causing "uncertainty of GPB [Capital]'s position" that "damag[ed] its financial health and, by extension, the finances of its investors." SPA-28 (internal quotation marks omitted). The district court thus reasonably concluded that a receivership was necessary to prevent diminishment of the funds available for investors. SPA-27-29.

The district court also found that "the gravity of the allegations" against Defendants supported the need for a receivership, noting that "one of the Individual Defendants has already pled guilty to criminal charges." SPA-31. Although the court did "not have enough information to determine the SEC's probability of success in this action" (SPA-31), it acknowledged the SEC's unrebutted showing that "'[i]n his sworn testimony under oath before the [SEC] in February 2020, Gentile admitted that he knew that investor money, and not only money from the portfolio companies' operations, was being used to pay distributions to investors,' contrary to GPB [Capital]'s representations to investors." SPA-27 (quoting D. Ct. Dkt. 103 at 7).

Further, the district court reasonably weighed the equities between Defendants-Appellants and the investors. A receivership

38

would "protect the investors by preventing Mr. Gentile and the new purported managers from undermining GPB [Capital]'s finances through improper access to funds and information[.]" SPA-30 (internal quotation marks omitted). Indeed, as the court observed, GPB [Capital]'s "more than 17,000 investors nationwide, approximately 4,000 of whom are seniors, have been unable to access their funds" for nearly three years in the absence of a receiver. SPA-31. By contrast, the court found that Defendants-Appellants would suffer relatively minimal harm from a receivership, as they would still be advanced "attorneys' fees and other expenses" under existing court orders. SPA-30; *see* SPA-4 n.3. The court thus found that "any harm to the Objectors is outweighed by the harm to the SEC, GPB [Capital], and GPB [Capital]'s investors." SPA-30.

Finally, the court determined that a less drastic remedy would be "inadequate." SPA-29. Because Gentile had already caused GPB Capital to violate the Amended Monitor Order, the court was "not persuaded" that a "further amended monitor order" would "eliminat[e] any future action the SEC or Monitor may deem detrimental to GPB [Capital]." SPA-29. Nor was the court persuaded that "a financial

39

penalty" would adequately deter Gentile from committing similar misconduct in the future.  SPA-29.

### 2. Gentile's contrary arguments lack merit.

Gentile fails to establish that the district court abused its discretion in appointing a receiver.  He identifies no legal error in the district court's analysis, and he cannot overcome the substantial deference owed to the district court's factual findings and exercise of its discretion.

### a. The district court was not required to find a likelihood of success on the merits, and regardless, the record supports such a finding.

Gentile argues that the district court erred as a matter of law because it "fail[ed] to require that the SEC make a clear and substantial showing of a likelihood of success on the merits and risk of recurrence[.]"  Br. 32.  But he cites no decision of this Court—or any other court of appeals—recognizing such a prerequisite for receiverships.  Br. 27-37.  To the contrary, this Court has upheld the appointment of a receiver based on a showing that a receiver was "necessary to prevent the dissipation of a defendant's assets pending further action by the court," *Am. Bd. of Trade*, 830 F.2d at 436; *see also,*

*e.g.*, *Alan F. Hughes, Inc.*, 461 F.2d at 983; *Manor Nursing*, 458 F.2d at 1105, and it has recognized the "variety of tools" that courts direct receivers to employ for the benefit of the receivership estate they manage, *Eberhard*, 530 F.3d at 131.

This result is consistent with longstanding equity practice, which informs the scope of courts' equitable authority. *Liu v. SEC*, 140 S. Ct. 1936, 1942 (2020); *see, e.g.*, 1 Dan B. Dobbs, Law of Remedies § 1.4 (1993) ("A receiver might be appointed before trial to preserve the property or manage it pending decisions on the merits."). In contrast, Gentile's rigid, categorical rule would undermine the flexible nature of a court's "equitable powers"—which "assume an even broader and more flexible character" when "federal law is at issue and 'the public interest is involved.'" *Kansas v. Nebraska*, 574 U.S. 445, 456 (2015) (internal quotation marks and citation omitted).

In arguing otherwise, Gentile relies on inapposite decisions addressing preliminary injunctions prohibiting defendants from committing violations of the law. Br. 28-29 (citing, *e.g.*, *City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 121 (2d Cir. 2010)). But this Court's controlling precedent holds that "an ancillary

41

remedy may be granted[] even in circumstances where the elements required to support a traditional SEC injunction have not been established." *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990). A receivership is one such ancillary remedy that is distinct from an injunction. *See Esbitt v. Dutch-American Mercantile Corp.*, 335 F.2d 141, 143 (2d Cir. 1964).

Gentile cites *Highland Ave. & B.R. Co. v. Columbian Equipment Co.*, 168 U.S. 627, 630-31 (1898), for the proposition that receiverships are "something in the nature of a mandatory injunction[.]" Br. 29 n.10. But the Supreme Court went on to emphasize the "clearly recognized . . . distinction" between "[o]rders granting injunctions and orders appointing receivers[.]" *Highland Ave.*, 168 U.S. at 631. And *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) (cited Br. 28) is similarly distinguishable because it involved a preliminary injunction, not a receivership or a lawsuit brought by the government to enforce the federal securities laws.

Although a showing of likelihood of success will often be relevant to whether a receivership is appropriate, it makes sense to distinguish the required showings for injunctions and receiverships. A receivership

42

is not ordered as a sanction for a securities-law violation, nor is it imposed to restrain future violations. Rather, receiverships are used "to promote orderly and efficient administration of the estate by the district court for the benefit of creditors" who may be entitled to funds from the receivership entity for reasons having nothing to do with securities violations. *SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986). The receiver, as an officer of the court "is appointed in behalf of all parties, and not of the complainant or of the defendant only" and the "money in his hands is in *custodia legis* for whoever can make out a title to it." *Chapman*, 208 U.S. at 371; *see also Tyler*, 149 U.S. at 181 (a receiver is appointed "for the benefit of the parties to the suit and all concerned[.]"). As the district court recognized, receiverships must operate within limits (SPA-24-25 (citing *Eberhard*, 530 F.3d at 132)), but Gentile's inflexible rule that—no matter the disarray of the subject property and the need for an independent third-party to administer it— a court is powerless to appoint a receiver without finding a likelihood of future violations misconceives the nature and purposes of the court's authority.

43

Regardless, the record here amply establishes that the
Commission is likely to succeed on its claims that Defendants violated
the federal securities laws. *Freedom Holdings, Inc. v. Cuomo*, 624 F.3d
38, 49 (2d Cir. 2010) (noting that court of appeals "may affirm the
district court's decision on any ground appearing in the record"). The
Commission's complaint extensively describes how Defendants are
alleged to have defrauded investors, and Defendants-Appellants do not
meaningfully dispute the factual accuracy of these allegations. *See* A-
420-21.

And facts before the court support these allegations. As the
district court noted, "'[i]n his sworn testimony under oath before the
[SEC] in February 2020, Gentile admitted that he knew that investor
money, and not only money from the portfolio companies' operations,
was being used to pay distributions to investors,' contrary to GPB
[Capital]'s representations to investors." SPA-27 (quoting D. Ct. Dkt.
103 at 7). Moreover, a federal grand jury found sufficient evidence to
indict certain Defendants for criminal securities fraud, among other
violations, based on substantially the same factual allegations, and
Lash has pleaded guilty to wire fraud. *USA v. Gentile, et. al.*, Case No.

44

21-cr-00054 (E.D.N.Y.) Dkt. 1.  That case is scheduled to proceed to trial in June 2024.

### b. The district court reasonably found that a receivership was necessary.

Gentile also contends that the district court applied the wrong legal standard in assessing whether a receivership was necessary to protect investor funds.  Br. 37.  But as he concedes (Br. 38), the district court expressly recited what Gentile views as the correct legal standard: "[T]he appointment of a receiver. . . should be employed cautiously and granted only when clearly necessary to protect plaintiff's interest in the property."  SPA-25 (quoting *Rosen v. Siegel*, 106 F.3d 28, 34 (2d Cir. 1997) (internal quotation marks omitted)).

Nor did the district court fail to apply that standard, as Gentile suggests.  Br. 38.  The district court repeatedly emphasized the strong showing of necessity required for appointment of a receiver—while finding that the Commission had made such a showing.  The court found that "Gentile's actions constituted a real and imminent threat of financial harm to GPB [Capital] and its investors" (SPA-29), and it "d[id] not exercise its discretion to convert the monitorship to a receivership lightly, but given the extreme circumstances of this case,"

45

found that the "requested relief is merited" (SPA-32). Gentile's contrary arguments disregard the plain terms of the district court's decision.

Gentile also accuses the district court of incorrectly applying a "preponderance of the evidence" standard. Br. at 38 (quoting SPA-25). He conflates the quantum of proof needed for each of the "factors" the district court considered (SPA-25) for the ultimate showing of a "clear[] necess[ity]" required to warrant appointment of a receiver (*Rosen*, 106 F.3d at 34). As the district court explained, and Gentile does not contest, "the appointment of a receiver 'lies in the discretion of the court' and 'the form and quantum of evidence required on a motion requesting the appointment of a receiver is a matter of judicial discretion.'" SPA-26 n.16 (quoting 9 Wright & Miller, Federal Practice and Procedure § 2983).

### c. Gentile shows no clear error in the district court's factual findings.

Gentile also fails to show any clear error in the factual findings underlying the district court's discretionary determination to appoint a receiver. *SEC v. Rajaratnam*, 622 F.3d 159, 171 (2d Cir. 2010) ("A district court abuses its discretion 'if it based its ruling on . . . a clearly erroneous assessment of the evidence'").

46

Gentile disputes (Br. at 41-47) the district court's finding that "there is an imminent risk that the assets of GPB [Capital] will diminish in value . . . based on Gentile's prior conduct" (SPA-27). He contends that "the Appointments and Amendments were ineffectual because GPB [Capital] and the Monitor immediately rejected them outright." Br. 43. But as described above at pp. 28-34, it is undisputed that the purported new managers behaved as though Gentile's actions were effective despite the Monitor's disapproval.

In any event, the district court's finding of an "imminent risk" to GPB Capital's and investors' assets did not depend on the effectiveness of Gentile's actions or the actual payment of compensation to Gentile's newly appointed managers. SPA-27. Gentile's actions "have resulted in a fracture in GPB [Capital]'s leadership that is irremediable without [c]ourt intervention." SPA-28 (quoting the R&R at A-599). The disagreement about GPB Capital's purported leaders created an "uncertainty of GPB's position" that "damag[ed] its financial health and, by extension, the finances of its investors." *Id.*; *see also* SPA-31 (finding that "GPB [Capital]'s management and Gentile have proven unable to agree or work together to implement GPB [Capital]'s future

47

strategy"). In other words, the lack of clarity around the effectiveness of Gentile's actions alone caused harm to GPB Capital's assets, jeopardizing investors' ability to recover their funds.

Gentile also asserts that "GPB [Capital]'s substantial assets have not been impacted in any way by Gentile's actions and, in fact, have realized significant value when sold in the last two years." Br. 45. But any success that has come from the Monitor overseeing GPB Capital does not mean that Gentile has any business being involved in the company. Indeed, the district court reasonably found that Gentile's continued involvement in managing GPB Capital's affairs risked depleting those funds, warranting appointment of a receiver to prevent Gentile from exerting any further control over GPB Capital's assets. *See* SPA-27-29. *See Alan F. Hughes*, 461 F.2d at 983 (affirming appointment of a receiver based on district court's finding that "permit[ting] [the director] to continue in control of the company would endanger the interests of the broker-dealer's customers").

Relatedly, Gentile contends there was no "imminent harm" to investor funds due to the length of time between the Receiver Motion and the district court's order granting it. Br. 46. But Gentile did not

48

withdraw his purported amendments to the Operating Agreement and manager appointments until long into that period, after the magistrate judge had recommended appointing a receiver. *See* Dkt. 168-8. The district court acted within its broad discretion in appointing a receiver to take control of GPB Capital because Gentile poses a "real and imminent threat of financial harm to GPB [Capital] and its investors." SPA-29.

Gentile challenges (Br. at 47-48) the district court's finding that other measures, such as continuation of the monitorship or financial penalties, would be inadequate. But he cites no authority holding that the district court was required to try "amending the AMO to include additional, stricter controls[.]" Br. 47 n.18. Based on its years of experience overseeing this litigation, the district court acted well within its discretion in determining that a lesser remedy would not be effective to prevent harm to GPB Capital and investors. SPA-29. *See Rosen*, 106 F.3d at 34 (noting district court's "detailed knowledge of the case" in upholding refusal to appoint receiver).

Gentile asserts (Br. at 48-49) that the district court "pointed to 'significant concerns' regarding Gentile's credibility" as a "substitute for

49

a finding of fraudulent conduct[.]" But as discussed above, a finding that Gentile engaged in fraud is not necessary to support a receivership. And the Commission's undisputed evidence—which the district court described as a "fact[]"—showing that Gentile admitted he had made misrepresentations to investors about the source of GPB Capital's distribution payments plainly supports the imposition of a receivership to safeguard funds that rightly belong to GPB Capital and its investors. SPA-27& n.18.

Gentile's challenge (Br. at 50-55) to the district court's weighing of the supposed harms to Defendants-Appellants and the benefits to GPB Capital and investors also fails for similar reasons. For instance, Gentile repeats his bare assertion that "the Appointments and Amendments resulted in no harm to GPB." Br. 51. But the district court reasonably found that even uncertainty around the effectiveness of Gentile's actions posed a risk of financial harm to GPB Capital and its investors. *Supra* pp. 30, 47-48.

Gentile further contends that "the putative receiver's ability to waive privilege" is "unlikely to benefit GPB [Capital] or investors." Br. 52. But GPB Capital supports the appointment of a receiver,

notwithstanding Gentile's complaints about privilege issues. *See, e.g.*, D. Ct. Dkt. 101. While Gentile asserts that "the possibility that the receiver could seek to waive GPB [Capital]'s, Gentile's, and Schneider's privileges would cause additional, significant harm to Gentile and Schneider[,]" (Br. 54) a receiver would possess no greater authority to waive any privileges than GPB Capital's management would have absent a receivership. *See* SPA-36-41. In any event, Gentile failed to show that the district court clearly erred in finding any hypothetical harm to Defendants-Appellants from the receiver's authority to waive GPB Capital's privilege was "outweighed by the harm to the SEC, GPB [Capital], and GPB [Capital]'s investors" absent appointment of a receiver. SPA-30.

Moreover, Gentile conflates his interests and GPB Capital's (as well as its investors') interests. The very purpose of appointing a receiver is to "[f]ree[]" GPB Capital from Gentile's "spell" by "oust[ing]" him from control and leaving the company free to operate for the benefit of its investors—Gentile's innocent victims—as opposed to for Gentile's benefit. *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir. 1995) (Posner, J.) (appointment of receiver "remove[s] the wrongdoer from the scene"

51

and ensures that the companies he controlled are no longer his "evil zombies"); *see also Donell v. Kowell*, 533 F.3d 762, 777 (9th Cir. 2008) (following *Scholes*). GPB Capital owns the privilege and can assert or waive it to let the truth out, as the company—not Gentile—deems in its best interests.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's order granting the Receiver Motion.

March 2024

Respectfully submitted,

MEGAN BARBERO
General Counsel

MICHAEL A. CONLEY
Solicitor

DANIEL STAROSELSKY
Assistant General Counsel

/s/ Morgan Bradylyons
MORGAN BRADYLYONS
Bankruptcy Counsel

SAMUEL B. GOLDSTEIN
Counsel to the General Counsel

U.S. Securities and Exchange Commission
100 F Street NE
Washington, D.C. 20549-9040
(202) 551-7926 (Bradylyons)
bradylyonsm@sec.gov

52

## CERTIFICATIONS

I certify that:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because it contains 9195 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Century Schoolbook.

3.     I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the ACMS system.  Service was accomplished via the ACMS system.

<div style="margin-left:40%">

/s/ Morgan Bradylyons
Morgan Bradylyons
U.S. Securities and Exchange Commission
100 F Street NE
Washington, D.C. 20549-9040
(202) 551-7926 (Bradylyons)
bradylyonsm@sec.gov

</div>

Dated: March 22, 2024